2015-1703, 2015-1704

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

———————

## APPLE, INC., DOMINO'S PIZZA, INC., DOMINO'S PIZZA, LLC, FANDANGO, LLC, OPENTABLE, INC.,

Appellants

v.

## AMERANTH, INC.,

Cross-Appellant

———————

Appeal from the United States Patent and Trademark Office,
Before the Patent Trial and Appeal Board, Case No. CBM2014-00013

———————

## APPELLANTS' OPENING BRIEF

———————

Mark D. Fowler
James M. Heintz
Erin P. Gibson
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700

*Attorneys for Appellant*
*Apple Inc.*

*Additional Parties and Counsel Listed*
*on Next Page*

Jonathan S. Franklin
Richard S. Zembek
Gilbert A. Greene
Norton Rose Fulbright US LLP
799 9th Street, N.W.
Washington, D.C. 20001
202.662.0466

*Attorneys for Appellants*
*Fandango, LLC and OpenTable, Inc.*

Frank A. Angileri
Thomas W. Cunningham
Mark A. Jotanovic
BROOKS KUSHMAN P.C.
1000 Town Center, 22nd Floor
Southfield, MI 48075
248.358.4400

*Attorneys for Appellants*
*Domino's Pizza, Inc. and Domino's Pizza,*
*LLC*

# <u>CERTIFICATE OF INTEREST</u>

*Apple Inc. et al. v. Ameranth, Inc.*, Nos. 2015-1703, 2015-1704

Counsel for Appellant Apple Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

Apple Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

DLA Piper LLP (US):  Mark D. Fowler, James M. Heintz, Erin P. Gibson, Robert C. Williams, Stanley J. Panikowski

Dated:  August 4, 2015                    By: */s/ Stanley J. Panikowski* _____
                                                                      Stanley J. Panikowski

# CERTIFICATE OF INTEREST

*Apple Inc. et al. v. Ameranth, Inc.*, Nos. 2015-1703, 2015-1704

Counsel for Appellants Fandango, LLC and OpenTable, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

Fandango, LLC and OpenTable, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Fandango, LLC is owned (through intermediate entities) by Comcast Corporation, which is a publicly held company.  No other parent corporation or publicly held corporation owns 10% or more of Fandango's stock.

OpenTable, Inc. is owned by The Priceline Group Inc., which is a publicly held company.  No other parent corporation or publicly held corporation owns 10% or more of OpenTable's stock.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

Norton Rose Fulbright US LLP:  Jonathan Franklin, Richard Zembek, and Gilbert Greene

Dated:  August 4, 2015                    By: */s/ Jonathan S. Franklin* _____
                                                           Jonathan S. Franklin

# <u>CERTIFICATE OF INTEREST</u>

*Apple Inc. et al. v. Ameranth, Inc.*, Nos. 2015-1703, 2015-1704

Counsel for Appellants Domino's Pizza, Inc. and Domino's Pizza, LLC certifies the following:

1.     The full name of every party or amicus represented by me is:

Domino's Pizza, LLC and Domino's Pizza, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Domino's Pizza, LLC is a wholly owned subsidiary of Domino's Inc., which is a wholly-owned subsidiary of Domino's Pizza, Inc.  Domino's Pizza, Inc. is a publicly held corporation.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Brooks Kushman P.C.:  Frank A. Angileri, Thomas W. Cunningham, and Mark A. Jotanovic

Dated:  August 4, 2015                    By: */s/ Frank A. Angileri*

                                                  Frank A. Angileri

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF RELATED CASES..........................................................1

II.  STATEMENT OF JURISDICTION ..............................................................1

III. STATEMENT OF ISSUES ...........................................................................1

IV.  INTRODUCTION ........................................................................................2

V.   STATEMENT OF THE CASE .....................................................................4

    A.   Procedural History...............................................................................4

    B.   Statement of Facts ...............................................................................5

        1.   The '733 Patent ..........................................................................5

        2.   Illustrative Claims ....................................................................11

VI.  SUMMARY OF ARGUMENT ...................................................................14

VII. ARGUMENT..............................................................................................16

    A.   Standard of Review ...........................................................................16

    B.   Patent-Eligible Subject Matter Under 35 U.S.C. § 101 ....................16

    C.   The Board Correctly Found Independent Claims 1, 4, 5, and 12
        Unpatentable Under 35 U.S.C. § 101................................................18

        1.   Claims 1, 4, 5, and 12 Are Directed to an Abstract Idea.........19

        2.   Claims 1, 4, 5, and 12 Do Not Recite an "Inventive
            Concept" Sufficient to Confer Patent Eligibility. ....................22

            a.   The Recitation of Conventional Computer
                Components Is Insufficient to Confer Patent
                Eligibility. ...................................................................22

            b.   Storing Menus Displayable in a Hierarchical
                Format Was a Well-Known, Conventional Concept
                That Is Insufficient to Confer Patent-Eligibility............24

            c.   The Display, Manipulation, and Generation of
                Menus Were Well-Known, Conventional Concepts
                That Are Insufficient to Confer Patent-Eligibility. .......25

# TABLE OF CONTENTS
### (continued)

**Page**

      d.      The Transmission and/or Synchronization of Data Was a Well-Known, Conventional Concept That Is Insufficient to Confer Patent-Eligibility. .......................27

      e.      Manual Modification of a Menu Was a Well-Known Conventional Concept That Is Insufficient to Confer Patent-Eligibility. ..........................................28

D.      The Board Erred in Failing to Find Dependent Claims 6–9 and 13–16 Unpatentable Under 35 U.S.C. § 101......................................30

      1.      The Board Erroneously Concluded That There Was Insufficient Evidence to Show the Additional Elements in Claims 6–9 and 13–16 Were Well-Known..............................32

      2.      Handwriting and Voice Capture Were Well-Known, Conventional Techniques That Are Insufficient to Confer Patent-Eligibility. ....................................................34

E.      The Board Erred in Failing to Find Dependent Claims 3 and 11 Unpatentable Under 35 U.S.C. § 101.................................................40

      1.      The Board Erroneously Concluded That There Was Insufficient Evidence to Show That the Additional Elements of Claims 3 and 11 Were Well-Known. .................41

      2.      Linking a Menu to a Customer Was a Well-Known, Conventional Concept That Is Insufficient to Confer Patent-Eligibility. ....................................................42

      3.      The Display and Modification of a Menu Via a GUI Was a Well-Known, Conventional Concept That Is Insufficient to Confer Patent-Eligibility. .................................44

VIII.  CONCLUSION.............................................................................45

WEST\259635777.1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014)................................................................passim

*Bancorp Services, LLC v. Sun Life Assur. Co. of Canada*,
687 F.3d 1266 (Fed. Cir. 2012) ...............................................29, 42

*Bilski v. Kappos*,
561 U.S. 593 (2010)...................................................................passim

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) ...............................................21, 34

*Content Extraction and Transmission, LLC v. Wells Fargo Bank, Nat'l
Ass'n.*,
776 F.3d 1343 (Fed. Cir. 2014) ...............................................21, 38

*Cyberfone Sys., LLC v. CNN Interactive Group, Inc.*,
558 F. App'x 988 (Fed. Cir. 2014) ..................................................34

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011) ...............................................25, 28

*Diamond v. Diehr*,
450 U.S. 175 (1981).........................................................................18

*Funk Bros. Seed Co. v. Kalo Inoculant Co.*,
333 U.S. 127 (1948).........................................................................16

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
802 F.2d 1367 (Fed. Cir. 1986) .........................................30, 36, 42

*Intellectual Ventures I LLC v. Capital One Bank*,
No. 2014-1506, ___ F.3d ___, slip op. (Fed. Cir. July 6, 2015) ................passim

*Internet Patents Corp. v. Active Network, Inc.*,
No. 2014-1048, ___ F.3d ___, slip op. (Fed. Cir. June 23, 2015)...............passim

WEST\259635777.1

# TABLE OF AUTHORITIES
(continued)

**Page**

*Mayo Collaborative Services v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012)................................................................passim

*Microsoft Corp. v. Proxyconn, Inc.*,
    789 F.3d 1292 (Fed. Cir. 2015) ........................................................16

*OIP Techs. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ..................................................passim

*Parker v. Flook*,
    437 U.S. 584 (1978).................................................18, 27, 32, 39, 40

*PerkinElmer, Inc. v. Intema Ltd.*,
    496 F. App'x 65 (Fed. Cir. 2012) ....................................................34

*Planet Bingo, LLC v. VKGS LLC*,
    576 F. App'x 1005 (Fed. Cir. 2014) ...........................................22, 34

*SmartGene, Inc. v. Advanced Biological Labs., SA*,
    555 F. App'x 950 (Fed. Cir. 2014) ...................................................34

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ...................................................21, 34

## STATUTES

28 U.S.C. § 1295(a)(4)(A) ......................................................................2

35 U.S.C. § 101..............................................................................passim

35 U.S.C. § 112...............................................................................4, 36

35 U.S.C. § 112(a)..............................................................................36

35 U.S.C. § 141(c) ................................................................................2

35 U.S.C. § 328....................................................................................2

## TABLE OF AUTHORITIES
(continued)

**Page**

35 U.S.C. § 329 ..........................................................................................2

AIA § 18, Pub. L. 112-29, 125 Stat. 284 (2011) ......................................2

AIA § 18(a)(1) ............................................................................................2

**OTHER AUTHORITIES**

Manual of Patent Examining Procedure § 2164.05(a).......................30, 36

## I.    STATEMENT OF RELATED CASES

*Ameranth, Inc. v. Agilysys, Inc.*, Nos. 15-1792 and 15-1793 (which have been consolidated with each other), are appeals by Ameranth, Inc. ("Ameranth") from decisions of the Patent Trial and Appeal Board of the U.S. Patent and Trademark Office ("Board") invalidating two related patents owned by Ameranth. This case and those two appeals have been set as companion cases.

In addition, counsel are aware of the following district court cases that involve the same patent that is at issue in this appeal:

*Ameranth, Inc. v. Apple Inc.*, Case No. 3-12-cv-02350 (S.D. Cal., filed Sept. 26, 2012); *Ameranth, Inc. v. Fandango, Inc.*, Case No. 3-12-cv-01651 (S.D. Cal., filed June 29, 2012); *Ameranth, Inc. v. Domino's Pizza, LLC et al.*, Case No. 3-12-cv-00733 (S.D. Cal., filed March 27, 2012); *Ameranth, Inc. v. OpenTable, Inc.*, Case No. 3-12-cv-00731 (S.D. Cal., filed March 27, 2012); *Ameranth, Inc. v. OpenTable, Inc.*, Case No. 3-13-cv-01840 (S.D. Cal., filed August 8, 2013); *Ameranth, Inc. v. Fandango, Inc.*, Case No. 3-13-cv-01525 (S.D. Cal., filed July 1, 2013); and *Ameranth, Inc. v. Domino's Pizza, LLC et al.*, Case No. 3-13-cv-01520 (S.D. Cal., filed July 1, 2013).

## II.    STATEMENT OF JURISDICTION

This action arises from a Covered Business Method Review ("CBM") proceeding, No. CBM2014-00013, before the Board.  The Board had jurisdiction

WEST\259635777.1

over the CBM proceeding pursuant to Section 18 of the Leahy Smith America Invents Act ("AIA"), Pub. L. 112-29, 125 Stat. 284 (2011).

This appeal is taken from a Final Written Decision issued by the Board, on March 20, 2015, pursuant to § 18(a)(1) of the AIA and 35 U.S.C. § 328. This Court has jurisdiction over this appeal pursuant to 35 U.S.C. § 329, 35 U.S.C. § 141(c), and 28 U.S.C. § 1295(a)(4)(A).

## III.  STATEMENT OF ISSUES

This appeal presents a single issue:

Did the Board legally err in failing to rule that claims 3, 6–9, 11, and 13–16 of U.S. Patent No. 6,982,733 are unpatentable under 35 U.S.C. § 101?

## IV.  INTRODUCTION

The '733 patent broadly "encompasses the generation of a menu in any context known to those of skill in the art where an objective is to facilitate display of the menu so as to enable selection of items from that menu." A0066 at 15:31–32. In Covered Business Method Review proceeding No. CBM2014-00013, the Board held that all of the patent's independent claims, and certain dependent claims, are patent-ineligible under 35 U.S.C. § 101 because they seek to patent the abstract idea of "generating a second menu from a first menu and sending the second menu to another location" (A0026), without reciting additional elements that supply an inventive concept (A0029; A0033–34; A0036–37; A0039–42). As

- 2 -

was true in *Bilski v. Kappos*, 561 U.S. 593 (2010), *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), and their progeny, the '733 patent improperly attempts to claim an abstract idea implemented through wholly conventional computer technology. Thus, the Board correctly determined that all the independent claims, and certain dependent claims, of the '733 patent are patent-ineligible under 35 U.S.C. § 101.

But the Board erred in not extending that ruling to other dependent claims that recite the concepts of manually modifying a menu through handwriting or voice capture, or linking a menu to a specific customer. The Board's apparent rationale was that Appellants did not present extrinsic evidence showing that these basic concepts were well-known or conventional. A0041-43. That rationale was mistaken. Numerous cases from this Court and the Supreme Court confirm that intrinsic evidence alone is sufficient to invalidate claims under § 101. Here, all of the '733 patent's claims are unpatentable under § 101 for the same reason: they recite an abstract concept implemented through conventional computer technology. And the same evidence—the patent itself—makes that clear for all of the claims. Nowhere in the '733 patent does the patentee even purport to disclose novel hardware or software for modifying a menu through handwriting or voice capture, or for linking a menu to a customer. To the contrary, the specification describes no inventive concept entailed by these steps, thereby making clear that they are to be

- 3 -

accomplished through the use of pre-existing, conventional computer technology—just like every other step of the patent's claims.

Accordingly, the Board erred in not ruling that all of the '733 patent's claims are unpatentable under § 101. The Court should reverse this portion of the Board's final written decision and hold that claims 3, 6–9, 11, and 13–16 of the '733 patent are unpatentable under § 101.

## V.     STATEMENT OF THE CASE

### A.     Procedural History

On October 15, 2013, Appellants filed a Petition for Covered Business Method Review of all claims of the '733 patent. A0003. The Petition asserted several independent grounds of unpatentability, including that the claims of the '733 patent are directed to unpatentable subject matter under 35 U.S.C. § 101 and are invalid under 35 U.S.C. § 112 for failing to satisfy the written description and definiteness requirements. A0127–144; A0110–27. On January 13, 2014, Ameranth filed its Patent Owner's Preliminary Response to the Petition. A0003.

On March 26, 2014, the Board instituted covered business method review as to all claims of the '733 patent on the proposed ground of unpatentability under 35 U.S.C. § 101. A0003; A1417. The Board declined to institute review on the proposed grounds of invalidity under 35 U.S.C. § 112. A1417.

- 4 -

On July 18, 2014, Ameranth filed its Patent Owner's Response to the Petition.  A0003.  Appellants filed their Reply on September 18, 2014.  *Id.*  An oral hearing was held on October 24, 2014.  A1895.  The oral hearing was consolidated with the oral hearing for CBM proceedings on two related Ameranth patents, U.S. Patent Nos. 6,384,850 and 6,871,325 that are the subject of companion appeal Nos. 15-1792 and 15-1793, discussed above.  A1897.

The Board issued its Final Written Decision ("Decision") on March 20, 2015.  A0005.  In its Decision, the Board concluded that claims 1-2, 4-5, 10 and 12 of the '733 patent had been shown to be unpatentable under 35 U.S.C. § 101, but that claims 3, 6–9, 11, and 13–16 had not been shown to be unpatentable under 35 U.S.C. § 101.  A0043.

## B.    <u>Statement of Facts</u>

### 1.    **The '733 Patent**

The '733 patent issued from a continuation-in-part application filed in 2001 that claims priority to an earlier application filed in 1999.  The patent describes a computer system and method for generating restaurant menus and transmitting them to handheld devices.  Specifically, the '733 patent describes generating a second menu from a first menu, transmitting the second menu to another location, such as a handheld device, and manually modifying the second menu.  *See, e.g.*, A0060 at 3:43–51.  The specification of the '733 patent notes that "[w]hile

- 5 -

computers have dramatically altered many aspects of modern life, pen and paper
have prevailed in the hospitality industry, e.g., for restaurant ordering, reservations
and wait-list management, because of their simplicity, ease of training and
operational speed." A0059 at 1:27–31. Accordingly, "a principal object" of the
purported invention was to provide a system that "facilitates user-friendly and
efficient generation of computerized menus for restaurants." *Id.* at 2:57–61.

Figure 1 of the '733 patent shows an exemplary graphical user interface
("GUI") that can be used to build a second menu from a first menu in a preferred
embodiment of the purported invention:



A0051 at Fig. 1; A0062 at 7:24–28.

The GUI depicted in Figure 1 includes a hierarchical tree structure 2 on the left, and a modifier window 5 and sub-modifier window 6 on the right. A0062 at 7:28–36. The hierarchical tree structure 2 displays a first menu including a list of menu categories (*e.g.*, Entrees, Desserts, etc.), menu items (*e.g.*, Lamb, NY Strip, etc.), menu modifiers (*e.g.* Vegetables, Meat Temperature, etc.) and sub-modifiers (*e.g.*, Med. Rare, Med Well, etc.). A0051 at Fig. 1; A0062 at 7:30–36, 8:16–20. The menu modifiers that correspond to the selected menu category (*e.g.*, Entrees) are shown in modifier window 5 and the sub-modifiers that correspond to the selected modifier (*e.g.*, Quantity) are shown in sub-modifier window 6. A0051 at Fig. 1; A0062 at 7:30–36, 7:45–50. The '733 patent describes using the GUI illustrated in Figure 1 to build a second menu by selecting a subset of the menu categories, menu items, modifiers, and sub-modifiers displayed in the first menu. A0062 at 7:28–65. The second menu can then be transmitted to another device, such as a handheld device. A0062 at 7:38–41, 8:21–29. The handheld device can be used by a server to take an order from a customer. A0064 at 11:33–39.

Figure 7 illustrates an exemplary second menu configured for display on a handheld device or Web page:

- 7 -



FIG.7

A0056 at Fig. 7; A0064 11:31–33, 11:40–43. In this embodiment, the second menu is displayed in a simple "catalogue-like point-and-click format" that a restaurant server can page through to take an order. *Id.* at 11:33–39.

The '733 patent further describes an embodiment in which the second menu is manually modified after it has been generated. A0060 at 3:43–51. Manual modifications allow the restaurant server to account for unusual or unanticipated customer requests that are not accounted for in the computerized menu. *Id.* at 3:51–57. For example, a restaurant server taking a drink order could select "Iced Tea" from the computerized menu on her hand-held device, and then manually

write (by hand) "w/ lemon" on the screen of the handheld device, as illustrated in

Fig. 8:



A0057 at Fig. 8; A0060 at 4:6–9.  Alternatively, the menu could be manually

modified via voice recording, or by known handwriting or voice recognition

technologies.  A0060 at 4:18–22, 4:32–47.  Thereafter, the modified menu is

presented to the bartender or chef preparing the order to ensure that the customer's

order is properly prepared.  *Id.* at 4:9–14, 4:22–25.

    While the '733 patent describes various embodiments for generating and

transmitting restaurant menus, the specification explains that the purported

invention is implemented using conventional computer systems including typical

hardware and software components.  For example, the specification states:

> The preferred embodiment of the present invention uses ***typical hardware
> elements in the form of a computer workstation, operating system and
> application software elements*** which configure the hardware elements for

- 9 -

operation in accordance with the present invention. ***A typical workstation platform includes hardware, such as a central processing unit ("CPU") e.g., a Pentium® microprocessor***, RAM, ROM, ***hard drive storage*** in which are stored various system and application programs and data used within the workstation, modem, ***display screen, keyboard, mouse*** and optional removable storage devices such as floppy drive or a CD ROM drive. The workstation hardware is configured by software including ***an operating system, e.g., Windows® 95, 98, NT or CE***, networking software (including internet browsing software) and ***application software components***.

A0061 at 6:47–62 (emphases added).

The specification further explains that the purported invention is implemented using conventional and well-known software techniques: "[t]he software applications for performing the functions falling within the [scope of the claims] can be written in any commonly used computer language," and "[t]he discrete programming steps are commonly known and thus programming details are not necessary to a full description of the invention." A0064 at 12:60–65. The specification also states that the invention can take advantage of "common GUI operating systems," such as Microsoft Windows on personal computers and Windows CE on wireless handheld devices. A0061at 6:20–25. In this regard, the specification explains that "[m]ost personal computers today run under an operating system that provides a graphical user interface ('GUI') for accessing user applications." *Id*. at 6:6–8. Likewise, the specification of the '733 patent does not include a description of any particular hardware or software for implementing handwriting or voice recognition.

- 10 -

Although the '733 patent is described entirely in the context of restaurant menus, the specification purports to apply the concept more broadly, stating that the purported invention "encompasses the generation of a menu in any context known to those of skill in the art where an objective is to facilitate display of the menu so as to enable selection of items from that menu." A0066 at 15:31–32. Ameranth has similarly attempted to apply the purported invention broadly by suing companies for infringement of the '733 patent in varied industry sectors far afield from and unrelated to restaurant menus, including handheld device manufacturer Apple, and event ticket provider Fandango.

## 2.    Illustrative Claims

The claims at issue in this appeal—claims 3, 6-9, 11, and 13–16—are each dependent claims. The independent claims from which these claims depend recite a system or method for generating a second menu from a first menu, transmitting the second menu to another device, and manually modifying the second menu. A0066–67 at claims 1, 4, 5, and 12. Claims 1 and 4, which are reproduced below, are illustrative of the independent claims from which the dependent claims at issue depend.

> 1. An information management and synchronous communications system for generating and transmitting menus comprising:
>
> a. a central processing unit,

b. a data storage device connected to said central processing unit,

c. an operating system including a graphical user interface,

d. a first menu consisting of menu categories, said menu categories consisting of menu items, said first menu stored on said data storage device and displayable in a window of said graphical user interface in a hierarchical tree format,

e. a modifier menu stored on said data storage device and displayable in a window of said graphical user interface,

f. a sub-modifier menu stored on said data storage device and displayable in a window of said graphical user interface, and

g. application software for generating a second menu from said first menu and transmitting said second menu to a wireless handheld computing device or Web page, wherein the application software facilitates the generation of the second menu by allowing selection of categories and items from the first menu, addition of menu categories to the second menu, addition of menu items to the second menu and assignment of parameters to items in the second menu using the graphical user interface of said operating system, said parameters being selected from the modifier and sub-modifier menus, wherein said second menu is manually modified after generation.

4. An information management and synchronous communications system for generating menus comprising:

a. a central processing unit,

b. a data storage device connected to said central processing unit,

c. an operating system including a graphical user interface,

d. a first menu stored on said data storage device,

- 12 -

e. application software for generating a second menu from said first menu, wherein the application software facilitates the generation of the second menu by allowing selection of items from the first menu, addition of items to the second menu and assignment of parameters to items in the second menu using the graphical user interface of said operating system and wherein data comprising the second menu is synchronized between the data storage device connected to the central processing unit and at least one other computing device, wherein said second menu is manually modified by handwriting or voice recording after generation.

Dependent claims 3, 6–9, 11, and 13–16 fall into two categories: (1) claims relating to linking a menu to a specific customer at a specific table (claims 3 and 11), and (2) claims that define the manner in which the second menu is manually modified (claims 6–9 and 13–16). A0066-67 at claims 3, 6–9, 11, and 13–16. Claim 3, which is reproduced below, is illustrative of the first category and claims 6–9, which are also reproduced below, are illustrative of the second category.

3. The system of claim 1 wherein the modified second menu can be linked to a specific customer at a specific table directly from the graphical user interface of a hand-held device.

6. The information management and synchronous communications system of claim 1, 4, or 5 wherein the manual modification involves handwriting capture.

7. The system of claim 6 wherein the handwriting capture involves handwriting recognition and conversion to text.

8. The information management and synchronous communications system of claim 1, 4, or 5 wherein the manual modification involves voice capture.

9. The system of claim 8 wherein the voice capture involves voice recognition and conversion to text.

- 13 -

## VI.    SUMMARY OF ARGUMENT

All of the claims of the '733 patent, including the claims at issue in this appeal, are unpatentable because they are directed to the implementation of an abstract idea using conventional computer components.  Implementing an abstract idea using generic computer components, even in a particular technology field, is not sufficient to transform the abstract idea into a patent-eligible invention.  *Alice*, 134 S. Ct. at 2357–2358.

The independent claims of the '733 patent are directed toward the abstract idea of "generating a second menu from a first menu and sending the second menu to another location."  A0026.  Although the independent claims recite computer-based limitations such as an "operating system," "central processing unit," "data storage device," and "wireless handheld computing device," these limitations do not supply an inventive concept sufficient to render the claims eligible for patent protection under 35 U.S.C. § 101.  As the Board correctly determined, "these claim elements require nothing more than a generic computer with generic computer elements performing generic computer functions," and as such "cannot transform a patent-ineligible abstract idea into a patent-eligible invention."  A0027 (citing *Alice*, 134 S. Ct. at 2358); *see also* A0031; A0034–35; A0038.  As the Board also correctly recognized, the limitations relating to the display, generation, transmission, and modification of computerized menus are nothing more than well-

- 14 -

understood, routine, conventional concepts that also fail to impart patentability. A0027–29; A0031–33; A0035–36; A0038–39. Accordingly, the Board correctly found independent claims 1, 4, 5, and 12 unpatentable under 35 U.S.C. § 101.

The Board erred, however, in failing to also rule that dependent claims 3, 6–9, 11, and 13–16 are unpatentable under 35 U.S.C. § 101. The additional limitations recited in these dependent claims lack any "inventive concept" sufficient to impart patent eligibility to any of these claims. The Board's apparent rationale was that Appellants did not present extrinsic evidence showing that the basic concepts recited by dependent claims 3, 6–9, 11, and 13–16 were well-known or conventional. A0041–43. That rationale is contrary to numerous cases from this Court and the Supreme Court, which confirm that intrinsic evidence alone is sufficient to invalidate claims under § 101.

All of the '733 patent's claims are unpatentable under § 101 for the same reason: they recite an abstract concept implemented through conventional computer technology. And the same evidence—the patent itself—makes that clear for all of the claims. For example, claims 6–9 and 13–16 recite additional limitations relating to handwriting and voice capture. These additional limitations were so well-known and conventional that the specification provides no description of how these techniques would be implemented. Claims 3 and 11 simply require that the system link (or associate) a particular order with a particular

- 15 -

customer, which also is a well-known and conventional practice in the restaurant industry. Because dependent claims 3, 6–9, 11, and 13–16 "simply append conventional steps" to the unpatentable systems and methods recited in the independent claims, these dependent claims are likewise unpatentable under 35 U.S.C. § 101. *Alice*, 134 S. Ct. at 2357.

## VII. <u>ARGUMENT</u>

### A. <u>Standard of Review</u>

The Board's legal conclusions are reviewed *de novo* and its findings of fact are reviewed for substantial evidence. *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1297 (Fed. Cir. 2015). Patent eligibility under 35 U.S.C. § 101 is an issue of law, reviewed *de novo*. *OIP Techs. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015).

### B. <u>Patent-Eligible Subject Matter Under 35 U.S.C. § 101</u>

The Supreme Court recently re-emphasized that "abstract ideas" are patent-ineligible subject matter and may not be removed from the public domain. *See Alice*, 134 S. Ct. at 2354; *Mayo Collaborative Services v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012); *Bilski*, 561 U.S. at 601–02. Abstract ideas "are 'part of the storehouse of knowledge of all men . . . free to all men and reserved exclusively to none.'" *Bilski*, 561 U.S. at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)). A patent on an abstract idea,

without more, is problematic because it effectively removes the abstract idea from the public domain by pre-empting the use of the idea itself. *See Bilski*, 561 U.S. at 608–12; *Mayo*, 132 S. Ct. at 1293–94 (explaining that by covering a broad range of potential known and unknown uses of an abstract idea, a patent would pre-empt an entire field).

The Supreme Court established a two-part test to determine the patentability of claims covering an "abstract idea." *Alice*, 134 S. Ct. at 2355. The first step is to determine whether the claims "are directed to a patent-ineligible concept," such as an abstract idea. *Id*. If the claims are directed to an abstract idea, the second step is to "search for an inventive concept beyond the abstract idea itself." *Id.* In order to confer patentability, these "additional elements" must be "'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294) (alteration in original).

The "additional elements" must be "more than simply stating the abstract idea while adding the words 'apply it.'" *Alice*, 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1294). Similarly, "'[s]imply appending conventional steps, specified at a high level of generality, [is] not '*enough*' to supply an 'inventive concept.'" *Alice*, 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1300, 1297, 1294) (emphasis in original). Thus, the "prohibition against patenting abstract ideas 'cannot be

- 17 -

circumvented by attempting to limit the use of the [abstract idea] to a particular technological environment' or adding 'insignificant post-solution activity.'" *Bilski*, 561 U.S. at 610–11 (quoting *Diamond v. Diehr*, 450 U.S. 175, 191–92 (1981)); *see also Mayo*, 132 S. Ct. at 1294; *Parker v. Flook*, 437 U.S. 584, 594 (1978). In this regard, the Supreme Court has rejected the "notion that post-solution activity, [which is] conventional or obvious in itself, can transform an unpatentable principle into a patentable process." *Bilski*, 561 U.S. at 610 (quoting *Flook*, 473 U.S. at 590).

The Supreme Court has also made clear that the addition of generic computer components is insufficient to confer patent eligibility. *See Alice*, 134 S. Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1297).

## C.   The Board Correctly Found Independent Claims 1, 4, 5, and 12 Unpatentable Under 35 U.S.C. § 101.

Appellants first address the independent claims that the Board correctly found unpatentable under § 101. This is because all of the dependent claims at issue in Appellants' appeal depend from the independent claims that the Board correctly invalidated.

- 18 -

### 1.    Claims 1, 4, 5, and 12 Are Directed to an Abstract Idea.

As the Board correctly ruled, the claims of the '733 patent are directed to the abstract idea of "generating a second menu from a first menu and sending the second menu to another location." A0026. The independent claims of the '733 patent purport to broadly "encompass[] the generation of a menu in any context known to those of skill in the art where an objective is to facilitate display of the menu so as to enable selection of items from that menu." A0066 at 15:31-32. For example, each of the independent claims of the '733 patent recites a system or method for generating a second menu from a first menu. A0066-67 at claims 1, 4, 5, and 12. As discussed above in Section V(B)(1), the specification describes a GUI that allows a user to create a second menu by selecting menu categories (*e.g.*, Entrees, Desserts, etc.), menu items (*e.g.*, Lamb, NY Strip, etc.), menu modifiers (*e.g.*, Vegetables, Meat Temperature, etc.), and sub-modifiers (*e.g.* Med. Rare, Med Well, etc.) from a first menu of available selections. A0051 at Fig. 1; A0062 at 7:30–36, 8:16–20. The claims do not, however, include any meaningful limits on how the second menu is generated. To the contrary, the specification explains that "***any means*** for displaying the master menu to the user and generating another menu in response to and comprised of the selections made ***is encompassed by the contemplated invention***." A0066 at 15:1–7 (emphases added).

Claim 1 further requires that the system transmit the second menu to a wireless handheld device or Web page. Again, however, the patent does not limit the manner in which the second menu is transmitted in any meaningful respect. Instead, the specification states that "*[a]ny display and transmission means* known to those skilled in the art *is equally usable* with respect to menus generated in accordance with the claimed invention." A0066 at 15:31–42 (emphases added).

Likewise, claims 4, 5, and 12 each recite that the second menu is synchronized with at least one other computing device, but do not limit how the required synchronization is to be performed. Instead, the specification explains that "[t]he software applications for performing the functions falling within the [scope of the claims] can be written in any commonly used computer language," and "[t]he discrete programming steps are commonly known and thus programming details are not necessary to a full description of the invention." A0064 at 12:60–65. Thus, the independent claims of the '733 patent purport to cover the generic concept of generating a second menu from a first menu and transmitting the second menu to another device.

Both the Supreme Court and this Court have consistently held that such generic concepts are patent-ineligible abstract ideas. For example, in *Alice* and *Bilski*, the Supreme Court held that claims reciting generic business concepts such as a method for mitigating settlement risk and a method for hedging risk,

- 20 -

respectively, are directed to patent-ineligible abstract ideas. *See, e.g.*, *Alice*, 134 S. Ct. at 2355; *Bilski*, 561 U.S. at 599. Similarly, in *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354–55 (Fed. Cir. 2014), this Court held that claims reciting a method of "creating a contractual relationship" were directed to a patent-ineligible abstract idea. And in *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014), this Court held that claims reciting a method of displaying an advertisement in exchange for access to copyrighted media were directed to a patent-ineligible abstract idea.

Likewise, this Court has consistently held that claims reciting generic concepts such as storing, manipulating, and transmitting data are directed to patent-ineligible abstract ideas. *See, e.g.*, *Content Extraction and Transmission, LLC v. Wells Fargo Bank, Nat'l Ass'n.*, 776 F.3d 1343, 1347, 1345 (Fed. Cir. 2014) (finding a computerized method of extracting data from a hardcopy document using a scanner, recognizing specific information in the extracted data, and storing this information in a memory to be an abstract idea); *Internet Patents Corp. v. Active Network, Inc.*, No. 2014-1048, ___ F.3d ___, slip op. at 10 (Fed. Cir. June 23, 2015) (finding a computerized method of maintaining state during navigation of online forms to be an abstract idea); *Intellectual Ventures I LLC v. Capital One Bank,* No. 2014-1506, ___ F.3d ___, slip op. at 10, 12 (Fed. Cir. July 6, 2015) (finding a computerized method of customizing web page content as a function of

- 21 -

navigation history and information about the user to be an abstract idea); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008–09 (Fed. Cir. 2014) (A1995) (finding that claims reciting a computer-implemented method of managing bingo games are directed to a patent-ineligible abstract idea).  Accordingly, the Supreme Court's and this Court's cases confirm that the generic concepts recited by the independent claims of the '733 patent are patent-ineligible abstract ideas.

**2.      Claims 1, 4, 5, and 12 Do Not Recite an "Inventive Concept" Sufficient to Confer Patent Eligibility.**

Turning to the second step of the *Alice* test, the independent claims of the '733 patent do not recite an "inventive concept . . . 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  *Alice*, 134 S. Ct. at 2355.

**a.      The Recitation of Conventional Computer Components Is Insufficient to Confer Patent Eligibility.**

Although claims 1, 4, 5, and 12 recite certain computer-based elements, the specification makes clear that each of these elements is a typical component of a conventional computer system.  For example, claim 1 recites a CPU, data storage device, operating system, and GUI.  A0066 at claim 1.  Claims 4, 5, and 12 recite certain additional computer-based elements, including a microprocessor, display device, input device, and application software.  A0066–67 at claims 4, 5, and 12.

The specification confirms that each of these elements is a "typical" component of a conventional computer system:

> The preferred embodiment of the present invention uses ***typical hardware elements in the form of a computer workstation, operating system and application software elements*** which configure the hardware elements for operation in accordance with the present invention. ***A typical workstation platform includes hardware, such as a central processing unit ("CPU") e.g., a Pentium® microprocessor***, RAM, ROM, ***hard drive storage*** in which are stored various system and application programs and data used within the workstation, modem, ***display screen, keyboard, mouse*** and optional removable storage devices such as floppy drive or a CD ROM drive. The workstation hardware is configured by software including ***an operating system, e.g., Windows® 95, 98, NT or CE***, networking software (including internet browsing software) and ***application software components***.

A0061 at 6:47–62 (emphases added).

Similarly, the specification states that "[m]ost personal computers today run under an operating system that provides a graphical user interface ('GUI') for accessing user applications." *Id.* at 6:6–8; *see also id.* at 6:20–25 (describing "common GUI operating systems" including Microsoft Windows for personal computers and Windows CE for wireless handheld devices).

These computer-related elements add nothing to the abstract idea of "generating a second menu from a first menu and sending the second menu to another location" other than the basic automation and efficiency accomplished through the use of conventional computer components. As explained above in Section VII(B), the Supreme Court has made clear that "the mere recitation of a generic computer" that performs "purely conventional" functions "cannot

- 23 -

transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358 (quoting *Mayo*, 132 S. Ct. at 1301).  Thus, the Board correctly determined that these claim elements are insufficient to confer patent eligibility because they "require nothing more than a generic computer with generic computer elements performing generic computer function."  A0027; A0031; A0034–35; A0038; *accord Intellectual Ventures*, No. 2014-1506, slip op. at 9.

> **b.    Storing Menus Displayable in a Hierarchical Format Was a Well-Known, Conventional Concept That Is Insufficient to Confer Patent-Eligibility.**

Claim 1 further recites claim elements directed to storing menus that are displayable in a hierarchical format.  For example, claim 1 recites a first menu displayable in a hierarchical tree format, a modifier menu, and a sub-modifier menu stored on a data storage device and displayed in a graphical user interface. A0066 at claim 1.  Claims 4, 5, and 12 recite similar elements of "storing" and "displaying" menus.  A0066–67 at claims 4, 5, and 12.  However, the specification acknowledges both that the use of a data storage device to store data is "typical" (A0061 at 6:55–56) and that the "use of menus is *conventional* in GUIs for software applications" (*id.* at 6:31–32 (emphasis added)).

The patent also explains that the display of menus in a hierarchical format is "typical."  *Id.* at 6:32–46.  For example, in describing "[m]enus [that] are *typically* utilized to provide end users of applications with available choices," the

- 24 -

specification states that "such a menu system comprises cascading sets of menus which are displayable in context to show the parent/child relationships between options of the context menu." *Id.* (emphasis added). Indeed, the display of a menu in a hierarchical tree structure was admittedly well-known and conventional in the industry. *See, e.g.*, A0062 at 8:1–4 ("The menu structure is similar to the Windows File Explorer in the way items are organized hierarchically.").

As explained above in Section VII(B), simply appending conventional steps specified at a high level of generality, such as the display of a menu in a hierarchical structure, is not enough to transform a patent-ineligible abstract idea into patent-eligible subject matter. *Alice*, 134 S. Ct. at 2357. Given the well-known and conventional nature of these elements, the Board correctly determined that they do not transform the abstract idea into a patent-eligible invention. A0027–28 (citing *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011) and *Mayo*, 132 S. Ct. at 1298); *see also* A0031–32; A0035; A0038.

> **c.  The Display, Manipulation, and Generation of Menus Were Well-Known, Conventional Concepts That Are Insufficient to Confer Patent-Eligibility.**

Claims 1 and 4 further recite application software for generating a second menu from the first menu, by allowing a user to select menu categories, menu items, modifiers, and sub-modifiers from the first menu to add to the second menu.

A0066 at claims 1 and 4.  Claims 5 and 12 recite similar elements.  A0066–A0067 at claims 5 and 12.  The specification acknowledges, however, the "conventional" nature of GUIs that display menus from which records can be "manipulate[d]… created, deleted, modified and arranged…."  A0061 at 6:6–32; A0062 at 7:4–23; *see also* A0064 at 12:62–65 ("the discrete programming steps are commonly known").  Indeed, the specification states explicitly that such menus were present in existing operating systems, such as Microsoft Windows.  A0061 at 6:6–32.

As the Board aptly noted, "to add significantly more to the claimed abstract idea, the additional elements recited by the claims must be more than well-understood, routine, conventional activity."  A0028 (citing *Mayo*, 132 S. Ct. at 1298); *see also* A0032; A0035; A0038.  Thus, "[s]imply appending conventional steps specified at a high level of generality," such as the display, manipulation, and generation of menus, "[is] not '*enough*' to supply an 'inventive concept.'" *Alice*, 134 S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1300, 1297, 1294) (emphasis in original); *Intellectual Ventures,* No. 2014-1506, slip op. at 7 (holding that a "communication medium" limitation for communicating data to a receiving device "does not render the claims any less abstract").  For these reasons, the Board correctly determined that these claim elements are insufficient to confer patent-eligibility.  A0028; A0032; A0035; A0038.

**d.    The Transmission and/or Synchronization of Data Was a Well-Known, Conventional Concept That Is Insufficient to Confer Patent-Eligibility.**

Claim 1 further recites that the application software transmits the second menu to a wireless handheld device or Web page.  A0066 at claim 1.  The specification discloses that menus are transmitted to a handheld device or Web page by downloading.  A0063 at 10:1–9 (describing downloading menu to a PDA); A0060 at 3:43–47; A0062 at 7:38–41, 8:29; 10:10–12.  Claims 4, 5, and 12 recite similar limitations requiring that the second menu be "synchronized" with another computing device.  A0066–67 at claims 4, 5, and 12.  At the oral hearing, the Patent Owner stated that synchronizing requires nothing more than simply downloading.  A1922.  Downloading (or synchronizing) data was a well-known, conventional function of computers at the time of the '733 patent.  In this regard, the specification acknowledges that operating systems such as Windows CE included "built in synchronization between handheld devices, internet and desktop infrastructure."  A0064 at 12:15–20.

Thus, as the Board correctly recognized, such downloading (or synchronizing) is merely conventional post-solution activity, which is insufficient to transform the abstract idea into patent eligible subject matter.  A0028–29 (citing *Flook*, 437 U.S. at 590–92); *see also Alice*, 134 S. Ct. at 2357; *Intellectual Ventures,* No. 2014-1506, slip op. at 7 (holding that a "communication medium"

limitation for communicating data to a receiving device "does not render the claims any less abstract"); A0033–34; A0035–36; A0038–39.

>    **e.    Manual Modification of a Menu Was a Well-Known Conventional Concept That Is Insufficient to Confer Patent-Eligibility.**

Finally, claims 1, 4, 5, and 12 each recite that the second menu is "manually modified" after generation.  As the Board recognized, these claim limitations encompass a second menu that is printed after generation and manually modified by being written upon by a user.  A0029; A0033; A0036; A0039.  The specification confirms that the manual modification of a paper menu by handwriting is a well-known, conventional activity that has long been practiced in the restaurant industry.  Specifically, the specification explains that "ordering prepared foods has historically been done verbally . . . whereupon the placed order is recorded on paper," and that "[w]hile computers have dramatically altered many aspects of modern life, pen and paper have prevailed in the hospitality industry, e.g. for restaurant ordering."  A0059 at 1:31–35, 1:26–29.  This Court has consistently held that additional limitations are insufficient to confer patent-eligibility where, as here, they "can be performed in the human mind, or by a human using a pen and paper."  *See, e.g.*, *CyberSource*, 654 F.3d at 1372.

Moreover, even if the claims were interpreted to require performing this manual modification task on a computer, this limitation cannot render the claims

patent-eligible.  Performing this task on a computer adds nothing more than the basic automation and efficiency accomplished through the use of conventional computer components.  This Court has held that such additional limitations are insufficient to confer patent-eligibility.  *See Bancorp Services, LLC v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) (finding claims patent-ineligible where the recited computer "simply performs more efficiently what could otherwise be accomplished manually").  Thus, as the Board correctly found, these limitations are merely insignificant post-solution activity.  A0029; A0033; A0036; A0039.

Claim 4 further recites that the second menu be manually modified "by handwriting or voice recording after generation."  A0066 at claim 4.  This limitation is also entirely conventional.  Although the specification describes embodiments in which a restaurant server manually writes on the screen of a handheld device (A0060 at 4:6–9) or records a voice message using a microphone on the handheld device (*id.* at 4:18–22), the specification does not disclose ***how*** the handwriting or voice recording would be implemented.  The absence of any description of how handwriting or voice recording would be implemented on a handheld device indicates that these techniques were conventional, not inventive.  In this regard, this Court's case law and the U.S. Patent Office's Manual of Patent Examining Procedure (MPEP) instruct that a patent specification "need not teach,

- 29 -

and preferably omits, what is well known in the art." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986); *see also* MPEP § 2164.05(a).

Even when considered as a combination, the elements of claims 1, 4, 5, and 12 add nothing that is not already present when the elements are considered separately. These claims recite nothing more than the generic concept of generating a second menu from a first menu and sending the second menu to another location. The Supreme Court's and this Court's cases confirm that such generic concepts are patent-ineligible abstract ideas. *See* Section VII(B), *supra*. The claims do not, for example, purport to improve the functioning of the computer itself or effect an improvement in any other technology or technical field. *See, e.g.*, *Alice*, 134 S. Ct. at 2359. Accordingly, the Board correctly found claims 1, 4, 5, and 12 unpatentable under 35 U.S.C. § 101. A0043.

### D. The Board Erred in Failing to Find Dependent Claims 6–9 and 13–16 Unpatentable Under 35 U.S.C. § 101.

Although the Board correctly ruled that the '733 patent's independent claims are unpatentable, it erred in not applying that same reasoning to likewise find dependent claims 6–9 and 13–16 unpatentable. Each of these claims depends from independent claims 1, 4, 5, and/or 12, which the Board properly determined to be directed to the unpatentable abstract idea of "generating a second menu from a first menu and sending the second menu to another location." A0026. The additional

- 30 -

limitations recited by dependent claims 6–9 and 13–16 "simply append[]

conventional steps, specified at a high level of generality" to the abstract idea

recited by the independent claims. *See Alice*, 134 S. Ct. at 2357 ("Simply

appending conventional steps specified at a high level of generality, [is] not

'*enough*' to supply an 'inventive concept'") (quoting *Mayo*, 132 S. Ct. at 1300,

1297, 1294) (emphasis in original).

Claims 6–9 and 13–16 include limitations that further define the manner in

which the "manual modification" of the second menu recited in the independent

claims is achieved. For example, claim 6, which depends from claims 1, 4, or 5,

recites that the "manual modification" of the second menu "involves handwriting

capture." A0067 at claim 6. Claim 7, which further depends from claim 6,

requires that the claimed "handwriting capture involve handwriting recognition and

conversion to text." *Id.* at claim 7. Claims 8 and 9, which depend from claims 1,

4, or 5, recite that the "manual modification" of the second menu involves "voice

capture" and "voice recognition and conversion to text," respectively. *Id.* at claims

8–9. Claims 13–16, which depend from claim 12, include limitations identical to

those found in claims 6–9. *Id.* at claims 13–16.

At best, the additional limitations of claims 6–9 and 13–16 are no more than

"insignificant post-solution activity," which the Supreme Court has repeatedly held

are insufficient to save the claims. *Bilski*, 561 U.S. at 610–11; *Mayo*, 132 S. Ct. at

WEST\259635777.1

1294; *Flook*, 437 U.S. at 594. Because the additional limitations recited in

dependent claims 6–9 and 13–16 fail to disclose an inventive concept sufficient to

ensure that the claims are directed to "significantly more than a patent upon the

[ineligible concept] itself," these claims are also unpatentable under 35 U.S.C.

§ 101. *Alice*, 134 S. Ct. at 2355.

### 1. The Board Erroneously Concluded That There Was Insufficient Evidence to Show the Additional Elements in Claims 6–9 and 13–16 Were Well-Known.

The Board's conclusion with respect to claims 6–9 and 13–16 appears to rest

on a purported "fail[ure] to provide sufficient evidence that menus having

handwriting capture or voice capture functionality were well-known or

conventional at the time of the '733 patent or require merely a general purpose

computer." A0043. As discussed below in Section VII(D)(2), Appellants have

cited the single most authoritative evidence that the additional elements recited by

claims 6–9 and 13–16 were well-known in the art at the time of the '733 patent—

the patent itself. Thus, the Board appears to fault Appellants for not providing

evidence beyond the patent itself.

The Supreme Court's and this Court's cases make clear, however, that the

two-step analysis set forth by the Supreme Court for determining patent-eligibility

under § 101 does not require evidence beyond the patent itself. Both the Supreme

Court and this Court have relied solely on evidence included in the patent in

reaching the conclusion that "additional elements" were routine and conventional, and thus insufficient to confer patent eligibility under § 101.  For example, in *Alice*, the Supreme Court found that limitations reciting "use of a computer to obtain data, adjust account balances, and issue automated instructions" were routine and conventional without relying on extrinsic evidence.  134 S. Ct. at 2359. Similarly, in *Intellectual Ventures*, this Court concluded that "[t]he recited elements, *e.g.*, a database, a user profile . . . and a communication medium, are all generic computer elements" without relying on extrinsic evidence.  No. 2014-1506, slip op. at 9; *see also Internet Patents*, No. 2014-1048, slip op. at 10 (relying solely on statements in the patent specification to find that recited internet browser functionality was conventional); *OIP Techs*, 788 F.3d at 1363–64 (affirming judgment on the pleadings of patent ineligibility and finding that limitations were "conventional computer activities or routine data-gathering steps" without relying

- 33 -

on extrinsic evidence).[1]  Indeed, in *Internet Patents* and *OIP Techs.*, this Court

recently held, in affirming the grant of motions to dismiss, that patents were invalid

under § 101 based on the pleadings and patents alone without considering any

other evidence.  *Internet Patents*, No. 2014-1048, slip op. at 10; *OIP Techs.*, 788

F.3d at 1363–64.

> ### 2.    Handwriting and Voice Capture Were Well-Known, Conventional Techniques That Are Insufficient to Confer Patent-Eligibility.

The '733 patent itself confirms that the additional elements recited by claims

6–9 and 13–16 were well-known in the art.  Nowhere in the patent is there any

indication that the patentee even purports to have invented the concepts of

---

[1] Numerous other cases are in accord.  *See, e.g.*, *Ultramercial*, 772 F.3d at 715–16 (affirming dismissal for failure to state a claim and finding that steps of "updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet" were routine and conventional without relying on extrinsic evidence); *buySAFE*, 765 F.3d at 1355 (affirming judgment on the pleadings of patent ineligibility and finding that "[t]he computer functionality is generic" without relying on extrinsic evidence); *Planet Bingo*, 576 F. App'x at 1008–09 (A1995) (finding that computer implementation of "storing, retrieving, and verifying a chosen set of bingo numbers" was generic without relying on extrinsic evidence); *Cyberfone Sys., LLC v. CNN Interactive Group, Inc*., 558 F. App'x 988, 992–93 (Fed. Cir. 2014) (A1999-2000) (relying solely on the specification to establish that a recited telephone was conventional and "adds nothing of significance to the claimed abstract idea"); *SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 F. App'x 950, 955 (Fed. Cir. 2014) (A2005) (finding that computer-implemented method steps were "well-understood, routine, conventional activity" without relying extrinsic evidence); *PerkinElmer, Inc. v. Intema Ltd.*, 496 F. App'x 65, 71 (Fed. Cir. 2012) (A2011) (relying solely on the patent specification in finding that steps of measuring screening markers and determining risk of Down's syndrome were routine and conventional).

handwriting or voice capture. None of these dependent claims recites *any*

hardware or software implementation for the claimed handwriting or voice capture,

much less an inventive one. Nor is there any teaching in the patent specification of

how handwriting or voice capture would be implemented.

The only descriptions of handwriting and voice capture in the specification

appear in the "Summary of the Invention." Specifically, the patent describes an

embodiment in which a restaurant server taking a drink order could select a menu

item (*e.g.*, "Iced Tea") from the computerized menu on her hand-held device, and

then manually modify the menu by writing (by hand) the modification (*e.g.*, "w/

lemon") on the screen of the handheld device. A0057 at Fig. 8; A0060 at 4:6–9.

Alternatively, the restaurant server could manually modify the menu by speaking

the modification into a microphone in the handheld device. A0060 at 4:18–22.

The manually modified menu could then be presented to a chef or bartender

preparing the order through entirely conventional means, such as printing the

handwritten modification or displaying it on a computer monitor, or by playing the

recorded voice information on a computer speaker. *Id.* at 4:9–18, 4:22–25. In this

regard, the specification does not describe any novel hardware or software for

implementing this handwriting or voice capture functionality. To the contrary, the

specification contemplates the use of known, pre-existing hand-held devices that

WEST\259635777.1

"can capture handwritten information" (*id.* at 3:58–61) and include an "integral

microphone" for recording voice information (*id.* at 4:18–22).

The specification also describes embodiments in which "handwriting and

voice recognition technologies" could be used to implement the manual menu

modification:

> Additionally, in certain embodiments, hand-writing and voice recognition technologies can be utilized to convert the manual operator inputs into appropriate text messages which can be combined with the computer generated menu options to convey the combined information to, for example, a bartender or chef.

*Id.* at 4:32–37.  This description, however, simply refers generically to "hand-

writing and voice recognition technologies."  The specification does not describe

any novel hardware or software for implementing this functionality, making clear

that these technologies were conventional and well-known in the art.[2]

As discussed above, this Court's case law and the U.S. Patent Office's

Manual of Patent Examining Procedure (MPEP) instruct that a patent specification

"need not teach, and preferably omits, what is well known in the art."  *Hybritech*,

802 F.2d at 1384; *see also* MPEP § 2164.05(a).  Thus, by leaving these concepts

---

[2] Indeed, if these technologies were not conventional and well-known in the art, the claims would fail the written description requirement of 35 U.S.C. § 112.  Section 112(a) requires that the specification provide "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains … to make and use the same."  Exempt from this requirement, however, is art that is "well known."  *Hybritech*, 802 F.2d at 1384.

- 36 -

unelucidated, the '733 patent makes clear that they are to be implemented through

pre-existing, conventional technology. Indeed, as Appellants pointed out in their

Reply before the Board, techniques for manual modification were well-known long

before the November 1, 2001 filing date of the '733 patent. *See* A1615–16. For

example, U.S. Patent No. 4,972,496 (the "'496 patent"), which issued in 1987,

more than 13 years before the filing of the application for the '733 patent, discloses

the use of handwriting capture, recognition, and conversion to text to manually

modify a medical record. *See, e.g.*, A1707 at Fig. 12C; A1709 at Fig. 12G. As

shown in Figures 12C and 12G of the '496 patent, a value for a patient's pulse is

manually modified in a medical record by using handwriting capture, recognition,

and conversion to text:



*Fig. 12C*



***Fig . 12G***

Thus, there is no "inventive concept" in the '733 patent's use of generic handwriting or voice recognition technologies "to perform well-understood, routine, and conventional activities commonly used in the industry." *Content Extraction*, 776 F.3d at 1348 (citing *Alice*, 134 S. Ct. at 2359).

This Court's recent decision in *Internet Patents* is particularly instructive, and reveals the Board's error in not invalidating claims 6–9 and 13–16 in this case. In *Internet Patents*, the Court held, in affirming the grant of a motion to dismiss, that a claim directed to maintaining the state of a web page when a user has navigated away from it was not directed to patentable subject matter under § 101. *Internet Patents*, No. 2014-1048, slip op. at 10. In so holding, the Court relied on the fact that, in the patent, "[t]he mechanism for maintaining the state is not

described, although this is stated to be the essential innovation." *Id*. Notably, the Court did not require any evidence beyond the patent itself to make that determination.

As in *Internet Patents*, the '733 patent itself establishes that the additional elements of claims 6–9 and 13–16 were well-understood, routine, and conventional activities commonly used in the industry. According to the Board, the essential innovation of claims 6–9 and 13–16—which the Board erroneously held was sufficient to impart patentability to those dependent claims—was the utilization of handwriting capture and voice recognition. But neither the '733 patent nor the claims describe the mechanism for doing either of these things. Accordingly, just as in *Internet Patents*, these additional elements do not constitute an inventive concept sufficient to impart patentability.

The Board's analysis of independent claim 4 is consistent with this analysis. The Board correctly recognized that the element of claim 4 requiring "the generation of a second menu that is capable of being changed by handwriting or voice recognition" is "nothing more than insignificant post solution activity and is not sufficient to transform the abstract idea into patent-eligible subject matter." A0033 (citing *Flook*, 437 U.S. at 590). The Board's conclusion that the "handwriting or voice recognition" element of claim 4 is "nothing more than insignificant post solution activity" supports the conclusion that the handwriting

- 39 -

and voice capture elements of dependent claims 6–9 and 13–16 are merely conventional, insignificant post-solution activity that fails to supply an inventive concept. *Alice,* 134 S. Ct. at 2357; *see also Bilski*, 561 U.S. at 610–11; *Mayo*, 132 S. Ct. at 1294; *Flook*, 437 U.S. at 594.

As explained above in Section VII(B), simply appending conventional steps specified at a high level of generality, such as the use of conventional handwriting and voice capture techniques, is not enough to transform a patent-ineligible abstract idea into patent-eligible subject matter. *Alice*, 134 S. Ct. at 2357. Thus, given the well-known and conventional nature of these elements, the additional limitations recited in dependent claims 6–9 and 13–16 fail to disclose an inventive concept sufficient to confer patent eligibility. Accordingly, the Board erred in failing to find claims 6–9 and 13–16 unpatentable under 35 U.S.C. § 101.

## E.    **The Board Erred in Failing to Find Dependent Claims 3 and 11 Unpatentable Under 35 U.S.C. § 101.**

Claims 3 and 11 are unpatentable for substantially the same reasons as claims 6–9 and 13–16. Claims 3 and 11 each depend from independent claims 1, 4, or 5—which, as established above, the Board properly determined to be directed to the unpatentable abstract idea of "generating a second menu from a first menu and sending the second menu to another location," in which the second menu is manually modified after generation. A0066–67 at claims 3, 11; *see also* Section VII(C)(2), *supra*. This manual modification could occur, for example, when a

customer places an order for something unusual or unanticipated. A0060 at 3:48–57. Claims 3 and 11 recite that the "modified second menu can be linked to a specific customer at a specific table directly from the graphical user interface of a hand-held device." A0066–67 at claims 3, 11. The limitations relating to both the linking of an order with a particular customer and the use of a GUI to do so "simply append conventional steps, specified at a high level of generality." *Alice*, 134 S. Ct. at 2357.

> **1.    The Board Erroneously Concluded That There Was Insufficient Evidence to Show That the Additional Elements of Claims 3 and 11 Were Well-Known.**

As with claims 6–9 and 13–16, the Board's conclusion with respect to claims 3 and 11 appears to rest on a purported "fail[ure] to provide sufficient evidence." A0041–42. As discussed below in Section VII(E)(2)–(3), Appellants have cited the single most authoritative evidence that the additional elements recited by claims 3 and 11 were well-known in the art at the time of the '733 patent—the patent itself. Thus, as with claims 6–9 and 13–16, the Board appears to fault Appellants for not providing evidence beyond the patent itself. But as explained above, the Supreme Court's and this Court's decisions make clear that that the two-step analysis set forth by the Supreme Court for determining patent-eligibility under § 101 does not require extrinsic evidence. *See* Section VII(D)(1), *supra*.

2.    **Linking a Menu to a Customer Was a Well-Known, Conventional Concept That Is Insufficient to Confer Patent-Eligibility.**

As with claims 6–9 and 13–16, the '733 patent itself illustrates that the additional elements recited by claims 3 and 11 were well-known in the art.  Aside from the claims, the only disclosure in the '733 patent related to the claimed linkage is as follows:

> Similarly, hand-held devices can link the above innovations to individual customers at specific tables through a graphical user interface on the hand-held screen that assigns each customer a number within a table. For example, table 20 might have 6 customers (1-6) and each customer has a different order, [sic] By enabling the linkage of the orders to specific customer positions within the table and accessible from the hand-held screen, the servers can easily track and link the specific orders to the specific customers.

A0060 at 4:37–46.  There is no description in the specification of any hardware or software for establishing or maintaining links between customers and orders, thus demonstrating that this concept was routine and conventional.  *See supra* at VII(D)(2); *see also Internet Patents*, No. 2014-1048, slip op. at 10; *Hybritech*, 802 F.2d at 1384.

Moreover, it is inherent in the very idea of a restaurant menu that an order must be associated (or "linked") to a specific customer.  Far from being new or unconventional, this is a classic example of a manual task that has been performed by restaurant waiters either by memory or by using pen-and-paper for decades, if not centuries.  *See Bancorp*, 687 F.3d at 1279 (Fed. Cir. 2012) (finding claims

- 42 -

patent-ineligible where recited computer "simply performs more efficiently what could otherwise be accomplished manually"). From time immemorial, restaurants have had to ensure that an order is associated with the person who ordered it.

Additionally, similar linking is shown in Figure 12C of the '496 patent, where the manually-modifiable medical record is configured to link the patient's information to a specific room and bed, which is similar to linking a customer's order to a customer at a specific table and chair:



A1707 at Fig. 12C (red annotation added).

Furthermore, claims 3 and 11 include no meaningful restriction on how the link between orders and customers is established or maintained. The failure to include any restriction on how the link is formed and maintained demonstrates that

the claim is directed to the abstract idea itself, and thus is ineligible under § 101.

*Internet Patents*, No. 2014-1048, slip op. at 10.

> **3.     The Display and Modification of a Menu Via a GUI Was a Well-Known, Conventional Concept That Is Insufficient to Confer Patent-Eligibility.**

Nor was there anything new or unconventional about the use of a GUI of a hand-held device.  The '733 patent does not purport to have invented a GUI for the display and modification of a menu.  To the contrary, the specification explains that such user interfaces were conventional aspects of common operating systems, including operating systems for handheld devices:

> **Most personal computers today run under an operating system that provides a graphical user interface ("GUI")** for accessing user applications.  A GUI is used in the preferred embodiment of the present invention… **The most common GUI operating systems** that provide this "object oriented" environment for personal computers **are Microsoft Windows® systems, including Windows CEO for handheld wireless devices** and the like.

A0061 at 6:6–30 (emphases added).  Further, the specification acknowledges the "conventional" nature of GUIs that display menus from which records can be "manipulate[d]… created, deleted, modified and arranged. . . ."  *Id.* at 6:6–32; A0062 at 7:4–23; *see also* A0064 at 12:62–65 ("the discrete programming steps are commonly known").  In this regard, the Board properly recognized that the use of a GUI on a handheld device is not a meaningful limitation on the claims:

> The Specification also discloses that the use of GUI operating systems, such as Microsoft Windows® and Window CE® for handheld wireless device, were known, and that GUIs were a known means for allowing a user to manipulate data.

A0027 (citing A0061 at 6:6–30).

As explained above in Section VII(B), simply appending conventional steps specified at a high level of generality, such as linking a menu to a customer and displaying and modifying a menu in a GUI of a handheld device, is not enough to transform a patent-ineligible abstract idea into patent-eligible subject matter. *Alice*, 134 S. Ct. at 2357. Thus, given the well-known and conventional nature of these elements, the additional limitations recited in dependent claims 3 and 11 fail to disclose an inventive concept sufficient to confer patent eligibility. Accordingly, the Board erred in failing to rule that claims 3 and 11 are unpatentable under 35 U.S.C. § 101.

## VIII. **CONCLUSION**

For these reasons, Appellants respectfully request that this Court reverse the Board's erroneous determination regarding claims 3, 6–9, 11, and 13–16 of the '733 patent, and hold these claims unpatentable under 35 U.S.C. § 101.

WEST\259635777.1

Respectfully submitted,

Dated:  August 4, 2015

By: */s/ Stanley J. Panikowski*

Mark D. Fowler
James M. Heintz
Erin P. Gibson
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700

*Attorneys for Appellant*
*Apple Inc.*

By: */s/ Jonathan S. Franklin*

Jonathan S. Franklin
Richard S. Zembek
Gilbert A. Greene
Norton Rose Fulbright US LLP
799 9th Street, N.W.
Washington, D.C. 20001
202.662.0466

*Attorneys for Appellants*
*Fandango, LLC and OpenTable, Inc.*

By: */s/ Frank A. Angileri*

Frank A. Angileri
Thomas W. Cunningham
BROOKS KUSHMAN P.C.
1000 Town Center, 22nd Floor
Southfield, Michigan 48075
248.358.4400

*Attorneys for Appellants Domino's Pizza,*
*Inc. and Domino's Pizza, LLC*

**<u>Declaration of Authority Pursuant to Federal Circuit Rule 47.3(d)</u>**

I, Stanley J. Panikowski, declare:

1.      I am a member of the State Bar of California, a member of the bar of this Court, and an attorney with DLA Piper LLP (US), counsel for Appellant Apple Inc. in this appeal.

2.      Jonathan S. Franklin, counsel of record for Appellants Fandango, LLC and OpenTable, Inc., has authorized me to sign on his behalf Appellants' Opening Brief.

3.      Frank A. Angileri, counsel of record for Appellants Domino's Pizza, Inc. and Domino's Pizza, LLC, has authorized me to sign on his behalf Appellants' Opening Brief.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on August 4, 2015 in San Diego, California.


*/s/ Stanley J. Panikowski*
Stanley J. Panikowski

## **ADDENDUM TO BRIEF**

A0005 – A0045          Final Written Decision of Patent Trial and Appeal Board

A0050 – A0067          U.S. Patent No. 6,982,733

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE, INC., DOMINO'S PIZZA, INC., DOMINO'S PIZZA, LLC,
FANDANGO, LLC, AND OPENTABLE, INC.,
Petitioner,

v.

AMERANTH, INC.,
Patent Owner.

_____

Case CBM2014-00013
Patent No. 6,982,733 B1

_____

Before JAMESON LEE, MEREDITH C. PETRAVICK, and
NEIL T. POWELL, *Administrative Patent Judges.*

PETRAVICK, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
Covered Business Method Patent Review
*35 U.S.C. § 328(a) and 37 C.F.R. § 42.73*

CBM2014-00013
Patent 6,982,733 B1

# I. INTRODUCTION

Apple Inc., Fandango, LLC, OpenTable, Inc., Domino's Pizza, Inc., and Domino's Pizza, LLC (collectively, "Petitioner") filed a Petition (Paper 10, "Pet.") requesting review under the transitional program for covered business method patents of claims 1–16 of U.S. Patent No. 6,982,733 B1 (Ex. 1033, "the '733 patent"). On March 26, 2014, pursuant to 35 U.S.C. § 324, we instituted this trial as to claims 1–16 on the proposed ground of unpatentability under 35 U.S.C. § 101. Paper 23 ("Dec. to Inst."). Ameranth, Inc. ("Patent Owner") filed a Patent Owner Response (Paper 29, "PO Resp.") and Petitioner filed a Reply (Paper 30, "Reply").

An oral hearing in this proceeding was held on October 24, 2014. A transcript of the hearing is included in the record (Paper 34, "Tr."). The oral hearing was consolidated with the oral hearing for related CBM2014-00015 and CBM2014-00016.

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is issued pursuant to 35 U.S.C. § 328(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 2, 4, 5, 10, and 12 of the '733 patent are unpatentable.

## A. The '733 Patent

The '733 patent relates to an information management and synchronous communication system and method for generating and transmitting computerized menus for restaurants. Ex. 1033, Abstract. Figure 1 of the '733 patent is reproduced below:

2

CBM2014-00013
Patent 6,982,733 B1



Figure 1 is a schematic representation of the menu display/user interface of the preferred embodiment of the '733 patent.

As shown in Figure 1, Graphical User Interface ("GUI") 1 includes menu tree 7, modifiers window 8, and sub-modifiers window 9. *Id.* at col. 7, ll. 44–48.  GUI 1 is used to build a menu on a desktop or other computer. *Id.* at col. 7, ll. 28–29.  Menu items are categorized and displayed in a hierarchical manner in menu tree 7.  Modifiers (e.g., salad dressing) are shown in modifiers window 8, and sub-modifiers (e.g., Italian dressing, French dressing, Ranch dressing, etc.) are shown in sub-modifiers window 9.  *Id.* at col. 7, ll. 30–36.  Once the menu is built using GUI 1, the menu may be downloaded to a handheld device or web page.  Ex. 1033, col. 10, ll. 1–9, col. 11, ll. 12–18.

3

CBM2014-00013
Patent 6,982,733 B1

Figure 7 is reproduced below:



FIG.7

Figure 7 depicts the interface on a typical wireless device used in conformity
with the invention of the '733 patent.

As shown in Figure 7, "the page menu is displayed in a catalogue-like point-
and-click format . . . [thereby allowing] a person with little expertise [to]
'page through' to complete a transaction with the POS [point of sale]
interface and avoid having to review the entire menu of Fig. 1 to place an
order." Ex. 1033, col. 11, ll. 34–39. This interface could be shown on a
PDA or web page. *Id.* at col. 11, l. 40.

4

CBM2014-00013
Patent 6,982,733 B1

Figure 8 is reproduced below:



Figure 8 depicts the handwritten screen according to one embodiment of the '733 patent.

In one embodiment, a server may take a drink order by selecting "Iced Tea" from the menu on the handheld device. Ex. 1033, col. 4, ll. 6-7. As shown in Fig. 8, the server then may manually modify the order by writing "w/ lemon" on the screen on the device. *Id.* at col. 4, ll. 7–9, Fig. 8. The manually modified drink order is then presented to the individual preparing the drinks. *Id.* at col. 4, ll. 9–11.

*B. Illustrative Claims*

Claims 1 and 12 of the '733 patent are illustrative of the claims at issue and read as follows:

1. An information management and synchronous communications system for generating and transmitting menus comprising:

a. a central processing unit,

b. a data storage device connected to said central processing unit,

5

CBM2014-00013
Patent 6,982,733 B1

c. an operating system including a graphical user interface,

d. a first menu consisting of menu categories, said menu categories consisting of menu items, said first menu stored on said data storage device and displayable in a window of said graphical user interface in a hierarchical tree format,

e. a modifier menu stored on said data storage device and displayable in a window of said graphical user interface,

f. a sub-modifier menu stored on said data storage device and displayable in a window of said graphical user interface, and

g. application software for generating a second menu from said first menu and transmitting said second menu to a wireless handheld computing device or Web page,

wherein the application software facilitates the generation of the second menu by allowing selection of categories and items from the first menu, addition of menu categories to the second menu, addition of menu items to the second menu and assignment of parameters to items in the second menu using the graphical user interface of said operating system, said parameters being selected from the modifier and sub-modifier menus, wherein said second menu is manually modified after generation.

12.  In a computer system having an input device, a storage device, a video display, an operating system including a graphical user interface and application software, an information management and synchronous communications method comprising the steps of:

a. outputting at least one window on the video display;

b. outputting a fist menu in a window on the video display;

c. displaying a cursor on the video display;

6

CBM2014-00013
Patent 6,982,733 B1

d. selecting items from the first menu with the input device or the graphical user interface;

e. inserting the items selected from the first menu into a second menu, the second menu being output in a window;

f. optionally adding additional items not included in the first menu to the second menu using the input device or the graphical user interface;

g. storing the second menu on the storage device; and

synchronizing the data comprising the second menu between the storage device and at least one other data storage medium, wherein the other data storage medium is connected to or is part of a different computing device, and wherein said second menu is manually modified after generation.

## C. Related Proceedings

Both parties identify numerous related ongoing district court proceedings. Pet. 10–11; Paper 3, 4–5.

In addition, Petitioner requested covered business method patent review of the following related patents:  U.S. Patent No. 6,348,850 (CBM2014-00015; "the '850 patent") and U.S. Patent No. 8,871,325 (CBM2014-00016).  We instituted covered business method patent review in CBM2014-00015 and CBM2014-00016, and final written decisions in those proceedings are entered concurrently with this decision.

Petitioner also requested covered business method patent review of related U.S. Patent No. 8,146,077 (CBM2014-00014).  We did not institute covered business method patent review in CBM2014-00014.

7

CBM2014-00013
Patent 6,982,733 B1

*D. Alleged Ground of Unpatentability*

Petitioner alleges that claims 1–16 are unpatentable under 35 U.S.C.

§ 101.


II. ANALYSIS

*A. Arguments Incorporated By Reference*

In footnote 10 on pages 12–13 of the Patent Owner Response, Patent

Owner attempts to incorporate certain arguments made in its Preliminary

Response (Paper 13) into the Patent Owner Response.  Our rules prohibit

incorporating arguments by reference.  37 C.F.R. § 42.6(a)(3) states:

"[a]rguments must not be incorporated by reference from one document into

another document."  Incorporation by reference circumvents our rule

limiting the pages in the Patent Owner response to 80 pages.  *See* 37 C.F.R.

§ 42.24(b)(2).  Arguments that are not developed and presented in the Patent

Owner Response, itself, are not entitled to consideration.  *See* Paper 24, 2–3.

(cautioning Patent Owner "that any arguments for patentability not raised

and fully briefed in the response will be deemed waived").


*B. Claim Construction*

The Board interprets claims of unexpired patents using the broadest

reasonable construction in light of the specification of the patent in which

they appear.  37 C.F.R. § 42.300(b).  Under the broadest reasonable

construction standard, claim terms are given their ordinary and customary

meaning, as would be understood by one of ordinary skill in the art in the

context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249,

1257 (Fed. Cir. 2007).  Any special definition for a claim term must be set

8

**A0012**

CBM2014-00013
Patent 6,982,733 B1

forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*,
30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition,
limitations are not to be read from the specification into the claims. *In re
Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

Prior to construing the relevant claim limitations, we turn to some
initial matters raised by Patent Owner. First, Patent Owner argues that we
must construe "the entirety of the challenged claims" (PO Resp. 31), and
proposes constructions for some, but not all, limitations of the challenged
claims (*see id.* at 34–36). Claim construction, however, "is not an inviolable
prerequisite to a validity determination under § 101." *Bancorp Servs. L.L.C.
v. Sun Life Assur. Co. of Canada (U.S.), L.L.C.*, 687 F.3d 1266, 1273 (Fed.
Cir. 2012). *See, e.g., Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d
795, 803 (Fed. Cir. 1999) (only those terms that are in controversy need to
be construed, and only to the extent necessary to resolve the controversy).
Below, we construe the limitations that are relevant to the issues of patent-
eligibility discussed below. We determine that all other claim limitations
need no explicit construction.

Second, Patent Owner urges us to adopt all previous judicial
constructions and, in particular, the constructions of United States District
Court for the Eastern District of Texas Marshall Division (*see* Ex. 2014–
2016). PO Resp. 30. Petitioner also relies upon previous judicial
constructions (*see* Ex. 2017) to support its arguments. *See* Reply 4.
However, the standard for claim construction in a district court infringement
action is different than the standard applied by the Board. *See In re Morris*,
127 F.3d 1048, 1053–54 (Fed. Cir. 1997). In covered business method
patent review proceedings, the Board applies the broadest reasonable

9

CBM2014-00013
Patent 6,982,733 B1

construction consistent with the specification. 37 C.F.R. § 42.300(b); *see also SAP Am., Inc. v. Versata Dev. Grp., Inc.*, Case CBM2012-00001, slip op. at 7–18 (PTAB June 11, 2013) (Paper 70) (discussing adoption of the broadest reasonable interpretation standard).

*i. Preamble*

The preamble of independent claim 1 recites "[a]n information management and synchronous communications system for generating and transmitting menus." The preamble of independent claims 4 and 5 each recites "[a]n information management and synchronous communication system for generating menus." The preamble of independent claim 12 recites "an information management and synchronous communications method." Petitioner and Patent Owner dispute whether the preambles limit these claims. Reply 3–7; PO Resp. 34, 35–36.

Patent Owner argues that the preambles are limiting because "[t]erms are recited in the preamble which do not appear in the remainder of the claims and 'synchronous communications system' is necessary to define the synchronization functionality of the first menus and the second menus on the back[-]office server (central database) and the handheld device/Web pages." PO Resp. 36. According to Patent Owner, the preamble should be construed as "a computerized system having multiple devices in which a change to data made on a central server is updated on client devices and vice versa." *Id.* at 34; *see id.* at 36–37. Patent Owner also argues that the preamble is limiting because the Specification describes that a synchronous communications system is important (*id.* (citing Ex. 1033, Title, Abstract, col. 3, ll. 9–15, 59–67)), and because the Examiner of the related '850 patent

10

CBM2014-00013
Patent 6,982,733 B1

relied upon the preamble during prosecution to distinguish over the prior art (*id.*).

Petitioner argues that the preambles are non-limiting because the preamble does not recite any structural components not captured in the body of the claims and "merely sets forth the purpose ('information management and synchronous communication') and intended use ('for generating and transmitting menus') of the claimed invention." Reply 3–6. Petitioner argues that Patent Owner's proposed construction improperly reads in a distributed system that includes a central server and client devices and improperly excludes a preferred desktop PC embodiment from the claims. Reply 6–7. Petitioner further argues that, contrary to Patent Owner's assertion, the Examiner did not rely upon the preamble to distinguish over the prior art. *Id.* at 5–6.

"In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 808 (Fed. Cir. 2002) (citing *Pitney Bowes Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir. 1999)). A preamble, however, is not limiting where the claim body defines a structurally complete invention and the preamble only states a purpose or intended use for the invention. *Id.*

The bodies of the independent claims 1, 4, and 5 recite a system that includes a central processing unit ("CPU") or microprocessor; a data storage device, a display device; a data input device; an operating system with a GUI, a first (i.e., master) menu, a modifier menu, a sub-modifier menu, and application software. The application software is capable of generating a second (i.e., modified) menu from said first menu. The application software

11

CBM2014-00013
Patent 6,982,733 B1

is capable of transmitting or synchronizing the second menu to another computing device. Claim 1 recites that the other computing device is such a wireless handheld computing device or Web page.

As can be seen from the above, the bodies of the independent claims 1, 4, and 5 recite a structurally complete invention; one that corresponds to the embodiment that has a desktop PC and a menu configuration application described in the Specification at column 7, line 24 thru column 10, line 15 and depicted in Figure 1. As described in the Specification, a menu is updated using the GUI of the menu configuration application and, then, the updated menu is downloaded to a connected handheld device by clicking on a "Download Database" item or icon in GUI 1. Ex. 1033, col. 10, ll. 1–9; *see id.* at col. 3, ll. 24–28, col. 7, ll. 38–41, col. 8, l. 29. Thus, the updated menu is the same on the desktop PC and the handheld device. At the oral hearing, Patent Owner indicated that downloading is synchronizing, as "[i]t's making something the same with something else." *See* Tr. 28.

Claim 12's preamble recites "an information management and synchronous communications method." The body of claim 12 recites multiple steps that require outputting of a first menu, selecting items from the first menu, inserting the selected items into a second menu, adding items to the second menu, storing the second menu, and a step of synchronizing the second menu between a storage device and another data storage medium. Given this, we determine that the preamble does not recite any essential steps not already recited in the body of claim 12.

For these reasons, we agree with Petitioner that the preambles of claims 1, 4, and 5 are non-limiting because they do not recite any structural components not already captured in the body of the claim and merely set

12

CBM2014-00013
Patent 6,982,733 B1

forth the purpose and intended use of the claimed invention. Also, the bodies of the claims already possess life, meaning, and vitality, without importing anything from the preamble. Further, claim 12's recitation of "information management and synchronous communications method" is non-limiting because the body of claim 12 already possesses life, meaning, and vitality, without importing anything from the preamble.

We further are not persuaded by Patent Owner's argument that the preamble is limiting, because the argument is based upon a proposed construction that is overly narrow. Patent Owner's proposed construction implies that a synchronous communication system requires a central back-office server that communicates data updates to and from multiple client devices. Although the Specification describes communication between a central back-office server and client devices (*e.g., see* Ex. 1033, col. 1, ll. 41–59), we see nothing in the Specification, and Patent Owner points to nothing, that suggests that a synchronous communication system is required to include these elements. Patent Owner's proposed construction attempts to import these extraneous elements from the Specification into the claim. If a feature is not necessary to give meaning to what the inventor means by a claim term, it would be "extraneous," and should not be read into the claim. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).

Further, we are not persuaded by Patent Owner's argument that the preamble is limiting because the Examiner of the related '850 patent relied upon the preamble during prosecution to distinguish over the prior art, as evidenced by the Examiner's reasons for allowance (PO Resp. 36). Clear

13

CBM2014-00013
Patent 6,982,733 B1

reliance on the preamble during prosecution to distinguish the claimed invention from the prior art may transform the preamble into a claim limitation. *Catalina*, 289 F.3d at 808 (citation omitted). The Examiner's reasons for allowance for the related '850 patent do not show that the preamble clearly was relied upon during the prosecution of the '733 patent. Further, contrary to the Patent Owner's argument, the Examiner's reasons for allowance in the '850 patent indicate that the claimed sub-modifier menu and the claimed application software are the uniquely distinct features, and not the synchronous communication system of the preamble. Ex. 1035, 7.

For the reasons discussed above, we are persuaded by Petitioner that the preambles are non-limiting.

### ii. "central processing unit"

Independent claims 1 and 4 recite a "central processing unit." Patent Owner proposes that CPU be construed as a "central server." PO Resp. 34, 37. According to Patent Owner, its construction takes into account "the centralized nature of the control over the recited menu generation and synchronous transmission functionally of the central processing unit" described in the Specification. *Id.* at 37.

Petitioner argues that there is nothing in the "intrinsic evidence [that] offers any alternative definition of this common technical term" and argues that Patent Owner's proposed construction is contrary to the Specification, which equates the CPU to a microprocessor. Reply 7 (citing Ex. 1033, col. 6, ll. 52–54, 63–65). Petitioner proposes that CPU should be construed according to its ordinary and customary meaning, which is "the computational and control unit of a computer." Pet. 41 (citing MICROSOFT COMPUTER DICTIONARY, 115 (4th ed. 1999)).

14

CBM2014-00013
Patent 6,982,733 B1

We are persuaded by Petitioner that the broadest reasonable construction in light of the Specification of the term CPU is the computational and control unit of a computer. Petitioner's construction is consistent with the Specification, which describes that the system of the '733 patent uses typical hardware elements in the form of a computer workstation and that "a typical workstation platform includes hardware such as a central processing unit ('CPU'), e.g., a Pentium® microprocessor." Ex. 1033, col. 6, ll. 52–54; *see also id.* at col. 6, l. 65 ("a CPU, e.g., Pentium® microprocessor"). Further, Petitioner's construction is consistent with the Specification, which as discussed above, discloses using a desktop PC to generate and download menus to a connected handheld device (*see id.* at col. 7, l. 38–col. 10, l. 15), as well as, discloses the use of a central back-office server (*e.g., see id.* at col. 2, ll. 37–40). Patent Owner's proposed construction improperly reads into the claims the central back-office server. *See Renishaw*, 158 F.3d at 1249 (explaining that extraneous features should not be read into the claims).

For these reasons, we determine that the broadest reasonable construction, in light of the Specification, of CPU is the computational and control unit of a computer.

### *iii. "Web page"*

Neither Petitioner nor Patent Owner contests the construction of the term "Web page" in the Decision to Institute. *See* PO Resp. 39; Reply 2. We construed Web page to mean "a document with associated files for graphics, scripts, and other resources, accessible over the internet and viewable in a web browser." Dec. on Inst. 9–10.

15

**A0019**

CBM2014-00013
Patent 6,982,733 B1

*iv. "menu"*

Petitioner does not propose explicitly a construction of menu, but argues that the claim terms should be given their ordinary and customary meaning. Pet. 30–31. Patent Owner proposes that menu should be construed as "computer data representing collections of linked levels of choices or options intended for display in a graphical user interface." PO Resp. 35, 40–41 ((referring to a construction by a district court); *see* Ex. 2014, 11–12). Patent Owner, however, provides no analysis as to why the district court's construction is the broadest reasonable construction in light of the Specification. PO Resp. 35, 40–41.

We are not persuaded by Patent Owner that its proposed construction is the broadest reasonable construction in light of the Specification. We see nothing in the Specification, and Patent Owner does not point to anything in the Specification, that provides support for Patent Owner's proposed construction, in particular that the menus have a "linked levels" feature. Although the Specification discloses some menus that are linked to additional menus, this "linked levels" feature is extraneous and should not be read from the Specification into the claim. *See* Ex. 1033, col. 6, ll. 37–46 ("File options *can have* additional subordinate or child options associated with them. *If* a file option having a subordinate option is selected . . ." (emphases added)).

We give "menu" its ordinary and customary meaning. RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY defines menu as "a list of options available to a user as displayed on a computer or TV screen." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY, 520 (2nd ed. 1997). This definition is consistent with the Specification, which describes menus as

16

**A0020**

CBM2014-00013
Patent 6,982,733 B1

providing choices or options in a GUI. *See* Ex. 1033, col. 5, ll. 32–34; *see*
Figure 1 (depicting a menu, a modifier menu, and a sub modifier menu).

For these reasons, we determine that the broadest reasonable
construction, in light of the Specification, of "menu" is a list of options
available to a user displayable on a computer.

### v. "manually modified"

Petitioner does not propose explicitly a construction of "manually
modified" but argues that the claim terms should be given their ordinary and
customary meaning. Pet. 40–41. Patent Owner proposes that "manually
modified" should be construed as "effecting a change as a result of a user's
input or request." PO Resp. 35–36, 42–43.

Patent Owner's proposed construction is consistent with the ordinary
and customary meaning of the claim terms (*see* Ex. 3002 (providing a
dictionary definition of "manual" and "modify")) and is consistent with the
Specification, which describes embodiments that make manual
modifications by handwritten screen captures or voice recorded messages,
coupled to the standard menus (Ex. 1033, col. 3, l. 48–col. 4, l. 56). On this
record, we determine that Patent Owner's proposed construction is the
broadest reasonable construction, in light of the Specification.

Claims 1 and 5 each recite "wherein said second menu is manually
modified after generation." Claim 4 recites "wherein said second menu is
manually modified by handwriting or voice recording after generation." As
discussed in our Decision to Institute, theses clauses are "a further limitation
regarding the application software's ability to facilitate the generation of the
second menu." Dec. to Inst. 18. Given our construction of "manually
modified" above, we determine that claims 1 and 5 require application

17

**A0021**

CBM2014-00013
Patent 6,982,733 B1

software that is capable of facilitating the generation of a second menu that is capable of being manually modified after generation. Claim 4 requires application software that is capable of facilitating the generation of a second menu that is capable of being manually modified by handwriting or voice recording after generation.

### C. 35 U.S.C. § 101

Petitioner challenges claims 1–16 of the '733 patent as claiming patent-ineligible subject matter under 35 U.S.C. § 101. Pet.49–60; Reply 8–15. According to Petitioner, the claims are directed to the abstract idea of generating a menu and do not contain additional limitations that meaningfully limit the abstract idea to a practical application. *Id.*

Patent Owner disagrees and contends that the claims are patent-eligible because they recite a machine and not an abstract idea and because they recite specialized software that synchronously generates and wirelessly transmits non-PC standard handheld menus comprised of multi-tiered levels of components. PO Resp. 44–80.

#### a. Section 101 Subject Matter Eligibility

For claimed subject matter to be patentable eligible, it must fall into one of four statutory classes set forth in 35 U.S.C. § 101: a process, a machine, a manufacture, or a composition of matter. The Supreme Court recognizes three categories of subject matter that are ineligible for patent protection: "laws of nature, physical phenomena, and abstract ideas." *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) (internal quotations and citation omitted). A law of nature or an abstract idea by itself is not patentable; however, a practical application of the law of nature or abstract idea may be

18

CBM2014-00013
Patent 6,982,733 B1

deserving of patent protection. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293–94 (2012). To be patentable, however, a claim must do more than simply state the law of nature or abstract idea and add the words "apply it." *Id.*

In *Alice Corp. Pty, Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), the Supreme Court recently clarified the process for analyzing claims to determine whether claims are directed to patent-ineligible subject matter. In *Alice*, the Supreme Court applied the framework set forth previously in *Mayo*, "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of these concepts." *Alice*, 134 S. Ct. at 2355. The first step in the analysis is to "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* If they are directed to a patent-ineligible concept, the second step in the analysis is to consider the elements of the claims "individually and 'as an ordered combination'" to determine whether there are additional elements that "'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1291, 1297). In other words, the second step is to "search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (alteration in original) (quoting *Mayo*, 132 S. Ct. at 1294). Further, the "prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'" *Bilski*, 130 S. Ct. at 3230 (quoting *Diamond v. Diehr*, 450 U.S.175, 191–92 (1981)).

19

CBM2014-00013
Patent 6,982,733 B1

The patents at issue in *Alice* claimed a "method of exchanging financial obligations between two parties using a third-party intermediary to mitigate settlement risk." *Alice*, 134 S. Ct. at 2356. Like the method of hedging risk in *Bilski*, 130 S. Ct. at 3240 — which the Court deemed "a method of organizing human activity" — *Alice's* "concept of intermediate settlement" was held to be "'a fundamental economic practice long prevalent in our system of commerce.'" *Alice*, 134 S. Ct. at 2356. Similarly, the Court found that "[t]he use of a third-party intermediary . . . is also a building block of the modern economy." *Id.* "Thus," the Court held, "intermediate settlement . . . is an 'abstract idea' beyond the scope of § 101." *Id.*

Accordingly, utilizing this framework, we analyze claims 1–16 of the '733 patent to determine whether these claims are directed to patent-ineligible subject matter.

*b. Ineligible Concept*

Petitioner argues that the claims are directed to the abstract idea of generating menus. Pet. 62–68; Reply 9–10. Patent Owner argues that the claims "are not directed to an 'idea' at all; they are directed to a new machine." PO Resp. 46 (emphasis omitted).

Nominally, the claimed subject matter of claims 1, 4, and 5 is a machine and the claimed subject matter of claim 12 is a process. A machine or process is one of the four categories of statutory subject matter. Statutory class, however, is not by itself determinative of whether a claim is directed to patent eligible subject matter. "Regardless of what statutory category ('process, machine, manufacture, or composition of matter,' 35 U.S.C. § 101) a claim's language is crafted to literally invoke, we look to the underlying invention for patent-eligibility purposes." *CyberSource Corp. v.*

20

**A0024**

CBM2014-00013
Patent 6,982,733 B1

*Retail Decisions, Inc.*, 654 F.3d 1366, 1374 (Fed. Cir. 2011). *See Alice*, 134
S. Ct. 2358–2359; *Bancorp Servs. v. Sun Life Assurance Co.*, 687 F.3d 1266,
1275 (Fed. Circ. 2012).

The independent claims recite a system or process that generates a
second menu, which is capable of being manually modified after generation,
from a first menu. As discussed in section I(A) above, the Specification
discloses a user generating a menu by adding or deleting menu categories,
such as salads or desserts; menu items, such as caesar salad or green salad;
menu modifiers, such as dressing; and menu sub-modifiers, such as ranch or
blue cheese, to create the second menu. Ex. 1033, col. 7, l. 38–col. 10, l. 15.
The Specification states:

> [w]hile the preferred embodiment of the invention includes the
> selection of items from a master menu wherein the master menu
> is displayed using a graphical user interface, it is to be
> appreciated that any means for displaying the master menu to
> the user and generating another menu in response to and
> comprised of the selections made is encompassed by the
> contemplated invention.

*Id.* at col. 15, ll. 1–7.

Independent claim 1 also recites that the system transmits the
second menu to a wireless handheld computing device or Web page,
and independent claims 4, 5, and 12 recite that the system is
synchronized between the data storage device and at least one other
computing device. In that regard, the Specification states:

> [t]he inventive concept encompasses the generation of a menu
> in any context known to those skilled in the art where an object
> is to facilitate display of the menu so as to enable selection of
> items from that menu. ... Likewise, displaying menus
> generated in accordance with the invention on PDAs and Web
> pages to facilitate remote ordering are but a few examples of

21

**A0025**

CBM2014-00013
Patent 6,982,733 B1

> ways in which such menu might be used in practice. Any
> display and transmission means known to those skilled in the
> art is equally usable with respect to menus generated in
> accordance with the claimed invention.

*Id.* at col. 15, ll. 31–42.

Given the above, we determine that the claims are directed to the abstract idea of generating a second menu from a first menu and sending the second menu to another location.

### c. Inventive Concept

Next, we look for additional elements that can "transform the nature of the claim" into a patent-eligible application of an abstract idea. That is, we determine whether the claims include an "inventive concept," i.e., an element or combination of elements sufficient to ensure that the patent in practice amounts to significantly more than a patent on the abstract idea itself. *Alice*, 134 S. Ct. at 2357. The Supreme Court in *Alice* cautioned that merely limiting the use of abstract idea "to a particular technological environment" or implementing the abstract idea on a "wholly generic computer" is not sufficient as an additional feature to provide "practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself." *Alice*, 134 S. Ct. at 2358.

### i. Independent Claim 1

Petitioner argues that the claims require nothing more than a general purpose computer using general purpose programming because the Specification, itself, discloses that the system of the '733 patent uses typical computer equipment and commonly known programming steps. *See* Pet. 55–56, 60–64; Reply 8–15. Patent Owner argues that the claims recite specialized software that synchronously generates and wirelessly transmits

22

CBM2014-00013
Patent 6,982,733 B1

non-PC standard handheld menus comprised of multi-tiered levels of components. PO Resp. 44–80.

Independent claim 1 recites a CPU, a data storage device, and an operating system with a GUI. The Specification states that "the present invention uses typical hardware elements in the form of a computer workstation, operating system and application software elements which configure the hardware elements for operation in accordance with the present invention." Ex. 1033, col. 6, ll. 46–52. CPUs and data storage devices are described as "typical hardware elements." *Id.* at col. 6, ll. 48–49. The Specification also discloses that the use of GUI operating systems, such as Microsoft Windows® and Window CE® for handheld wireless device, were known, and that GUIs were a known means for allowing a user to manipulate data. *Id.* at col. 6, ll. 6–30. Given this, we determine that these claim elements require nothing more than a generic computer with generic computer elements performing generic computer functions. Merely reciting a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2358. Using a graphical user interface, a known way for a user to interact with the computer, does not change the generic nature of the computer.

The independent claim 1 also recites a first menu, a modifier menu, and a sub-modifier menu stored on the data storage device and displayable in a window of a GUI. The first menu is displayable in a hierarchical tree format. The Specification discloses that the use of a data storage device to store data is "typical" and the displaying of menus in a hierarchical format in a GUI is "conventional." *See* Ex. 1033, col. 6, ll. 31–32, 52–56, col. 7, ll. 4–23. Given this, we determine that storing the menus on the data storage

23

CBM2014-00013
Patent 6,982,733 B1

device is nothing more than routine data gathering and does not transform the abstract idea into a patent-eligible invention. *See CyberSource*, 654 F.3d at 1370. Further, displaying menus in a GUI, including in a hierarchical format, is a well-understood, routine, conventional activity that does not add significantly more to the abstract idea. *Mayo*, 132 S. Ct. at 1298.

The claim, further, recites application software that functions to generate a second menu from a first menu by selecting menu categories and items from the first menu, adding menu categories and item to the second menu, and selecting parameters from modifier and sub-modifier menus to assign to items in the second menu. The Specification discloses that GUIs that display menus from which records can be created, deleted, modified, or arranged are conventional. Ex. 1033, col. 6, ll. 6–32; col. 7, ll. 4–23: *see also* col. 12, ll. 62–65 ("the discrete programming steps are commonly known"). To add significantly more to the abstract idea, additional features must be more than well-understood, routine, conventional activity. *Mayo*, 132 S. Ct. at 1298.

Claim 1 recites that the application software also functions to transmit the second menu to a wireless handheld computing device or Web page. As discussed above in section II(B)(i), the Specification discloses that the menu is transmitted to the wireless handheld device and Web page by downloading. Ex. 1033, col. 10, ll. 1–9 (describing downloading the new menu to a connected PDA); *see also id.* at col. 3, ll. 42–43, col. 6, ll. 33–36, col. 7, l. 26, col. 10, ll. 12–14 (describing downloading the new menu to a wireless handheld device and Web page). Such downloading is merely a conventional post-solution activity. Conventional post-solution activity is

24

CBM2014-00013
Patent 6,982,733 B1

not sufficient to transform the abstract idea into patent-eligible subject matter. *See Parker v. Flook*, 437 U.S. 584, 590–92 (1978).

As discussed above in section II(B)(iv), claim 1 also recites that the "second menu is manually modified after generation," and we have construed this limitation as requiring the application software to be capable of facilitating the generation of a second menu that is capable of being changed, after generation, as a result of a user's input or request. This encompasses a second menu that is capable of being changed by being written upon by a user after generation and after being printed. The Specification discloses that menus are commonly printed on paper (Ex. 1033, col. 2, ll. 10–11) and that it is known to use pen and paper in the hospitality industry (*see id.* at col. 1, ll. 27–35). *See* Reply 11–12. This claim element is nothing more than insignificant post solution activity and is not sufficient to transform the abstract idea into patent-eligible subject matter. *See Flook*, 437 U.S. at 590.

Even when the claim elements are considered as a combination, they add nothing that is not already present when the elements are considered separately. *Alice*, 134 S. Ct. at 2359. Claim 1 conveys nothing more meaningful than the fundamental concept of generating a second menu from a first menu and sending the second menu to another location.

Upon review of Petitioner's analysis and supporting evidence and taking into account Patent Owner's arguments, discussed below, we are persuaded by Petitioner that independent claim 1 does not recite additional elements that transform the claim into a patent-eligible application of an abstract idea.

25

CBM2014-00013
Patent 6,982,733 B1

We are not persuaded by Patent Owner's argument that the claims
require additional elements that transform the abstract idea into a patent-
eligible application (PO Resp. 44–74, 76–80) because it is based up on an
overly narrow construction of the claimed elements, as discussed in section
II(B) above, and is based on additional elements not recited or required by
the claims. Patent Owner argues the claims "supply a new and useful
application of the idea by virtue of the fact that they synchronously generate
and wirelessly transmit out non-PC standard handheld menus comprised of
multi-tiered levels of components." *Id.* at 47.

Patent Owner's argument is based upon its overly narrow construction
of the preamble of the claim and the claimed CPU and menu. As discussed
above in section II(B), when given the broadest reasonable construction in
light of the Specification, the claim elements do not require a central back-
office server that updates changes to the menu on multiple client devices and
vice versa and do not require menus that have multi-tiered levels of
components.

Patent Owner's argument also is based upon elements not recited or
required by the claim. Patent Owner implies that the claims require that
second menu is transmitted "wirelessly" to the wireless handheld computing
device. *E.g., see id.* at 62. Although, the handheld computing device is
described as "wireless," the claims do not recite that the second menu is
wirelessly transmitted to the handheld device, and do not preclude, for
example, transmitting the second menu to a PDA (i.e., a wireless handheld
computing device) via a wire and docking station, as described in the
Specification (Ex. 1033, col. 10, ll. 1–9). Patent Owner also implies that the
claims require that the application software functions to configure the

26

second menu so that it is in a non-PC standard graphical format (*e.g., see id.* at 49, 61–67) for the wireless handheld computing device. However, no such limitations appear in the claims. The claims are silent as to the format of the second menu and contain no requirement that the second menu be in such a format.

*ii. Independent Claim 4*

Independent claim 4 recites a CPU, a data storage device, and an operating system with a GUI. The Specification states that "the present invention uses typical hardware elements in the form of a computer workstation, operating system and application software elements which configure the hardware elements for operation in accordance with the present invention." Ex. 1033, col. 6, ll. 46–52. CPUs and data storage devices are described as "typical hardware elements." *Id.* at col. 6, ll. 48–49. The Specification also discloses that the use of GUI operating systems, such as Microsoft Windows® and Window CE® for handheld wireless device, were known, and that GUIs were a known means for allowing a user to manipulate data. *Id.* at col. 6, ll. 6–30. Given this, we determine that these claim elements require nothing more than a generic computer with generic computer elements performing generic computer functions. Merely reciting a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2358. Using a graphical user interface is a known way for a user to interact with the computer and does not change the generic nature of the computer.

Independent claim 4 also recites a first menu stored on the data storage device. The Specification discloses that the use of a data storage device to store data is "typical." *See* Ex. 1033, col. 6, ll. 52–56. Given this,

27

CBM2014-00013
Patent 6,982,733 B1

we determine that storing the menus on the data storage device is nothing more than routine data gathering and does not transform the abstract idea into a patent-eligible invention. *See CyberSource*, 654 F.3d at 1370.

The claim, further, recites application software that functions to generate a second menu from a first menu by allowing for the selection of items from the first menu, the addition of items to the second menu, and assigning parameters to the items. The Specification discloses that GUIs that display menus from which records can be created, deleted, modified, or arranged are conventional. Ex. 1033, col. 6, ll. 6–32; col.7, ll. 4–23: *see also* col. 12, ll. 62–65 ("the discrete programming steps are commonly known"). To add significantly more to the abstract idea, additional features must be more than well-understood, routine, conventional activity. *Mayo*, 132 S. Ct. at 1298.

Claim 4 also recites that the application software functions to synchronize the second menu between the data storage device and another computing device. As discussed above in section II(B)(i), the Specification discloses downloading a generated menu from a desktop PC to a connected wireless handheld device. Ex. 1033, col. 10, ll. 1–6; *see also id.* at col. 3, ll. 42–43, col. 6, ll. 33–36, col. 7, l. 26, col. 10, ll. 12–14. At the oral hearing, Patent Owner indicated that downloading is synchronizing, as "[i]t's making something the same with something else." *See* Tr. 28. Further, the Specification discloses that Windows CE® includes "built in synchronization between handheld devices, internet and desktop infrastructure" (Ex. 1033, col. 12, ll. 15–18) and describes Windows CE® as a common GUI operating system (*id.* at col. 6, ll. 20–24). Such downloading or synchronizing is merely a conventional post-solution

28

activity. Conventional post-solution activity is not sufficient to transform the abstract idea into patent-eligible subject matter. *See Flook*, 437 U.S. at 590–92.

As discussed above in section II(B)(iv), claim 4 also recites "second menu is manually modified by handwriting or voice recording after generation," and we have construed this limitation as requiring the application software to be capable of facilitating the generation of a second menu that is capable of being changed by handwriting or voice recognition, after generation, as a result of a user's input or request. As discussed above with regard to claim 1, this encompasses the second menu being manually modified by being written upon by a user after generation and after being printed. The Specification discloses that menus are commonly printed on paper (Ex. 1033, col. 2, ll. 10–11) and that it is known to use pen and paper in the hospitality industry to record orders (*see id.* at col. 1, ll. 27–35). *See* Reply 11–12. This claim element is nothing more than insignificant post solution activity and is not sufficient to transform the abstract idea into patent-eligible subject matter. *See Flook*, 437 U.S. at 590.

Even when the claim elements are considered as a combination, they add nothing that is not already present when the elements are considered separately. *Alice*, 134 S. Ct. at 2359. Claim 4 conveys nothing more meaningful than the fundamental concept of generating a second menu from a first menu and sending the second menu to another location.

Upon review of Petitioner's analysis and supporting evidence and taking into account Patent Owner's arguments, discussed below, we are persuaded by Petitioner that independent claim 4 does not recite additional

29

CBM2014-00013
Patent 6,982,733 B1

elements that transform the claim into a patent-eligible application of an abstract idea.

For the same reasons as discussed above with regard to claim 1, we are not persuaded by Patent Owner's argument that this claim requires additional elements that transform the abstract idea into a patent-eligible application (PO Resp. 44–74, 76–80). In addition, we are not persuaded by Patent Owner's argument because claim 4, unlike claim 1, does not recite that the application software is for transmitting the second menu to a wireless hand-held device or Web page. Claim 4 does not require a wireless hand-held device or Webpage.

### iii. Independent Claim 5

Independent claim 5 recites a microprocessor, a display device, an input device, a data storage device, application software, and an operating system with a GUI. The Specification states that "the present invention uses typical hardware elements in the form of a computer workstation, operating system and application software elements which configure the hardware elements for operation in accordance with the present invention." Ex. 1033, col. 6, ll. 46–52. Microprocessors, display devices, data input device, and data storage devices are described as "typical hardware elements." *Id.* at col. 5, ll. 53–59. The Specification also discloses that the use of GUI operating systems, such as Microsoft Windows® and Window CE® for handheld wireless device, were known, and that GUIs were a known means for allowing a user to manipulate data. *Id.* at col. 6, ll. 6–30. Given this, we determine that these claim elements require nothing more than a generic computer with generic computer elements performing generic computer functions. Merely reciting a generic computer cannot transform a patent-

30

CBM2014-00013
Patent 6,982,733 B1

ineligible abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at
2358. Using a graphical user interface, a known way for a user to interact
with the computer, does not change the generic nature of the computer.

Independent claim 5 also recites a master menu stored on the data
storage device. The Specification discloses that the use of a data storage
device to store data is "typical." *See* Ex. 1033, col. 6, ll. 52–56. Given this,
we determine that storing the menus on the data storage device is nothing
more than routine data gathering and does not transform the abstract idea
into a patent-eligible invention. *See CyberSource*, 654 F.3d at 1370.

The claim recites that the microprocessor, operating system, and
application software function to display the master menu on the display
device in response to input from the input device and function to create the
modified menu from the master menu in response to input from the input
device. The Specification discloses that GUIs that display menus from
which records can be created, deleted, modified, or arranged are
conventional. Ex. 1033, col. 6, ll. 6–32, col.7, ll. 4–23: *see also* col. 12,
ll. 62–65 ("the discrete programming steps are commonly known"). To add
significantly more to the abstract idea, additional features must be more than
well-understood, routine, conventional activity. *Mayo*, 132 S. Ct. at 1298.

Claim 5 also recites that the system functions to synchronize the
modified menu between the data storage device and another computing
device. As discussed above in section II(B)(i), the Specification discloses
downloading a generated menu from a desktop PC to a connected wireless
handheld device. Ex. 1033, col. 10, ll. 1–6; *see also id.* at col. 3, ll. 42–43,
col. 6, ll. 33–36, col. 7, l. 26, col. 10, ll. 12–14. At the oral hearing, Patent
Owner indicated that downloading is synchronizing, as "[i]t's making

31

CBM2014-00013
Patent 6,982,733 B1

something the same with something else." *See* Tr. 28. Further, the
Specification discloses that Windows CE® includes "built in
synchronization between handheld devices, internet and desktop
infrastructure" (Ex. 1033, col. 12, ll. 15–18) and describes Windows CE® as
a common GUI operating system (*id.* at col. 6, ll. 20–24). Such
downloading or synchronizing is merely a conventional post-solution
activity. Conventional post-solution activity is not sufficient to transform
the abstract idea into patent-eligible subject matter. *See Flook*, 437 U.S. at
590–92.

As discussed above in section II(B)(iv), claim 5, like claim 1, recites
"wherein said modified menu is manually modified after generation." As
discussed above with regard to claim 1, this encompasses the modified menu
being changed by being written upon by a user after generation and after
being printed. The Specification discloses that menus are commonly printed
on paper (Ex. 1033, col. 2, ll. 10–11) and that it is known to use pen and
paper in the hospitality industry (*see id.* at col. 1, ll. 27–35). *See* Reply 11–
12. This claim element is nothing more than insignificant post solution
activity and is not sufficient to transform the abstract idea into patent-
eligible subject matter. *See Flook*, 437 U.S. at 590.

Even when the claim elements are considered as a combination, they
add nothing that is not already present when the elements are considered
separately. *Alice*, 134 S. Ct. at 2359. Claim 5 conveys nothing more
meaningful than the fundamental concept of generating a second menu from
a first menu and sending the second menu to another location.

Upon review of Petitioner's analysis and supporting evidence and
taking into account Patent Owner's arguments, discussed below, we are

32

CBM2014-00013
Patent 6,982,733 B1

persuaded by Petitioner that independent claim 5 does not recite additional elements that transforms the claim into a patent-eligible application of an abstract idea.

For the same reasons as discussed above with regard to claim 1, we are not persuaded by Patent Owner's argument that this claim requires additional elements that transform the abstract idea into a patent-eligible application (PO Resp. 44–74, 76–80). In addition, we are not persuaded by Patent Owner's argument because claim 5, unlike claim 1, does not recite that the application software is for transmitting the second menu to a wireless hand-held device or Web page. Claim 5 does not require a wireless hand-held device or Webpage. Further, unlike claims 1 and 4, claim 5 does not require a CPU.

*iv. Independent Claim 12*

Independent claim 12 recites "a computer system having an input device, a storage device, a video display, an operating system including a graphical user interface and application software." Claim 12 recites steps of using these elements to display a first menu, a second menu, and a cursor in windows of the video display and using the input device to select items from the first menu and insert the item into a second menu. Claim 12 also recites steps of adding additional items to the second menu and storing the second menu on the storage device.

The Specification states that "the present invention uses typical hardware elements in the form of a computer workstation, operating system and application software elements which configure the hardware elements for operation in accordance with the present invention." Ex. 1033, col. 6, ll. 47–52; *see also* col. 12, ll. 62–65 ("the discrete programming steps are

33

**A0037**

CBM2014-00013
Patent 6,982,733 B1

commonly known"). CPUs and data storage devices are described as "typical hardware elements." *Id.* at col. 6, ll. 52–59. The Specification also discloses that the use of GUI operating systems, such as Microsoft Windows® and Window CE® for handheld wireless device, were known, and that GUIs were a known means for allowing a user to manipulate data. *Id.* at col. 6, ll. 6–30. The Specification further discloses that GUIs that display menus from which records can be created, deleted, modified, or arranged are conventional. *Id.* at col. 6, ll. 6–32, col.7, ll. 4–23; *see also* col. 12, ll. 62–65 ("the discrete programming steps are commonly known"). Given this, we determine that these claim elements require nothing more than a generic computer with generic computer elements performing generic computer functions. Merely reciting a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2358. Using a graphical user interface is a known way for a user to interact with the computer and does not change the generic nature of the computer.

Claim 12 further recites a step of synchronizing the second menu between the storage device and another data storage device that is connected to a different computing device. As discussed above in section II(B)(i), the Specification discloses downloading a generated menu from a desktop PC to a connected wireless handheld device. Ex. 1033, col. 10, ll. 1–6; *see also id.* at col. 3, ll. 42–43, col. 6, ll. 33–36, col. 7, l. 26, col. 10, ll. 12–14. At the oral hearing, Patent Owner indicated that downloading is synchronizing, as "[i]t's making something the same with something else." *See* Tr. 28. Further, the Specification discloses that Windows CE® includes "built in synchronization between handheld devices, internet and desktop

34

**A0038**

infrastructure" (Ex. 1033, col. 12, ll. 15–18) and describes Windows CE® as a common GUI operating system (*id.* at col. 6, ll. 20–24). Such downloading or synchronizing is merely a conventional post-solution activity. Conventional post-solution activity is not sufficient to transform the abstract idea into patent-eligible subject matter. *See Flook*, 437 U.S. at 590–92.

Claim 12 recites a step of manually modifying the second menu after generation. As discussed above with regard to claims 1, 4, and 5, this encompasses modifying the menu by a user writing changes on the menu after it is generated and printed. The Specification discloses that menus are commonly printed on paper (Ex. 1033, col. 2, ll. 10–11) and that it is known to use pen and paper in the hospitality industry (*see id.* at col. 1, ll. 27–35). *See* Reply 11–12. This claim element is nothing more than insignificant post solution activity and is not sufficient to transform the abstract idea into patent-eligible subject matter. *See Flook*, 437 U.S. at 590.

Even when the claim steps are considered as a combination, they add nothing that is not already present when the steps are considered separately. *Alice*, 134 S. Ct. at 2359. The claims convey nothing more meaningful than the fundamental concept of generating a second menu from a first menu and sending the second menu to another location.

Upon review of Petitioner's analysis and supporting evidence and taking into account Patent Owner's arguments, discussed below, we are persuaded by Petitioner that independent claim 12 does not recite additional elements that transforms the claim into a patent-eligible application of an abstract idea.

CBM2014-00013
Patent 6,982,733 B1

For the same reasons as discussed above with regard to claim 1, we are not persuaded by Patent Owner's argument that this claim requires additional elements that transform the abstract idea into a patent-eligible application (PO Resp. 44–74, 76–80). In addition, we are not persuaded by Patent Owner's argument because claim 12, unlike claim 1, does not recite that the application software is for transmitting the second menu to a wireless hand-held device or Web page. Claim 12 contains no requirement for a wireless hand-held device or Webpage. Further, unlike claims 1 and 4, claim 12 does not require a CPU.

### iii. Dependent Claims 2 and 10

Claim 2 depends from claim 1 and recites "wherein the modified second menu can be selectively printed on any printer directly from the graphical user interface of a hand-held device." Claim 10 depends from claims 4 and 5 and recites a similar limitation. The Specification discloses that menus are commonly printed on paper. Ex. 1033, col. 2, ll. 10–11. These claim elements are nothing more than insignificant post solution activity and are not sufficient to transform the abstract idea into patent-eligible subject matter. *See Flook*, 437 U.S. at 590.

Upon review of Petitioner's analysis and supporting evidence and taking into account Patent Owner's arguments, discussed below, we are persuaded by Petitioner that dependent claims 2 and 10 do not recite additional elements that transforms the claim into a patent-eligible application of an abstract idea.

We are not persuaded by Patent Owner's argument that the limitations recited by these claims were unconventional or unique "in 2001 because the very capability of selecting a printer from the GUI on a mobile device . . .

36

**A0040**

CBM2014-00013
Patent 6,982,733 B1

was novel then and unique to mobility and wireless handhelds" (PO Resp. 75). Patent Owner's argument is based on an additional element not recited or required by the claims. Claim 2 recites that the menu is capable of being printed from a GUI of "a hand-held device" and claim 11 recites that the menu is capable of being printed from a GUI of "said other computing device." Neither claim requires that the menu be capable of being printed from the menu, itself, or from a mobile or wireless hand-held device.

*iv. Dependent Claims 3 and 11*

Claim 3 depends from claim 1 and recites "wherein the modified second menu can be linked to a specific customer at a specific table directly from the graphical user interface of a hand-held device." Claim 11 depends from claims 4 and 5 and recites a similar limitation. These claims require that second menu has the claimed linking functionality. This is consistent with the Specification, which discloses that the hand-held devices can link a customer's order from the menu to the specific customer's position at a table. Ex. 1033, col. 4, ll. 38–46.

Patent Owner argues that claims 3 and 11 recite limitations that were unconventional or unique "in 2001 because the very capability of . . . linking a particular order to a particular customer at a table was novel then and unique to mobility and wireless handhelds" (PO Resp. 75) and argues that Petitioner has not provided any evidence that establishes otherwise (*id.* at 75–76).

We are persuaded by Patent Owner's argument. Petitioner states that the claimed linking is a "classic example[] of manual tasks that cannot be rendered patent-eligible merely by performing them with a computer." Reply 15. However, Petitioner fails to provide sufficient evidence to support

37

CBM2014-00013
Patent 6,982,733 B1

its statement. *See* Pet. 49–66; Reply 9–15. Petitioner provides insufficient evidence to establish that a menu having the functionality to perform the claimed linking from a GUI on a hand-held device, was well-known or conventional and merely require a general purpose computer. *See id.* Upon review, we determine that Petitioner fails to establish by a preponderance of the evidence that claims 3 and 11 recite patent-ineligible subject matter.

*v. Dependent Claims 6 –9 and 13–16*

Claim 6 depends from claims 1, 4, or 5 and recites "wherein the manual modification involves handwriting capture." Claim 7 depends from claim 6 and further recites that "the handwriting capture involves handwriting recognition and conversion to text." Claim 8 depends from claims 1, 4, or 5 and recites "wherein the manual modification involves voice capture." Claim 9 depends from claim 8 and further recites that "the voice capture involves voice recognition and conversion to text." Claims 13–16 depend from claim 12 and recite similar limitations. These claims require that the menus have handwriting capture or voice capture functionality. This is consistent with the Specification, which discloses using handwritten screen captures and voice recorded message captures to couple additional information to the fixed menu information before sending it to a point of sale system, printer, or display. *See* Ex. 1033, col. 3, l. 48–col. 4, l. 37; Fig. 8.

Patent Owner argues that these dependent claims recite a particular kind of manual modification that transforms these claims into patent eligible subject matter and argues that Petitioner ignored this in the Petition. PO Resp. 75–76; *see id.* at 53–54, 56, 69.

38

**A0042**

CBM2014-00013
Patent 6,982,733 B1

We are persuaded by Patent Owner argument. Petitioner argues that "'[m]anual modification' of a menu is a classic example of a manual task that can be performed with a pen and paper, which cannot be rendered patent-eligible merely by performing it with a computer." Reply 11 (citation omitted). Petitioner, further, argues that none of the claims of the '733 patent are directed to any specific software for accomplishing manual modification. *Id.* Petitioner, however, does not specifically address these dependent claims, which require the menu to have functionality to perform handwriting capture or voice capture. *See* Pet. 49–66; Reply 9–15. Further, Petitioner fails to provide sufficient evidence that menus having handwriting capture or voice capture functionality were well-known or conventional at the time of the '733 patent or require merely a general purpose computer. *See id.*

Upon review of the Petitioner's evidence and analysis, we determine that Petitioner fails to establish by a preponderance of the evidence that claims 6–9 and 13–16 recite patent-ineligible subject matter.


## III. CONCLUSION

We conclude Petitioner has proven, by a preponderance of the evidence, that claims 1, 2, 4, 5, 10, and 12 of the '733 patent are unpatentable under 35 U.S.C. § 101.

We conclude Petitioner has not proven, by a preponderance of the evidence, that claims 3, 6–9, 11, and 13–16 of the '733 patent are unpatentable under 35 U.S.C. § 101.

CBM2014-00013
Patent 6,982,733 B1

This is a final written decision of the Board under 35 U.S.C. § 328(a).
Parties to the proceeding seeking judicial review of this decision must
comply with the notice and service requirements of 37 C.F.R. § 90.2.


IV. ORDER

Accordingly, it is hereby:

ORDERED that claims 1, 2, 4, 5, 10, and 12 of U.S. Patent No.
6,982,733 B1 are held unpatentable.

40

**A0044**

CBM2014-00013
Patent 6,982,733 B1

FOR PETITIONER:

Richard Zembeck
Gilbert Greene
richard.zembeck@nortonrosefullbright.com
bert.greene@nortonrosefullbright.com

FOR PATENT OWNER:

John Osborne
Michael Fabiano
josborne@osborneipl.com
mdfabiano@fabianolawfirm.com

41



US006982733B1

## (12) United States Patent
McNally et al.

(10) Patent No.: **US 6,982,733 B1**
(45) Date of Patent: **\*Jan. 3, 2006**

(54) **INFORMATION MANAGEMENT AND SYNCHRONOUS COMMUNICATIONS SYSTEM WITH MENU GENERATION, AND HANDWRITING AND VOICE MODIFICATION OF ORDERS**

(75) Inventors: **Keith R. McNally**, San Diego, CA (US); **Ken Rogers**, San Diego, CA (US); **Paul Rubin**, San Diego, CA (US)

(73) Assignee: **Ameranth Wireless, Inc.**, San Diego, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 673 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: 10/016,517

(22) Filed: **Nov. 1, 2001**

### Related U.S. Application Data

(63) Continuation-in-part of application No. 09/400,413, filed on Sep. 21, 1999, now Pat. No. 6,384,850.

(51) Int. Cl.
*G06F 3/00* (2006.01)

(52) U.S. Cl. ...................................... **345/810**; 345/841

(58) Field of Classification Search ................. 345/810, 345/841, 765, 744, 781
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,724,069 A    3/1998  Chen

5,802,526 A    9/1998  Fawcett et al.
5,912,743 A    6/1999  Kinebuchi et al.
5,991,739 A    11/1999 Cupps et al.
6,107,944 A    8/2000  Behr

FOREIGN PATENT DOCUMENTS

EP      0 779 759 A2    6/1997
WO      WO 98/20434     5/1998
WO      WO 98/41936     9/1998

OTHER PUBLICATIONS

"Graphic User Interlace Builder Menu Construction Using A Tree–View Container" IBM Technical Disclosure Bulletin, vol. 38 No. 9 Sep. 1995.
"Entertainment Industry Leader Rich Rank Takes Helm At Cybermeals, World's Largest Online Meal Ordering System" Sep. 15, 1998, <URL:Http://www.food.com/food.sph/saisp . . . s/aboutus/pressrelease.jsp?id=228>, printed on Apr. 20, 2001.
"W3C Putting Compact HTML, HDML to Test for Net Access—Mobile Markup Langueages Face Off", Yoshiko Hara, Apr. 6, 1998, <URL:http://www.techweb.com/se/directlink.cgi?eet19980406s0089>, printed Sep. 2, 1999.

*Primary Examiner*—Cao (Kevin) Nguyen
(74) *Attorney, Agent, or Firm*—Morgan & Finnegan, L.L.P.

(57) **ABSTRACT**

An information management and synchronous communications system and method facilitates database equilibrium and synchronization with wired, wireless and Web-based systems, user-friendly and efficient generation of computerized menus and reservations with handwritten/voice modifications for restaurants and other applications that utilize equipment with nonstandard graphical formats, display sizes and/or applications for use in remote data entry, information management and communication with host computer, digital input device or, remote pager via standard hardwired connection, the internet, a wireless link, printer or the like.

**16 Claims, 8 Drawing Sheets**





POS – Menu Explorer
File Edit View Help
Menu
Appetizers
Desserts
Drinks
Entrees
Chicken
Red Meat
BEEF TOURNEDO
LAMB
NY STRIP
VEGETABLES
MEAT TEMPERATURE
MED RARE
MED WELL
MEDIUM
RARE
WELL
VEAL SCALOPPINI
Seafood
Salads
Sandwiches
Soups
Ready
Modifier
Code
Price
CHEESE 1107 0
CONDIMENTS 3984 0
DRESSING 1084 0
MEAT TEMPERATURE 4083 0
PREPARED 3481 0
QUANTITY 1466 0
VEGETABLES 3486 0
Sub Modifier
Code
Display
NO 3241 NO
EXTRA 3242 EXTRA
SIDE 3243 SIDE
MODIFIERS WINDOW
SUB-MODIFIERS WINDOW
MENU TREE
1
2
3
4
5
6
7
8
9

FIG. 1

**FIG.2**



**FIG.3**



FIG.4



FIG.5



FIG.6



FIG.7



This is an example of the ordering "Literal Screen".

FIG. 8



Ameranth 21st Century Communications Integration
• On-line ordering
• On-line reservations
• On-line waitlisting
• On-line Frequent customer
• On-line reports/ coordination
POS Interface 15+ POS Partners
Ethernet
Web Links
318 MHz
PadLink Table Status
Ameranth Middleware Communications Controller
Web Hub
Linked Databases
• Com setup
• Wait list
• Frequent Customers
• Reservations
Wireless Hub
Spectrum24
Spectrum24
Fixed POS stations with Spectrum24 card
2700 for valet parking
2700 for Manager Inventory Scanning
2700 for wireless POS
2700 for hostess station
WAN Wireless Growth in 2000+
Ethernet
Other PC-based systems
Jtech Paging
318 MHz
27MHz

FIG. 9

US 6,982,733 B1

# INFORMATION MANAGEMENT AND SYNCHRONOUS COMMUNICATIONS SYSTEM WITH MENU GENERATION, AND HANDWRITING AND VOICE MODIFICATION OF ORDERS

The present application is a continuation-in-part of application Ser. No. 09/400,413, filed Sep. 21, 1999 now U.S. Pat. No. 6,384,850. The contents of application Ser. No. 09/400,413 are incorporated herein by reference.

## FIELD OF THE INVENTION

This invention relates to an information management and synchronous communications system and method for generation of computerized menus for restaurants and other applications with specialized display and synchronous communications requirements related to, for example, the use of equipment or sore with non-PC-standard graphical formats, display sizes and/or applications for use in remote data entry, information management and synchronous communication between host computer, digital input device or remote pager via standard hardwired connection, the internet, a wireless link, smart phone or the like.

## BACKGROUND OF THE INVENTION

While computers have dramatically altered many aspects of modern life, pen and paper have prevailed in the hospitality industry, e.g., for restaurant ordering, reservations and wait-list management, because of their simplicity, ease of training and operational speed. For example, ordering prepared foods has historically been done verbally, either directly to a waiter or over the telephone, whereupon the placed order is recorded on paper by the recipient or instantly filled.

Although not previously adapted for wide-scale use in the hospitality industry, various forms of digital wireless communication devices are in common use, e.g., digital wireless messengers and pagers. Also in common use are portable laptop and handheld devices. However, user-friendly information management and communication capability not requiring extensive computer expertise has not heretofore been available for use in everyday life such as for restaurant ordering, reservations and wait-list management. Hundreds of millions of dollars have been spent on personal digital assistant ("PDA") development seeking to produce a small, light-weight and inexpensive device that could be adapted to such uses; yet none have yielded a satisfactory solution.

One of the inherent shortcomings of PDA type devices is that, as they strive for small size, low weight and low cost, they must compromise the size and clarity of the operator display medium interface itself, which in most cases is one of a variety of LCD (liquid crystal display) type devices. As the size of the display shrinks, the amount of information that may be displayed at any one point or time is commensurately decreased, typically requiring multiple screens and displays to display information to the operator. This reduces the overall utility of the device. Additionally, the smaller display and keyboard results in a non-optimal operator interface, which slows down operation and is thus unacceptable for the time criticality of ordering, reservation and wait-list management and other similar applications. This necessitates many design compromises which in the aggregate have resulted in limited acceptance of PDA type devices in the restaurant and hospitality fields.

Many of the negatives prevalent in earlier devices have been eliminated, but, to date, there is still no integrated solution to the ordering/waitlist/reservation problem discussed above. With the advent of the Palm® and other handheld wireless devices, however, the efforts to make such devices ubiquitous have begun to bear fruit at least in some areas, e.g., personal calendars. However, substantial use of such devices in the restaurant and hospitality context has not occurred to date. As discussed above, at least one of the reasons PDAs have not been quickly assimilated into the restaurant and hospitality industries is that their small display sizes are not readily amenable to display of menus as they are commonly printed on paper or displayed on, e.g., large, color desktop computer screens. Another reason is that software for fully realizing the potential for wireless handheld computing devices has not previously been available. Such features would include fast and automatic synchronization between a central database and multiple handheld devices, synchronization and communication between a World Wide Web ("Web") server and multiple handheld devices, a well-defined application program interface ("API") that enables third parties such as point of sale ("POS") companies, affinity program companies and internet content providers to fully integrate with computerized hospitality applications, real-time communication over the internet with direct connections or regular modem dialup connections and support for batch processing that can be done periodically throughout the day to keep multiple sites in synch with the central database. A single point of entry for all hospitality applications to communicate with one another wirelessly has also previously been unavailable. Such a single point of entry would work to keep all wireless handheld devices and linked Web sites in synch with the backoffice server (central database) so that the different components are in equilibrium at any given time and an overall consistency is achieved. For example, a reservation made online would be automatically communicated to the backoffice server and then synchronized with all the wireless handheld devices. Similarly, changes made on any of the wireless handheld devices would be reflected instantaneously on the backoffice server, Web pages and the other handheld devices.

For the foregoing reasons, paper-based ordering, waitlist and reservations management have persisted in the face of widespread computerization in practically all areas of commerce. At most, computerization of these functions has been largely limited to fixed computer solutions, i.e., desktop or mainframe, because of the problems heretofore faced in configuring wireless handheld devices and maintaining database synchronization for such applications. Specifically, the unavailability of any simple technique for creating restaurant menus and the like for use in a limited display area wireless handheld device or that is compatible with ordering over the internet has prevented widespread adoption of computerization in the hospitality industry. Without a viable solution for this problem, organizations have not made the efforts or investments to establish automated interfaces to handheld and Web site menus and ordering options.

A principal object of the present invention is to provide an improved information management and synchronous communications system and method which facilitates user-friendly and efficient generation of computerized menus for restaurants and other applications that utilize equipment with non-PC-standard graphical formats, display sizes and/or applications.

A further object of the present invention is to provide an improved information management and synchronous communications system and method which provides for entry, management and communication of information from the

US 6,982,733 B1

3

operator as well as to and from another computer, Web page menu, remote digital device using a standard hardwired connection, the internet or a wireless link.

A further object of the present invention is to provide an improved information management and synchronous communications system which is small, affordable and lightweight yet incorporates a user-friendly operator interface and displays menus in a readily comprehensible format.

A further object of the present invention is to provide a synchronous information management and communications system which enables automatic updating of the wireless and internet menu systems when a new menu item is added, modified or deleted from any element of the system.

SUMMARY OF THE INVENTION

The foregoing and other objects of the present invention are provided by a synchronous information management and communications system and method optimized for simplicity of operation which incorporates menu generation for creation of menus to be used with wireless remote handheld computer and PDA devices, the internet or any application where simple and efficient generation of menus is appropriate. The menu generation approach of the present invention includes a desktop software application that enables the rapid creation and building of a menu and provides a means to instantly download the menu configuration onto, e.g., a handheld device or Web page and to seamlessly interface with standard point of sale ("POS") systems to enable automatic database updates and communication exchanges when a change or input occurs in any of the other system elements. To solve the above and other related problems, an information management and communications system is provided which results in a dramatic reduction in the amount of time, and hence cost, to generate and maintain computerized menus for, e.g., restaurants and other related applications that utilize non-PC-standard graphical formats, display sizes or applications.

The menu generation approach of the present invention has many advantages over previous approaches in solving the problem of converting paper-based menus or Windows® PC-based menu screens to small PDA-sized displays and Web pages. In one embodiment, the present invention is a software tool for building a menu, optimizing the process of how the menu can be downloaded to either a handheld device or Web page, and making manual or automatic modifications to the menu after initial creation.

Manual modifications to the generated menus include handwritten screen captures and/or voice recorded message captures coupled with the standard menus and modifiers generated according to standard choices . Such manual modifications enable an extremely rapid and intuitive interface to enhance operations and further optimize the overall operator interface. This approach solves a long-standing, operational issue in restaurant/hotel/casino food/drink ordering when customers want something unusual and not anticipated and available through normal computerized selections. As seen in FIG. 8, the operator screen on the hand-held can capture handwritten information specific to a customers requests directly on the touch-sensitive screen of the wireless computing device. This additional information can then be coupled with the fixed menu and modifier information generated automatically from the hospitality application software and the combined message can be sent to a restaurant point of sale (POS), printer or/or display system. This unique operator interface enables universal languages and an unlimited set of information to be manu-

4

ally communicated and exchanged. The resultant combined message of one or more fixed indications selected from a menu of a device such as a hand-held, and dynamic handwritten messages and/or data provides an even more powerful tool than either modality used independently.

For example a restaurant server taking a drink order could select from a menu of her hand-held device's screen "Iced Tea", and then manually write in the literal screen of her hand-held "with lemon" as shown in FIG. 8. The manually-written information could, for example, be printed or displayed in front of a bartender preparing the drink order. The indication "Iced Tea" as selected from a menu of the hand-held would also be presented to the bartender, perhaps by printing and/or screen display. The server can also select any printer from within the hospitality establishment directly from the operator interface on the screen of the hand-held and have either the order or the receipt printed out where it is most convenient and efficient Similarly, a server taking a drink order could select from a menu of her hand-held device's screen "Iced Tea", and then record the voice message "with lemon" using her hand-held device integral microphone. The recorded information could, for example, be played on a speaker attached to a computer, POS system, or the like located near the bartender or chef preparing the order. The indication "Iced Tea" as selected from a menu of the hand-held would also be presented to the bartender/chef, perhaps by printing and/or screen display. Both the literal screen capture method and the voice recorded message method combine the power of automatic fixed menu generation with the expanded flexibility to resolve operational issues that exist throughout the hospitality market without this innovative solution. Additionally, in certain embodiments, hand-writing and voice recognition technologies can be utilized to convert the manual operator inputs into appropriate text messages which can be combined with the computer generated menu options to convey the combined information to, for example, a bartender or chef.

Similarly, hand-held devices can link the above innovations to individual customers at specific tables through a graphical user interface on the hand-held screen that assigns each customer a number within a table. For example, table 20 might have 6 customers (1–6) and each customer has a different order, By enabling the linkage of the orders to specific customer positions within the table and accessible from the hand-held screen, the servers can easily track and link the specific orders to the specific customers.

The use of wireless handheld devices in the restaurant and hospitality industry is becoming increasingly pervasive as restaurant owners and managers become more aware of the benefits. With the proper wireless handheld system in place, restaurants can experience increased table turns from improved server productivity and shorter order taking and check paying times. Restaurants and POS companies seeking to provide a wireless handheld interface to their desktop-based POS systems or a Web page equivalent face several challenges. These challenges include building a menu using their existing database and transferring the menu onto hand-held devices or Web pages that will interface with servers wirelessly or to restaurants/customers over the internet The menu generation approach of the present invention is the first coherent solution available to accomplish these objectives easily and allows one development effort to produce both the handheld and Web page formats, link them with the existing POS systems, and thus provides a way to turn a complicated, time-consuming task into a simple process.

The information management and synchronous communications system of the present invention features include

US 6,982,733 B1

5

fast synchronization between a central database and multiple handheld devices, synchronization and communication between a Web server and multiple handheld devices, a well-defined API that enables third parties such as POS companies, affinity program companies and internet content providers to fully integrate with computerized hospitality applications, real-time communication over the internet with direct connections or regular modem dialup connections and support for batch processing that can be done periodically throughout the day to keep multiple sites in synch with the central database.

The communication module also provides a single point of entry for all hospitality applications, e.g., reservations, frequent customer ticketing, wait lists, etc. to communicate with one another wirelessly and over the Web. This communication module is a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol and can be easily updated to work with a new communication protocol without modifying the core hospitality applications. An exemplary system diagram of such a communications systemic relationship is shown in FIG. 9 and serves as an example of the power of the synchronization element of the invention through a common, linked solution. A single point of entry works to keep all wireless handheld devices and linked web sites in synch with the backoffice server applications so that the different components are in equilibrium at any given time and an overall consistency is achieved. For example, a reservation made online can be automatically communicated to the backoffice server and then synchronized with all the wireless handheld devices wirelessly. Similarly, changes made on any of the wireless handheld devices are reflected instantaneously on the backoffice server Web pages and the other handheld devices.

BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing features and advantages of the present invention can be appreciated more fully from the following description, with references to the accompanying drawings in which:

FIG. 1 is a schematic representation of a window displayed on a computer display screen which shows a hierarchical tree menu, modifier window and sub-modifier window in conformity with a preferred embodiment of the present invention.

FIG. 2 is a schematic representation of a modifier dialog box in conformity with a preferred embodiment of the present invention.

FIG. 3 is a schematic representation of a menu category dialog box in conformity with a preferred embodiment of the present invention.

FIG. 4 is a schematic representation of a menu item dialog box in conformity with a preferred embodiment of the present invention.

FIG. 5 is a schematic representation of a display customization dialog box in conformity with a preferred embodiment of the present invention.

FIG. 6 is a schematic representation of a communications control window in conformity with a preferred embodiment of the present invention.

FIG. 7 is a schematic representation of a point of sale interface on a wireless handheld device for use in displaying page menus created in conformity with a preferred embodiment of the present invention.

FIG. 8 is an example of a literal, hand-written screen according to embodiments of the present invention.

6

FIG. 9 is an exemplary system diagram relating to embodiments of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

Most personal computers today run under an operating system that provides a graphical user interface ("GUI") for accessing user applications. A GUI is used in the preferred embodiment of the present invention. Through an interface of windows, pull-down menus, and toolbars, GUI operating systems have simplified PCs and have rendered computer technology more user friendly by eliminating the need to memorize keyboard entry sequences. In addition, GUIs allow users to manipulate their data as they would physical entities. For example, a window can represent a file and the contents of the window can represent the records of the file. The window can be opened, closed, or set aside on a desktop as if it were an actual object. The records of the file can be created, deleted, modified and arranged in a drag-and-drop fashion as if they also were physical objects. The most common GUI operating systems that provide this "object-oriented" environment for personal computers are Microsoft Windows® systems, including Windows CE® for handheld wireless devices and the like. Generally, a particular application program presents information to a user through a window of a GUI by drawing images, graphics or text within the window region. The user, in turn, communicates with the application by "pointing" at graphical objects in the window with a pointer that is controlled by a hand-operated pointing device, such as a mouse, or by pressing keys on a keyboard.

The use of menus is conventional in GUIs for software applications. Menus are typically utilized to provide end users of applications with available choices or processing options while using the applications. For example, in a typical desktop or interactive application, selection of a "file" from a menu bar may cause display of a context menu which provides "file" options. File options can have additional subordinate or child options associated with them. If a file option having subordinate options is selected, the child options are displayed in context in a child menu or submenu proximate to the selected parent option. One or more of the child options provided in the child menu may have further subordinate options. Thus, such a menu system comprises cascading sets of menus which are displayable in context to show the parent/child relationships between options of the context menu. A menu system of this type is incorporated into the preferred embodiment of the invention. The preferred embodiment of the present invention uses typical hardware elements in the form of a computer workstation, operating system and application software elements which configure the hardware elements for operation in accordance with the present invention. A typical workstation platform includes hardware such as a central processing unit ("CPU"), e.g., a Pentium® microprocessor, RAM, ROM, hard drive storage in which are stored various system and application programs and data used within the workstation, modem, display screen, keyboard, mouse and optional removable storage devices such as floppy drive or a CD ROM drive. The workstation hardware is configured by software including an operating system, e.g., Windows® 95, 98, NT or CE, networking software (including internet browsing software) and application software components. The preferred embodiment also encompasses a typical file server platform including hardware such as a CPU, e.g., Pentium® microprocessor, RAM, ROM, hard drive, modem, and optional removable storage devices, e.g., floppy or CD ROM drive. The server hardware is configured by

US 6,982,733 B1

7

software including an operating system, e.g., Windows® 95, 98, NT or CE, networking software (including Web server software) and database software.

A computer workstation for use in the preferred embodiment also includes a GUI. As is conventional, the GUI is configured to present a graphical display on the display screen arranged to resemble a single desktop. Execution of an application program involves one or more user interface objects represented by windows and icons. Typically, there may be several windows and icons simultaneously present on the desktop and displaying information that is generated by different applications. The window environment is generally part of the operating system software that includes a collection of utility programs for controlling the operation of the computer system. The computer system, in turn, interacts with application programs to provide higher level functionality, including a direct interface with the user. Specifically, the application programs make use of operating system functions by issuing task commands to the operating system which then performs the requested task. For example, an application program may request that the operating system display certain information on a window for presentation to the user.

An aspect of the preferred embodiment of the information management and communications application of the invention is shown in FIG. 1. FIG. 1 shows an example of the GUI provided by the operating system of the preferred embodiment of the present invention. With reference to FIG. 1, the preferred embodiment includes an intuitive GUI 1 from which to build a menu on a desktop or other computer. A hierarchical tree structure 2 is used to show the different relationships between the menu categories 3 (e.g., soups, salads, appetizers, entrees, deserts, etc.), menu items 4 (e.g., green salad, chicken caesar salad, etc.), menu modifiers 5 (e.g., dressing, meat temperature, condiments, etc.) and menu sub-modifiers 6 (e.g., Italian, French, ranch, bleu cheese, etc.).

The procedure followed in configuring a menu on the desktop PC and then downloading the menu configuration onto the POS interface on the handheld device is as follows.

The menu configuration application is launched by clicking on the appropriate icon on the desktop display screen. FIG. 1 will then be displayed. There are three windows on the screen shown in FIG. 1. The left window is the menu tree 7, also called the tree view. The top right window is the Modifiers window 8 and the bottom right window is the Sub-Modifiers window 9. The Sub-Modifiers window lists the sub-modifiers that correspond to the modifier that is selected. The views on the right are referred to as list views. There are several ways of invoking a command, including using the menu options; using the context menu (right mouse click); using the keyboard or using the toolbar icons. For example, if it is desired to add a category to the menu, the following four options are available: (1) clicking on Edit, Add Category; (2) right mouse clicking on Menu, then clicking on Add Category; (3) highlighting Menu, then typing Ctrl+T or (4) clicking on the Add Category icon on the toolbar. To add an item to a category, the following options are available: (1) highlighting the category to which it is desired to add an item and then clicking on Edit>Add Item; (2) right mouse clicking on the desired category and then clicking on Add Item; (3) highlighting the desired category, then typing Ctrl+N or (4) clicking on the Add icon on the toolbar.

When building a menu, it should be kept in mind that the menu items are stored using a tree metaphor similar to how

8

files are stored on a PC with folders and subfolders. The menu structure is similar to the Windows® File Explorer in the way the items are organized hierarchically. Below is an example of how an item may be configured:

```
Menu
>>  Entrees
    >>  Red Meat
        >>  NY Strip
            >>  Vegetables
                >>  Tomato
                >>  Lettuce
            Meat Temperature
                >>  Medium Rare
```

In the above example, Menu is the root. Entrees is a menu category. Red Meat is an Entree category. NY Strip is a modifier. Vegetable is a modifier. Meat Temperature is a modifier. Medium Rare is a sub-modifier of Meat Temperature.

The steps taken in building a menu are as follows:
1. Add Modifiers;
2. Add Sub-Modifiers and link them to the Modifiers;
3. Create Menu categories;
4. Add menu items to the categories;
5. Assign Modifiers to the menu items;
6. Preview the menu on the POS emulator on the desktop PC;
7. Download the menu database to the handheld device.

To add modifiers, a user clicks on the inside of the Modifiers window, then (1) clicks on Edit>Add Modifier, (2) Presses Ctrl+N; (3) right mouse clicks in the Modifiers window, then clicks on Add Modifier or (4) clicks on the Add icon from the toolbar. If a menu is being built from scratch, the procedure is to enter the Long Name, Short Name, Code and Price in the Modifier dialog box 10 shown in FIG. 2. The Long Name is the fill descriptive name of the item. The Short Name is the abbreviated name that will be displayed on the handheld device. The Code is the numeric or alphanumeric code for the item. If there is an existing database, the existing database can be browsed and menu items retrieved from the database. Clicking on the Browse button will bring up the existing database of menu items. The item to be added is then selected and "OK" is clicked. The fields will then be filled with the information from the database. Clicking on OK again will add the item as a modifier. To delete a modifier, the modifier is selected and the Delete key pressed on the keyboard. To edit a modifier, either the modifier is double clicked or the Enter key is pressed.

Sub-modifiers represent the last level of modifiers that can be assigned to a menu tree. To add sub-modifiers, the modifier to which sub-modifiers are to be assigned is selected. Then, the focus is set on the sub-modifier window by clicking inside the Sub-Modifier window as follows: (1) clicking on Edit>Add Sub-Modifier; (2) pressing Ctrl+N; (3) right mouse clicking in the Sub-Modifiers window, then clicking on Add Sub-Modifiers or (4) clicking on the Add icon from the toolbar. If a menu is being built from scratch, the procedure is to enter the Long Name, Short Name, Code and Price in a Sub-Modifier dialog box similar to the Modifier dialog box shown in FIG. 2. As with modifiers, the Long Name is the full descriptive name of the item. The Short Name is the abbreviated name that will be displayed on the handheld device. The Code is the numeric or alphanumeric code for the item. As before, if there is an existing database, the existing database can be browsed and menu

9

10

items retrieved from the database. Clicking on the Browse button will bring up the existing database of menu items. The item to be added is then selected and OK clicked. The fields will then be filled with the information from the database. Clicking on OK again will add the item as a submodifier. To delete a sub-modifier, the sub-modifier is selected and the Delete key depressed on the keyboard. To edit a sub-modifier, either the sub-modifier is double clicked or the Enter key is pressed.

Menu categories are created from the root. Some examples of categories are Appetizers, Soups, Salads, Entrees, Desserts, etc. The first step is to click on Menu in the menu tree window. Categories are added by (1) clicking on the Add Category icon from the toolbar; (2) clicking on Edit>Add Category or (3) pressing Ctrl+T. As shown in FIG. 3, Menu Category dialog box 11 then appears in which to enter the Long and Short names for the menu category.

To add menu items to categories, the menu category which is being built is clicked. For example, if items are being added to Appetizers, the Appetizers branch is clicked on. Then the Edit>Add Item is clicked on or Ctrl+N pressed. As before, if a menu is being built from scratch, the procedure is to enter the Long Name, Short Name, Code, Prep Time, Recipe and Price into the Menu Item dialog box 12 shown in FIG. 4. The Long Name is the full descriptive name of the item. The Short Name is the abbreviated name that will be displayed on the handheld device. The Code is the numeric or alphanumeric code for the item. Prep Time is the time it takes to prepare the meal and Recipe would include preparation methods and ingredients that are used in the preparation of the item. If there is an existing database, the existing database can be browsed and menu items retrieved from the database. Clicking on the Browse button will bring up the existing database of menu items. The item to be added is then selected and OK is clicked. The fields will then be filled with the information from the database. Clicking on OK again will add the item to the category.

Once the menu items have been entered, it may be desired to assign some modifiers to the menu items. For example, it may be desired to assign meat temperature to a steak order. To accomplish this, first the modifier to be assigned is selected, then the menu item on the tree view that is to be assigned the modifier is clicked on and then Edit>Assign Modifier is clicked on. Or, the modifier can simply be dragged and dropped onto the menu item to link them. A dialog box is then displayed asking if this modifier is a required modifier. If it is a required modifier, the display icon will be red but if it is a non-required modifier the display icon will be green. As many modifiers as are applicable can be assigned. If any changes are made to the modifiers, those changes will be automatically reflected throughout the menu tree.

Once the modifiers have been entered, it may be desired to assign sub-modifiers to the modifiers items. For example, it may be desired to add Honey Mustard as a sub-modifier to Dressing. To accomplish this, first the modifier to be assigned a submodifier is selected, then the sub-modifier window is clicked on, then Edit>Add Sub Modifier is clicked on, Ctrl+N entered or the Add icon from the toolbar is clicked on. Or, the sub-modifier can simply be dragged and dropped onto the modifier to link them.

When the menu has been completely configured, it can be previewed on a POS emulator on the desktop to verify that the menu is correctly configured before downloading it to the handheld device. To preview, File>Preview Database is clicked on or the Preview Database icon from the toolbar is clicked on. The handheld POS emulator on the desktop can then be run. If the configuration is deemed acceptable, the handheld device is connected to the desktop PC to ensure that a connection has been established; the POS application on the handheld device is exited and File>Download Database is clicked on or the Download Database icon from the toolbar is clicked on. If there is an existing menu database on the handheld device, the system will ask if the existing database should be replaced. Yes is clicked if existing database replacement is desired.

A database function enables the creation of, e.g., a breakfast menu, lunch menu and dinner menu and downloading them to a handheld device. Functions available are (1) creating a new database; (2) opening an existing database; (3) saving a database under a different name. To access these functions, File is clicked on the menu bar.

The preferred embodiment encompasses customized layout, views and fonts. To set the focus on the view it is desired to change, click inside the desired window. The main customizing dialog box is accessed by clicking on View>Customize View. A dialog box 13, as shown in FIG. 5, will be displayed including tabs that allow the following options: selection of Columns to display in the list view by choosing and arranging the fields to display in the Modifiers and Sub-Modifiers windows; formatting Columns by specifying the column widths and justification; selecting Filter allows restricting the list to display only the items that meet certain criteria. For example, display of modifiers with codes between 500 and 550. Selecting Sort allows sorting the modifiers or submodifiers according to any of the available fields such as Name, Code or Price. Selecting Style facilitates choice of font type, style, size, etc. To change the font in a particular window, click on View>Fonts or right mouse click in the desired window and then click on Fonts. To change the size of the windows, drag the borders of the windows to expand or contract the size of the windows. To change the column widths, simply drag the edge of the column headers to increase or decrease the column widths.

A communications control program monitors and routes all communications to the appropriate devices. It continuously monitors the wireless network access point and all other devices connected to the network such as pagers, remote devices, internet Web links and POS software. Any message received is decoded by the software, and then routed to the appropriate device. No user action is needed during operation of the software once the application has been launched To launch the communications control module, a Wireless Traffic icon is clicked on the desktop PC. When the program loads, the screen shown in FIG. 6 appears. Messages received are logged in the window 14 shown in FIG. 6 with a time stamp. The messages are also logged to a file on the hard drive. This provides a mechanism to monitor all traffic across the network (possibly useful for troubleshooting, or maintenance, but not necessary for normal operation). The program may be minimized so the screen is not displayed on the desktop, but it must be running for proper communications to exist between all devices on the network.

As stated, the preferred embodiment of the present invention includes the use of and compatibility with GUI technology. A drag-and-drop approach is used for organizing the tree structure 2 in the generated menu. Drag-and-drop is also used for assigning modifiers (modifiers can be dragged from the modifiers window 5 and dropped onto the menu item 4 for assignment). In-cell editing results in fast editing of items in building the menus. Customizable fonts enable users to change font types, style and size. Customizable layouts enable users to resize windows, change icons and

US 6,982,733 B1

11

display preferences. The inventive approach provides for fully persistent storage between sessions, even if a session is improperly or abruptly terminated. Font and the tree state (i.e., which nodes are expanded/collapsed) are stored between sessions. Layout for modifiers and sub-modifiers list views (filter, columns, formatting, font, etc.) are stored between sessions. The last database used is likewise stored between sessions. Splitter views allow the user to see different views at the same time. Each view is displayed on its own section of the screen. Views can be resized via the keyboard or a mouse by simply dragging the splitter in the middle.

An automated function is provided to import existing POS databases into the inventive menu generation system and, as discussed above with respect to the detailed example of how to use the preferred embodiment, an automated download procedure is provided to transfer the desktop database onto a handheld device and/or Web page. Also as discussed, the preferred embodiment facilitates preview of the handheld device or Web page version of the POS menu on the desktop before downloading and configuration. Customizable desktop menu generation is contemplated, as discussed above, in the form of customizable fonts, columns, layouts, etc. The inventive approach also includes templates for common modifiers that can be assigned to similar menu items. The preferred embodiment also supports multiple databases, thus providing for the creation and storing of different menu databases on handheld devices such as breakfast, lunch or dinner menus. The user can then select the appropriate database to reflect the time of day.

FIG. 7 is a schematic representation of a point of sale interface 15 for use in displaying a page-type menu 16 created using the inventive menu generation approach. As can be seen from FIG. 7, the page menu is displayed in a catalogue-like point-and-click format whereas the master menu, FIG. 1, is displayed as a hierarchical tree structure. Thus, a person with little expertise can "page through" to complete a transaction with the POS interface and avoid having to review the entire menu of FIG. 1 to place an order. A PDA or Web page format could appear like FIG. 7 or the display could be configured for particular requirements since fully customizable menu generation and display are contemplated.

The POS interface on the handheld device supports pricing in the database or querying prices from the POS server. The POS device also can be customized with respect to "look and feel" for the particular version. As can be seen in FIG. 7, the POS interface provides for billing, status and payment with respect to orders. A myriad of options can be provided depending on the application.

Advanced database functions are provided in the preferred embodiment of the invention, including an automated download process onto handheld devices and/or Web sites. In the preferred embodiment, the menu generation system of the present invention uses an API called ActiveX Data Objects ("ADO") for database access. ADO is useful in a variety of settings. It is built on top of OLE DB and can be used to talk to databases and, in the future, any data source with any OLE DB driver. Advanced querying is supported. The database can be queried on virtually all fields. Queries can be built using SQL syntax for experienced users or can be created using a query builder which guides users through the creating process. Advanced error handling is supported. Errors occurring at run time can be trapped. A descriptive message is displayed to alert the user and provide error information. However, the application does not terminate when the errors happen. The source code is easy to maintain

12

and modify, thus allowing for on time delivery of customized versions of the software. The advanced database functions produce well-designed databases that accommodate growth and scalability.

The inventive menu generation approach provides a solution for the pervasive connectivity and computerization needs of the restaurant and related markets. The inventive solution includes automatic database management and synchronization, PDA and handheld wireless operating system integration and optimization, wireless communications and internet connectivity, user interface design, and graphics design.

In the preferred embodiment, the menu generation approach of the present invention uses Windows CE® as the operating system for the handheld devices. Windows CE® provides the benefits of a familiar Windows 95/98/NT® look and feel, built-in synchronization between handheld devices, internet and desktop infrastructure, compatibility with Microsoft Exchange®, Microsoft Office 9® and TCP/IP quick access to information with instant-on feature.

Windows CE® provides a basic set of database and communication tools for developer use. However, interfacing with these tools to provide application specific results can be a complex task. In addition to the menu generation described above, a set of software libraries described herein in conformance with the present invention not only enhances the basic Windows CE® functionality by adding new features but also maximizes the full potential of wireless handheld computing devices. Such features include fast synchronization between a central database and multiple handheld devices, synchronization and communication between a Web server and multiple handheld devices, a well-defined API that enables third parties such as POS companies, affinity program companies and internet content providers to fully integrate with computerized hospitality applications, real-time communication over the internet with direct connections or regular modem dialup connections and support for batch processing that can be done periodically throughout the day to keep multiple sites in synch with the central database.

The synchronous communications control module discussed above provides a single point of entry for all hospitality applications to communicate with one another wirelessly or over the Web. This communications module is a layer that sits on top of any communication protocol and acts as an interface between hospitality applications and the communication protocol. This layer can be easily updated to work with a new communication protocol without having to modify the core hospitality applications. The single point of entry works to keep all wireless handheld devices and linked Web sites in synch with the backoffice server (central database) so that the different components are in equilibrium at any given time and an overall consistency is achieved. For example, a reservation made online is automatically communicated to the backoffice server which then synchronizes with all the wireless handheld devices wirelessly. Similarly, changes made on any of the wireless handheld devices will be reflected instantaneously on the backoffice server and the other handheld devices.

The software applications for performing the functions falling within the described invention can be written in any commonly used computer language. The discrete programming steps are commonly known and thus programming details are not necessary to a full description of the invention.

A simple point-to-point wireless capability is contemplated which permits simple digital messages to be sent from

US 6,982,733 B1

13

the wireless handheld devices to a receiver in a beeper and/or valet parking base-station. The POS interface of FIG. 7 is representative of the display on a typical wireless device used in conformity with the invention. A simple protocol is used to acknowledge receipt of the message and thus simultaneous communication is not necessary, which reduces the cost of the wireless link. The range of the wireless link is determined by the characteristics of the radio transceiver. Adding a wireless link allows paging of beeper equipped customers directly from the operator interface on the wireless handheld devices and communication to and from various input/output transmitters and receivers to update the status of the order, reservation or other information and thus further reduce the workload on the operator and enable operations to proceed much faster. This link could also be hardwired or otherwise implemented using any two-way messaging transport.

A further aspect of the invention is the use of the menus generated in accordance with the described technique to place orders from wireless remote handheld devices or from remote locations through the internet. The World Wide Web is a distributed hypermedia computer system that uses the internet to facilitate global hypermedia communication using specified protocols. One such protocol is the Hypertext Transfer Protocol ("HTTP"), which facilitates communication of hypertext Hypertext is the combination of information and links to other information. In the context of the Web, hypertext is defined by the Hypertext Mark-up Language ("HTML"). The links or hyperlinks in a HTML document reference the locations of resources on the Web, such as other HTML documents. Another language used in creating documents for use on the Worldwide Web, to display on computer screens, or to create speech style sheets for use in, e.g., telephones, is the Extensible Mark-Up Language ("XML"). XML is a "metalanguage", i.e., a language for describing languages which was developed to eliminate the restrictions of HTML.

The Web is a client-server system. The HTML documents are stored on Web server computers, typically in a hierarchical fashion with the root document being referred to as the home page. The client specifies a HTML document or other source on the server by transmitting a Uniform Resource Locator ("URL") which specifies the protocol to use, e.g., HTTP, the path to the server directory in which the resource is located, and filename of the resource. Users retrieve the documents via client computers. The software running on the user's client computer that enables the user to view HTML documents on the computer's video monitor and enter selections using the computer's keyboard and mouse is known as a browser. The browser typically includes a window in which the user may type a URL. A user may cause a URL to be transmitted by typing it in the designated window on the browser or by maneuvering the cursor to a position on the displayed document that corresponds to a hyperlink to a resource and actuating the mouse button. The latter method is commonly referred to simply as "clicking on the hot-spot" or "clicking on the hyperlink". The hyperlink methodology is contemplated for use in accordance with the preferred embodiment to transmit orders via the internet.

Web server application software exists that enables a user to shop for and order merchandise. Such systems are sometimes referred to as electronic merchandising systems or virtual storefronts. Systems that enable a user to choose among several retailers' goods are sometimes referred to as electronic malls. An electronic retailer's or electronic mall operator's Web server provides HTML forms that include

14

images and descriptions of merchandise. The user may conventionally search for an item by entering a key word search query in a box on a form. When a user selects an item, the server may provide a linked form that describes that item in further detail. The user may also conventionally enter ordering information into boxes on the form, such as the type and quantity of the item desired. The information entered by the user is transmitted to the server. The user may select multiple items in this manner and then enter a credit card number to pay for the purchases. The retailer processes the transaction and ships the order to the customer. As can be appreciated, ordering merchandise can also be done from menus. The generation of menus of items or merchandise for sale over the internet is readily accomplished by the menu generation approach of the present invention.

Searching for items that the user is interested in purchasing is insufficient in prior merchandising systems. Database management programs use index searching to facilitate rapid searching of large amounts of data. The creator of the database may instruct the program to use specified fields in the database as indexed or key fields. The program locates all terms in the database that appear in the indexed fields and stores them in an index table. Each entry in the index table includes a term and corresponding pointer to the location in the database where the term is found. If a user initiates a search for a term that is present in the index table, the program can locate the instances of that term in the database with exceptional speed. Users who are familiar with the particular database they are searching will generally know which fields are indexed and will know the format of the data in those fields. For example, a user of a database containing the inventory of a bookstore may know that users can search for the names of authors of books and that a user who wishes to do so should enter the author's last name first. A user having such knowledge will therefore be able to search efficiently. Users of electronic merchandising systems, however, are generally end-consumers who have no knowledge of a merchant's database. If, as is very likely, such a user initiates a search for a term that is not present in the index table, the program must sequentially search through all records in the database. Sequential records are typically linked by pointers. Using pointers in this manner is very demanding on server resources, resulting not only in an exceptionally slow search, but also creating a bottleneck for other processes that the server may be executing. The menu generation approach of the present invention can be used to create customized menus from a database that includes every item of merchandise the vendor has for sale. In this manner, customers can scan the generated menu much more readily than they could view the entire database and the necessity of having familiarity with the database is eliminated as well, reducing the need for resource intensive pointers.

While the preferred embodiment of the invention is for the generation of restaurant menus and the like, the broad scope of the invention is far greater. For example, menus generated in accordance with the invention can be used in the desktop computing environment in association with the operating system or application programs. One such use is to facilitate the creation of user personalized file structures for general desktop use. Another use is to facilitate the location of customized menus from master menus for use in association with application software to make the execution of the application software more efficient by, e.g., eliminating the necessity of querying or checking every tree branch in the master menu file structure in response to user input or other criteria and to create handheld/PDA compatible versions of the software.

US 6,982,733 B1

15

While the preferred embodiment of the invention includes the selection of items from a master menu wherein the master menu is displayed using a graphical user interface, it is to be appreciated that any means for displaying the master menu to the user and generating another menu in response to and comprised of the selections made is encompassed by the contemplated invention. The invention encompasses the selection of nontextual symbols, characters, icons and the like, in addition to text, from a hierarchical tree menu or the like for generation of another menu comprised of such items.

It is also within the scope of the invention to generate menus automatically in response to predetermined criteria. For example, in the restaurant menu generation embodiment, a modified menu can be generated to comply with a particular specification or group of criteria such as, e.g., "dinner", "low cholesterol", "low fat", "fish", "chicken", or "vegetarian". In this embodiment, only items from the master menu that satisfy specified parameters will be included in the generated menu. The selection process could involve selection of master menu items based on tags or identifiers associated with the items or by checking every master menu item against a dictionary of items acceptable for inclusion in the modified menu. It should also be appreciated that the invention encompasses any combination of automatic and manual user selection of the items comprising the generated menu. For example, a user might specify criteria which would further control automatic selection or the user could manually select some items with automatic selection of others. The menu generation aspect of the invention is equally applicable to table-based, drive-thru, internet, telephone, wireless or other modes of customer order entry, as is the synchronous communications aspect of the invention.

The inventive concept encompasses the generation of a menu in any context known to those skilled in the art where an objective is to facilitate display of the menu so as to enable selection of items from that menu. The restaurant menu generation embodiment is but one example of a use for the inventive concept. Likewise, displaying menus generated in accordance with the invention on PDAs and Web pages to facilitate remote ordering are but a few examples of ways in which such a menu might be used in practice. Any display and transmission means known to those skilled in the art is equally usable with respect to menus generated in accordance with the claimed invention.

In the more general situation, menus can be generated in accordance with the present invention in a variety of situations. For example, the usable file structure for a particular data processing application can be dictated by the user or an application program prior to or during the execution of the application program. Efficiencies with respect to computational speed and equipment, e.g., storage and processor, usage can thus be achieved along with the facilitation of display of the generated menu.

While the best mode for carrying out the preferred embodiment of the invention has been illustrated and described in detail, those familiar with the art to which the invention relates will recognize various alternative designs and embodiments which fall within the spirit of practicing the invention. The appended claims are intended to cover all those changes and modifications falling within the true spirit and scope of the present invention.

That which is claimed is:

1. An information management and synchronous communications system for generating and transmitting menus comprising:

  a. a central processing unit,

  b. a data storage device connected to said central processing unit,

  c. an operating system including a graphical user interface,

16

  d. a first menu consisting of menu categories, said menu categories consisting of menu items, said first menu stored on said data storage device and displayable in a window of said graphical user interface in a hierarchical tree format,

  e. a modifier menu stored on said data storage device and displayable in a window of said graphical user interface,

  f. a sub-modifier menu stored on said data storage device and displayable in a window of said graphical user interface, and

  g. application software for generating a second menu from said first menu and transmitting said second menu to a wireless handheld computing device or Web page,

wherein the application software facilitates the generation of the second menu by allowing selection of categories and items from the first menu, addition of menu categories to the second menu, addition of menu items to the second menu and assignment of parameters to items in the second menu using the graphical user interface of said operating system, said parameters being selected from the modifier and sub-modifier menus, wherein said second menu is manually modified after generation.

2. The system of claim 1 wherein the modified second menu can be selectively printed on any printer directly from the graphical user interface of a hand-held device.

3. The system of claim 1 wherein the modified second menu can be linked to a specific customer at a specific table directly from the graphical user interface of a hand-held device.

4. An information management and synchronous communications system for generating menus comprising:

  a. a central processing unit,

  b. a data storage device connected to said central processing unit,

  c. an operating system including a graphical user interface,

  d. a first menu stored on said data storage device,

  e. application software for generating a second menu from said first menu,

wherein the application software facilitates the generation of the second menu by allowing selection of items from the first menu, addition of items to the second menu and assignment of parameters to items in the second menu using the graphical user interface of said operating system and wherein data comprising the second menu is synchronized between the data storage device connected to the central processing unit and at least one other computing device, wherein said second menu is manually modified by handwriting or voice recording after generation.

5. An information management and synchronous communications system for generating menus comprising:

  a. a microprocessor,

  b. a display device,

  c. a data and instruction input device,

  d. a data storage device for storing information and instructions entered through said data and instruction input means or information generated by said microprocessor,

  e. an operating system,

  f. a master menu stored on said data storage device for generating a modified menu, and

  g. application software,

US 6,982,733 B1

17

wherein said microprocessor, operating system and application software are operative to display the master menu on the display device in response to instructions programmed into said microprocessor, operating system, application software and information and instructions entered through said data input device, and wherein said microprocessor, operating system and application software are operative to create the modified menu from said master menu in response to information and instructions entered through said data and instruction input device and wherein data comprising the modified menu is synchronized between the data storage device and at least one other computing device, wherein said modified menu is manually modified after generation.

6. The information management and synchronous communications system of claim 1, 4, or 5 wherein the manual modification involves handwriting capture.

7. The system of claim 6 wherein the handwriting capture involves handwriting recognition and conversion to text.

8. The information management and synchronous communications system of claim 1, 4, or 5 wherein the manual modification involves voice capture.

9. The system of claim 8 wherein the voice capture involves voice recognition and conversion to text.

10. The system of claim 4 or 5 wherein the modified second menu can be selectively printed on any printer directly from the graphical user interface of said other computing device.

11. The system of claim 4 or 5 wherein the modified second menu can be linked to a specific customer at a specific table directly from the graphical user interface of said other computing device.

12. In a computer system having an input device, a storage device, a video display, an operating system including a graphical user interface and application software, an infor-

18

mation management and synchronous communications method comprising the steps of:

a. outputting at least one window on the video display;

b. outputting a fist menu in a window on the video display;

c. displaying a cursor on the video display;

d. selecting items from the first menu with the input device or the graphical user interface;

e. inserting the items selected from the first menu into a second menu, the second menu being output in a window;

f. optionally adding additional items not included in the first menu to the second menu using the input device or the graphical user interface;

g. storing the second menu on the storage device; and

synchronizing the data comprising the second menu between the storage device and at least one other data storage medium, wherein the other data storage medium is connected to or is part of a different computing device, and wherein said second menu is manually modified after generation.

13. The method of claim 12 wherein the manual modification involves handwriting capture.

14. The method of claim 13 wherein the handwriting capture involves handwriting recognition and conversion to text.

15. The method of claim 12 wherein the manual modification involves voice capture.

16. The method of claim 15 wherein the voice capture involves voice recognition and conversion to text.

*   *   *   *   *

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 4, 2015, I electronically filed the foregoing Appellants' Opening Brief with the Court's CM/ECF filing system, which constitutes service, pursuant to Fed. R. App. P. 25(c), Fed. Cir. R. 25(a), and the Court's Administrative Order Regarding Electronic Case Filing 6(A) (May 17, 2012).

*/s/ Stanley J. Panikowski*
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief contains 10,301 words, as calculated by the word count of the word processing system used in preparing it, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in Microsoft Word 2010 in Times New Roman 14 point font.

*/s/ Stanley J. Panikowski*
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700