2015-1703, 2015-1704

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

APPLE, INC., DOMINO'S PIZZA, INC., DOMINO'S PIZZA, LLC, FANDANGO, LLC, OPENTABLE, INC.,

Appellants

v.

AMERANTH, INC.,

Cross-Appellant

_____

Appeal from the United States Patent and Trademark Office, Before the Patent Trial and Appeal Board, Case No. CBM2014-00013

_____

## APPELLANTS' REPLY AND CROSS-APPEAL RESPONSE BRIEF

_____

Mark D. Fowler
James M. Heintz
Erin P. Gibson
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700

_Attorneys for Appellant
Apple Inc._

_Additional Parties and Counsel Listed
on Next Page_

Jonathan S. Franklin
Richard S. Zembek
Gilbert A. Greene
Norton Rose Fulbright US LLP
799 9th Street, N.W.
Washington, D.C. 20001
202.662.0466

*Attorneys for Appellants*
*Fandango, LLC and OpenTable, Inc.*

Frank A. Angileri
Thomas W. Cunningham
BROOKS KUSHMAN P.C.
1000 Town Center, 22nd Floor
Southfield, MI 48075
248.358.4400

*Attorneys for Appellants*
*Domino's Pizza, Inc. and Domino's Pizza,*
*LLC*

# CERTIFICATE OF INTEREST

*Apple Inc. et al. v. Ameranth, Inc.*, Nos. 2015-1703, 2015-1704

Counsel for Appellant Apple Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

Apple Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

DLA Piper LLP (US):  Mark D. Fowler, James M. Heintz, Erin P. Gibson, Robert C. Williams, Stanley J. Panikowski

Dated:  December 9, 2015              By: */s/ Stanley J. Panikowski*
                                                      Stanley J. Panikowski

## <u>CERTIFICATE OF INTEREST</u>

*Apple Inc. et al. v. Ameranth, Inc.*, Nos. 2015-1703, 2015-1704

Counsel for Appellants Fandango, LLC and OpenTable, Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

Fandango, LLC and OpenTable, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Fandango, LLC is owned (through intermediate entities) by Comcast Corporation, which is a publicly held company.  No other parent corporation or publicly held corporation owns 10% or more of Fandango's stock.

OpenTable, Inc. is owned by The Priceline Group Inc., which is a publicly held company.  No other parent corporation or publicly held corporation owns 10% or more of OpenTable's stock.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

Norton Rose Fulbright US LLP:  Jonathan Franklin, Richard Zembek, and Gilbert Greene


Dated:  December 9, 2015                     By: */s/ Jonathan S. Franklin*
                                                          Jonathan S. Franklin

# CERTIFICATE OF INTEREST

*Apple Inc. et al. v. Ameranth, Inc.*, Nos. 2015-1703, 2015-1704

Counsel for Appellants Domino's Pizza, Inc. and Domino's Pizza, LLC certifies the following:

1.     The full name of every party or amicus represented by me is:

Domino's Pizza, LLC and Domino's Pizza, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Domino's Pizza, LLC is a wholly owned subsidiary of Domino's Inc., which is a wholly-owned subsidiary of Domino's Pizza, Inc.  Domino's Pizza, Inc. is a publicly held corporation.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Brooks Kushman P.C.:  Frank A. Angileri, Thomas W. Cunningham, and Mark A. Jotanovic

Dated:  December 9, 2015          By: */s/ Frank A. Angileri*
_____
                                                    Frank A. Angileri

# TABLE OF CONTENTS

**Page**

I.      SUMMARY OF ARGUMENT ................................................................. 1

    A.      REPLY IN SUPPORT OF APPELLANTS' APPEAL ........................ 1

    B.      RESPONSE TO CROSS-APPEAL ...................................................... 3

II.     ARGUMENT:  REPLY IN SUPPORT OF APPELLANTS' APPEAL ........ 6

    A.      THE BOARD ERRED IN FAILING TO FIND CLAIMS 3, 6-9, 11, AND 13-16 OF THE '733 PATENT UNPATENTABLE UNDER 35 U.S.C. § 101. ................................................................. 6

        1.      Appellants Presented Argument and Evidence That the Additional Limitations of Claims 3, 6-9, 11, and 13-16 Are Conventional ..................................................................... 7

            a.      Appellants' Petition Presented Argument and Evidence That All Challenged Claims Are Merely Directed To Conventional Technology. .......................... 9

            b.      Appellants' Reply Presented Argument and Evidence That All Challenged Claims Are Merely Directed To Conventional Technology. ........................ 11

            c.      At the Oral Hearing, Appellants Presented Argument and Evidence That All Challenged Claims Are Merely Directed To Conventional Technology. ................................................................. 14

            d.      Appellants Did Not Waive Arguments That the Additional Limitations of Claims 3, 6-9, 11, and 13-16 Are Conventional. ............................................... 15

        2.      Claims 3, 6-9, 11, and 13-16 Are Not Patent-Eligible Under 35 U.S.C. § 101 ........................................................... 16

            a.      Ameranth Misstates the Standard of Review. ............... 16

            b.      Handwriting and Voice Capture Were Well-Known, Conventional Techniques That Are Insufficient to Confer Patent-Eligibility. ....................... 17

# TABLE OF CONTENTS
### (continued)

**Page**

      c.    Linking a Menu to a Customer Was a Well-Known, Conventional Concept That Is Insufficient to Confer Patent-Eligibility. ..........................................21

III.  ARGUMENT:  RESPONSE TO CROSS-APPEAL ....................................23

    A.    THE BOARD CORRECTLY FOUND THAT THE '733 PATENT IS NOT DIRECTED TO A TECHNOLOGICAL INVENTION. ...................................................................................23

        1.    The Technological Invention Inquiry Does Not Involve a Novelty and Non-Obviousness Determination Under Sections 102 and 103. ...............................................................25

        2.    The '733 Patent Is Not Directed to a Technological Invention. ...................................................................29

            a.    Synchronization ...........................................30

            b.    Displayability on non-standard devices........................31

            c.    The generation of hierarchical menus ...........................33

            d.    Manual modification......................................35

    B.    THE BOARD CORRECTLY DETERMINED THAT CLAIMS 1-2, 4-5, 10 AND 12 OF THE '733 PATENT ARE UNPATENTABLE UNDER 35 U.S.C. § 101...................................38

        1.    The Claims Are Directed to a Patent-Ineligible Abstract Idea.......................................................................39

        2.    The "Additional Elements" Identified by Ameranth Are Insufficient to Impart Patent Eligibility. ..................................43

            a.    Synchronous Communication Is A Conventional Computer Function That Is Insufficient to Impart Patent Eligibility.......................................44

            b.    The Display and Generation of Hierarchical Menus Is A Conventional Computer Function That Is Insufficient to Impart Patent Eligibility........................46

WEST\266751750.1

## TABLE OF CONTENTS
### (continued)

**Page**

c.    The Recited Central Processing Unit Is A Generic Computer Component That Is Insufficient to Impart Patent Eligibility. ...............................................50

d.    Displayability On "Non-PC Standard Devices" Is Not An "Additional Element" Sufficient to Impart Patent Eligibility. ...........................................................52

e.    Manual Modification of the Second Menu Is A Conventional Computer Function That Is Insufficient to Impart Patent Eligibility.........................53

f.    The Additional Limitations of Claims 2 and 10 Are Not Sufficient to Impart Patent Eligibility. ...................54

IV.    CONCLUSION.................................................................................56

# TABLE OF AUTHORITIES

**Page**

## CASES

*Accenture Global Service. GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013) ..........................................................18

*Alice Corp. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ...............................................................passim

*Amkor Tech., Inc. v. Intern. Trade Comm'n*,
  692 F.3d 1250 (Fed. Cir. 2012) ..........................................................16

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014) ..........................................................40

*Content Extraction and Transmission, LLC v. Wells Fargo Bank, Nat'l
  Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ..........................................................41

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) .....................................................41, 42

*D.M.I., Inc. v. Deere & Co.*,
  755 F.2d 1570 (Fed. Cir. 1985) ..........................................................47

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) .....................................................48, 49

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012) ............................................................9

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) .....................................................19, 53

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
  802 F.2d 1367 (Fed. Cir. 1986) .....................................................20, 28

*In re Bilski*,
  545 F.3d 943 (Fed. Cir. 2008) .............................................17, 38, 39, 40

# TABLE OF AUTHORITIES
(continued)

Page

*In re Cuozzo Speed Technologies, LLC*,
793 F.3d 1268 (Fed. Cir. 2015) .........................................................49

*In re Hiniker Co.*,
150 F.3d 1362 (Fed. Cir. 1998) .........................................................23

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) ...................................................17, 41

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) .............................................10, 41, 48

*Mayo Collaborative Services v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012) ......................................................................38

*Muniauction Inc. v. Thomson Corp.*,
532 F.3d 1318 (Fed. Cir. 2008) .........................................................29

*Nelson v. Adams USA, Inc.*,
529 U.S. 360 (2000).......................................................................7, 16

*OIP Techs. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) .........................................................17

*Parker v. Flook*,
437 U.S. 584 (1978)...........................................................................39

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ...................................................19, 54

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) ...........................................................41

*Versata Dev. Grp. v. SAP Am., Inc.*,
793 F.3d 1306 (Fed. Cir. 2015) ...................................................passim

- v -

# TABLE OF AUTHORITIES
(continued)

**Page**

**STATUTES**

35 U.S.C. § 101 ...................................................................................................passim

35 U.S.C. § 102 ...............................................................................................4, 25, 26

35 U.S.C. § 103 ...............................................................................................................4

35 U.S.C. § 112 .............................................................................................................19

AIA, Pub. L. 112-29, § 18(d)(1), 125 Stat. 284, 329-31 (2011)..............3, 23, 25, 37

AIA, Pub. L. 112-29, § 18 .....................................................................3, 4, 23, 24


**OTHER AUTHORITIES**

37 C.F.R. § 42.300(b) ...................................................................................................49

37 C.F.R. § 42.301(a)............................................................................................28, 29

37 C.F.R. § 42.301(b) ...................................................................................................25

77 Fed. Reg. 48,736 .............................................................................................28, 24

77 Fed. Reg. 48,763-64.................................................................................................26

77 Fed. Reg. 48,764 .....................................................................................26, 30, 37

MPEP § 2164.05(a)..............................................................................................20, 28

WEST\266751750.1

# I.    SUMMARY OF ARGUMENT

## A.    REPLY IN SUPPORT OF APPELLANTS' APPEAL

All of the claims of the '733 patent are unpatentable under § 101 for the same reason:  they recite an abstract concept implemented through conventional computer technology.  And the same evidence—the patent itself—makes that clear for all of the claims.  Thus, while the Board correctly determined that claims 1-2, 4-5, 10 and 12 are unpatentable under 35 U.S.C. § 101, the Board erred in failing to rule that the remaining claims, *i.e.*, claims 3, 6-9, 11, and 13-16, are unpatentable.

As established in Appellants' Opening Brief, the additional limitations recited in dependent claims 3, 6-9, 11, and 13-16 lack an "inventive concept" sufficient to impart patent eligibility to any of these claims.  Opening Br. at 30-45. For example, claims 6-9 and 13-16 recite additional limitations relating to handwriting and voice capture.  The specification provides no description of how the techniques would be implemented, thus demonstrating that these additional limitations were well-known and conventional rather than inventive.  Claims 3 and 11 simply require that the system link (or associate) a particular order with a particular customer, which is a well-known and conventional practice in the restaurant industry.  Because dependent claims 3, 6-9, 11, and 13-16 "simply append conventional steps" to the unpatentable systems and methods recited in the

independent claims, these dependent claims are likewise unpatentable under 35 U.S.C. § 101. *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2357 (2014).

Ameranth and the Director of the United States Patent and Trademark Office ("Director"), as intervenor, do not convincingly dispute the conventional nature of the limitations recited in claims 3, 6-9, 11, and 13-16. Instead, their arguments focus primarily on waiver. Ameranth and the Director contend that Appellants failed to present argument and evidence to the Board that the additional limitations of claim 3, 6-9, 11, and 13-16 were conventional, and that these arguments therefore should be deemed waived. To the contrary, Appellants consistently argued throughout the CBM proceeding that *all* of the challenged claims of the '733 patent are unpatentable under 35 U.S.C. § 101 because the specification fails to describe inventive techniques for implementing *any* of the limitations of *any* of the challenged claims.

Appellants argued in their petition, in their reply, and at the oral hearing that *all* claims of the '733 patent were drawn merely to conventional techniques that are insufficient to confer patent-eligibility under 35 U.S.C. § 101. Appellants supported their arguments by citing the single most authoritative evidence that the claimed subject matter was well-known in the art: the patent itself. Appellants also showed that admissions in the patent specification and the patent's lack of disclosure of non-conventional techniques to implement the purported invention

- 2 -

confirmed that *all* of the challenged claims of the '733 patent were directed merely to conventional technologies implemented by conventional hardware and software. Appellants further cited teachings in the prior art confirming the conventional nature of the claimed subject matter.

Thus, Appellants' arguments regarding the conventionality of the additional limitations recited in claims 3, 6-9, 11, and 13-16 were not "new" arguments. Appellants consistently argued throughout the CBM proceeding that *all* of the challenged claims of the '733 patent were drawn merely to conventional techniques that are insufficient to confer patent-eligibility under 35 U.S.C. § 101. Accordingly, these arguments were not waived and the Board's ruling that claims 3, 6-9, 11, and 13-16 of the '733 patent are patent-eligible under Section 101 should be reversed.

## B.    RESPONSE TO CROSS-APPEAL

Despite its attempts to conflate the issues, Ameranth has not shown any error in either the Board's Institution Decision or its Final Written Decision on claims 1, 2, 4-5, 10 and 12. In its Institution Decision, the Board correctly concluded that the '733 patent does not recite "a technological invention" and thus is subject to review under Section 18 of the America Invents Act ("AIA"). Contrary to Ameranth's assertions, the threshold inquiry as to whether a patent qualifies as a "technological invention" under Section 18(d)(1) of the AIA does not require a

- 3 -

full-blown novelty or non-obviousness determination under 35 U.S.C. §§ 102 or 103. The "technological invention" inquiry asks only whether there is any claim of the patent that, on its face, recites a non-conventional technological feature. Whether a patent claim might ultimately fail to satisfy the requirements of Sections 102 or 103 is immaterial to this inquiry. Instead, the novelty and non-obviousness component of the technological invention inquiry is akin to the search for an inventive concept under 35 U.S.C. § 101; it asks whether a purportedly technological feature is an inventive technical solution rather than one that simply employs generic or conventional technology. Thus, just as the recitation of well-known or conventional technology is insufficient to render claims patent-eligible under Section 101, it is also insufficient to render the claims a "technological invention" exempt from CBM review under Section 18 of the AIA.

Properly applying this standard, the Board correctly found that at least one claim of the '733 patent—claim 12—failed to recite any non-conventional technological feature and therefore that the patent was subject to review under Section 18 of the AIA. As the Board correctly found, the patent itself demonstrates that the allegedly "technological" features identified by Ameranth—synchronization, the display of menus on non-PC standard devices, the generation of hierarchical menus, and manual modification—merely involve known technologies. Thus, the Board correctly concluded that the features identified by

- 4 -

Ameranth are insufficient to render claim 12 of the '733 patent a "technological invention."

In its Final Written Decision, the Board correctly ruled that claims 1-2, 4-5, 10 and 12 of the '733 patent are patent-ineligible under 35 U.S.C. § 101. The claims purport to broadly cover the generic concept of generating a second menu from a first menu and sending the second menu to another location. Both the Supreme Court and this Court have consistently held that such generic concepts are patent-ineligible abstract ideas and that generic computer implementation fails to transform such abstract ideas into patent-eligible inventions. But even if, as Ameranth asserts, the claims go beyond the generic concept by requiring the conversion of data into a different format (which the claims do not), the outcome of the Section 101 analysis would remain the same. This Court has consistently held that claims reciting generic concepts relating to the manipulation of data are directed to patent-ineligible abstract ideas.

Nor did the Board preclude Ameranth from making its case by subsuming within the abstract idea the "additional elements" that Ameranth alleges render the claims patent-eligible. The Board expressly considered each of the "additional elements" identified by Ameranth as purportedly supplying an inventive concept and correctly found each of them insufficient to render the claims patent-eligible. Those elements include (1) synchronous communication, (2) a hierarchical menu

- 5 -

structure, (3) the central processing unit ("CPU"), (4) the display of menus on "non-PC standard devices," (5) manual modification, and (6) printing the modified second menu from a graphical user interface ("GUI").  The patent itself demonstrates that these elements, whether or not recited by the claims (some are not), amount to nothing more than the use of a conventional computer including conventional computer components performing conventional computer functions.  These types of elements cannot transform a patent-ineligible abstract idea into a patent-eligible invention.  Accordingly, the Board properly concluded that the claims convey nothing more meaningful than the abstract idea itself and are thus patent-ineligible under Section 101.

## II.  ARGUMENT:  REPLY IN SUPPORT OF APPELLANTS' APPEAL

### A.  THE BOARD ERRED IN FAILING TO FIND CLAIMS 3, 6-9, 11, AND 13-16 OF THE '733 PATENT UNPATENTABLE UNDER 35 U.S.C. § 101.

Although the Board correctly found that the independent claims of the '733 patent are patent-ineligible under Section 101, it erred in not applying the same reasoning to likewise find dependent claims 3, 6-9, 11, and 13-16 patent-ineligible.

Claims 6-9 and 13-16 depend from independent claims 1, 4, 5 and/or 12 and recite additional limitations that further define the manner in which the "manual modification" of the second menu is achieved.  A67 at 17:14-22, 18:23-31.  Claims 3 and 11 depend from independent claim 1, 4 or 5, and further recite that the

- 6 -

"modified second menu can be linked to a specific customer at a specific table directly from the graphical user interface" of a hand-held device (claim 3) or other computing device (claim 11).  A66 at 16:28-31; A67 at 17:27-30.  As shown in Appellants' Opening Brief, the additional limitations recited in each of these claims "simply append conventional steps, specified at a high level of generality" to the abstract idea recited in the independent claims, and hence fail to render the claims patent-eligible under Section 101.  *See* Opening Br. at 30-45.

Ameranth and the Director argue primarily that Appellants allegedly failed to present evidence and argument to the Board demonstrating that the additional limitations of claims 3, 6-9, 11, and 13-16 were conventional and such arguments were therefore waived.  Ameranth Br. at 60-62; Director Br. at 36-40.  This waiver argument lacks merit.

### 1. Appellants Presented Argument and Evidence That the Additional Limitations of Claims 3, 6-9, 11, and 13-16 Are Conventional.

"[I]n order to be preserved as potential grounds of decision [on appeal]," arguments must be presented in a lower proceeding in a manner sufficient to "fairly put [the Board] on notice as to the substance of the issue[s]."  *Nelson v. Adams USA, Inc.*, 529 U.S. 360, 469-70 (2000).  Appellants' arguments regarding the conventional nature of the additional limitations of claims 3, 6-9, 11, and 13-16 satisfy this standard.  Throughout the CBM proceeding, Appellants consistently

argued that the '733 patent itself demonstrates the conventional nature of the additional limitations recited by claims 3, 6-9, 11, and 13-16 because the specification fails to describe inventive techniques for implementing *any* of the limitations of *any* of the challenged claims.

Contrary to the Director's suggestion, Appellants' arguments and supporting evidence presented to the Board regarding the alleged patentability of claims 3, 6-9, 11, and 13-16 were not limited to "two sentences" in their reply brief.  Director Br. at 37.  Appellants argued in their petition, in their reply, and at the oral hearing that *all* of the challenged claims of the '733 patent recited merely conventional techniques that are insufficient to confer patent-eligibility under 35 U.S.C. § 101. Appellants argued that admissions in the patent specification, and the patent's lack of disclosure of non-conventional techniques to implement the challenged claims, showed that *all* of the challenged claims were merely directed to conventional technologies implemented using conventional hardware and software.  To support these arguments, Appellants cited the single most authoritative evidence that the additional limitations recited by these claims were well-known in the art at the time of the '733 patent:  the patent itself.  Appellants further cited teachings in the prior art that confirmed that the claimed manual modification techniques recited in all of challenged claims were conventional.

### a. Appellants' Petition Presented Argument and Evidence That All Challenged Claims Are Merely Directed To Conventional Technology.

Appellants argued in their petition that all of the claims of the '733 patent were directed to systems using well-known conventional computer hardware and software:

> In claiming "an information management and synchronous communications system for generating and transmitting menus," the claims are directed to nothing more than a general purpose computer using general purpose programming.

A132-33. To support this argument, Appellants cited to portions of the specification stating that the claimed system employs "typical" computer equipment, such as a computer workstation, operating system, modem, display screen, keyboard, mouse, and optional removable storage devices (*e.g.*, floppy drive or CD ROM drive) and "commonly known" general purpose programming steps. *Id.* (citing A61 at 6:48-73; A64 at 12:65-65).

Appellants further emphasized that all of the claims of the '733 patent were merely directed at conventional software technology, implemented using commonly known software programming techniques.

> Although the Challenged Claims recite a computerized system for efficient generation of menus, the claims fail to specify how the computer is "specifically programmed to perform the steps claimed in the patent."

A135 (quoting *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012)). Again, Appellants relied on evidence from the '733 patent itself, which states that

- 9 -

the general purpose programming steps are so "commonly known" that the disclosure of "programming details [is] not necessary." A135 (citing A64 at 12:62-65).

In the Opening Brief, Appellants cited copious authority from this Court and the Supreme Court holding that in a Section 101 inquiry, the conventionality of a claimed inventive concept can be—and typically is—shown by reference to the patent itself rather than any extrinsic evidence. *See* Opening Br. 32-34 & n.1. For example, in *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015), the Court held on a motion to dismiss, without requiring any extrinsic evidence, that a patent did not pass muster under Section 101 because the purportedly inventive concept (maintaining the state of a web page) "is not described [in the patent], although this is stated to be the essential innovation."

Notably, neither Ameranth nor the Director even addresses—much less refutes—any of this cited authority, which amply demonstrates the Board's error in upholding dependent claims 3, 6-9, 11, and 13-16. Just as in *Internet Patents*, the lack of any description in the specification regarding the additional elements of these claims proves that these elements merely involve well-known and conventional technology or processes. Nowhere in the patent did Ameranth even purport to have invented the concepts of handwriting capture or recognition, voice capture or recognition, or linking an order with a customer. Yet the Board held

- 10 -

that these elements were inventive concepts sufficient to satisfy Section 101.

Under this Court's and the Supreme Court's precedents, that decision was error.

> **b.    Appellants' Reply Presented Argument and Evidence That All Challenged Claims Are Merely Directed To Conventional Technology.**

In their reply brief below, Appellants again emphasized that all challenged

claims of the '733 patent lack an "inventive concept," because the claims recite no

inventive techniques for implementing any of the limitations of any of the

challenged claims:

> Claims 1-16 lack an "inventive concept" because they merely broadly recite the abstract idea of menu generation and nothing more. [Ameranth] incorrectly contends that the claims include meaningful limitations that the Board overlooked, but [Ameranth] relies primarily on limitations that are irrelevant to patent eligibility because they are not in the claims at all.

A1613.

Appellants also again relied on evidence from the '733 patent itself, which

describes the use of conventional hardware and software to implement the claimed

system.  For example, Appellants quoted a passage from the Board's Institution

Decision, noting that the Board properly recognized that the specification describes

the use of "typical" hardware and "commonly known" software:

> ***The specification*** describes the hardware used in the preferred embodiment as "***typical***" and the software as something that could be written in any commonly used computer language" with programming steps that are "***commonly known***."

- 11 -

A1617 (quoting A1416 (citing A61-62 at 6:47-7:3; A64 at 12:61-65)) (emphasis in

original reply).

Similarly, Appellants demonstrated that Ameranth was incorrect in its

contention that the claims were directed to software whose "programming is not

trivial," again relying on evidence from the '733 patent itself:

> Furthermore, [Ameranth's] argument that "such programming is not
> trivial" (POR at 10) is belied by the specification, which expressly
> states: "[t]he software applications for performing the functions
> falling within the described invention can be written in any *commonly
> used* computer language.  The discrete programming steps are
> *commonly known* and thus programming details are not necessary . . .
> ."  The specification does not disclose any algorithm, flowchart, or
> diagram identifying special programming steps.

A1617 (quoting A64 at 12:60-65) (internal citations omitted, emphasis in original

reply).

As explained in Appellants' Opening Brief and above, it is not necessary to

introduce extrinsic evidence to show the conventionality of a claimed inventive

concept, where the patent itself demonstrates that fact.  But in any event,

Appellants also cited to a prior art patent (U.S. Patent No. 4,972,496, the "'496

patent") that specifically shows that techniques for manual modification, such as

handwriting capture, were well-known, conventional techniques:

> Technology for "manually modifying"/editing on a handheld
> computer was old and well-known in the art at the time of the '733
> patent.

- 12 -

A1615-16 (citing A1698 at Figs. 1-2, A1703-04 at Figs. 11A-E, A1706-09 at Figs.

and 12A-G, and accompanying text).  Contrary to Ameranth's contention,

Appellants' reference to the '496 patent was not simply a "string cite" "without

specifically explaining what [it is] being relied on for."  Ameranth Br. at 63.

Rather, Appellants explained that "[t]echnology for 'manually modifying'/editing

on a handheld computer was old and well-known in the art at the time of the '733

patent," and cited to specific figures and accompanying text in the '496 patent

demonstrating these techniques.  A1615-16 (citing A1698 at Figs. 1-2, A1703-04

at Figs. 11A-E, A1706-09 at Figs. and 12A-G, and accompanying text).  Indeed, as

the Director recognizes in its brief, the Board in multiple instances cited this

passage from Appellants' reply brief "to support its conclusion that 'manual

modification' of a document is a conventional activity."  Director Br. at 33; *see

also id.* at 32 (citing A29, A33, A36 and A39).

Despite recognizing that Appellants cited the '496 patent as evidence that

"manual modification" was well known at the time of the '733 patent (Director Br.

at 32-33), the Director nonetheless contends that this evidence fails to establish the

conventionality of the particular types of manual modification recited in dependent

claims 6-9 and 13-16, because "[t]his patent was cited … only with respect to the

independent claims."  Director Br. at 41.  Contrary to the Director's assertion,

however, Appellants cited the '496 patent in a section of the reply entitled "The

Claims Do Not Include an Inventive Concept." A1613; A1615-16. The first two

sentences of this section make clear that it was directed to *all* of the challenged

claims, stating both that "*[c]laims 1-16* lack an 'inventive concept'" and the claims

lack any "meaningful limitations" sufficient to impart patent eligibility. A1613

(emphasis added). Additionally, Appellants' cited to specific figures of the '496

patent, including Figures 11A-E and 12A-G, which clearly depict manual

modification via handwriting capture, *i.e.*, the "particular kind of manual

modification" recited in several of the dependent claims at issue in this appeal.

A1615-16. Thus, Appellants' arguments with respect to the '496 patent were

applicable to *all* of the challenged claims.

> c.    **At the Oral Hearing, Appellants Presented Argument and Evidence That All Challenged Claims Are Merely Directed To Conventional Technology.**

Again at the oral hearing, Appellants argued that all of the challenged claims

are merely directed at conventional technologies because the specification fails to

disclose any non-conventional methods for implementing the limitations recited in

the any of the claims. This argument included specific reference to the additional

limitations of dependent claims 6-9 and 13-16 relating to handwriting and voice

capture:

> Then you heard some argument about the dependent claims and how
> the dependent claims add certain elements to the invention that imbue
> it with 101 patent eligibility. We saw dependent claims that refer to
> things like selectively printing, handwriting capture, voice capture. *I*

- 14 -

*think clearly Patent Owner is -- I certainly haven't heard them argue in their briefs and I don't see anywhere in the patent where they're alleging to have invented printing something or a new way of printing something or voice capture or handwriting recognition.*

I think all of these fall under what the Supreme Court would call token post solution activity, and grafting such token post solution activity onto a claim certainly doesn't make it patent eligible under 101.

A1971 (emphasis added).

> ### d.    Appellants Did Not Waive Arguments That the Additional Limitations of Claims 3, 6-9, 11, and 13-16 Are Conventional.

As established above, Appellants consistently presented argument and evidence to the Board throughout the CBM proceeding that all of the challenged claims, including claims 3, 6-9, 11, and 13-16, merely recite conventional techniques insufficient to confer patent eligibility.  Contrary to the Director's assertion, these arguments and evidence were not hidden "truffles" for which the Board had to hunt through the record.  Director Br. at 40.  While Appellants' Opening Brief to this Court presented these arguments with additional detail specifically directed to the additional limitations of claims 3, 6-9, 11, and 13-16, Appellants' arguments regarding the admissions in the patent specification, the patent's lack of disclosure of any non-conventional technology for implementing the claimed subject matter, and prior art teachings demonstrating the conventionality of the claimed manual modification were not "new" arguments, as the Director incorrectly suggests.  Director Br. at 39.

- 15 -

Rather, the Board was "fairly put on notice" of Appellants' position that none of the claims recited any non-conventional technology sufficient to confer patent eligibility under Section 101, and thus these arguments were not waived. *Nelson*, 529 U.S. at 369-70 (explaining that the general rule of issue preservation "does not demand the incantation of particular words" but simply requires that the lower tribunal "be fairly put on notice as to the substance of the issue"); *Amkor Tech., Inc. v. Intern. Trade Comm'n*, 692 F.3d 1250 (Fed. Cir. 2012) (declining to find waiver of obviousness argument where "the record … reveals that the obviousness issues were raised, albeit briefly").

### 2.    Claims 3, 6-9, 11, and 13-16 Are Not Patent-Eligible Under 35 U.S.C. § 101

For the reasons set forth in Appellants' Opening Brief and below, the additional limitations of claims 3, 6-9, 11, and 13-16 merely recite conventional techniques, insufficient to confer patent-eligibility.  *See* Opening Br. at 30-45.

### a.    Ameranth Misstates the Standard of Review.

Ameranth wrongly characterizes as a "factual determination" the Board's statement that it was "persuaded by PO's argument" that the particular types of manual modifications recited in claims 6-9 and 13-16 conferred patent-eligibility on these claims.  Ameranth Br. at 62 (quoting A0042-43).  Whether additional claim limitations are sufficient to transform an abstract idea into patent-eligible subject matter under 35 U.S.C. § 101 is a not a factual determination.  Rather, it is

well-established that "patent eligibility under § 101 is an issue of law reviewed de novo" on appeal. *OIP Techs. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) ("Patent eligibility under 35 U.S.C. § 101 is an issue of law we review de novo."); *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008) ("Whether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law that we review de novo."). Ameranth's improper attempt to convert legal rulings into factual findings should be rejected.

> **b.     Handwriting and Voice Capture Were Well-Known, Conventional Techniques That Are Insufficient to Confer Patent-Eligibility.**

As established in Appellants' Opening Brief, the specification of the '733 patent confirms that technology for handwriting/voice recognition and capture was well-known in the art at the time of the patent, and implemented using conventional technologies. Opening Br. at 34-40. Nowhere in the patent is there any indication that the patentee even purports to have invented the concepts of handwriting or voice capture. And none of the dependent claims at issue recites any hardware or software implementation for the claimed handwriting or voice capture, much less an inventive one. Nor is there any teaching in the specification of how handwriting or voice capture would be implemented. *Id.*

Ameranth does not claim to have invented any novel handwriting or voice

recognition or capture technology.  Ameranth Br. at 66-68.  Nor does Ameranth

dispute that handwriting/voice recognition and capture technology were known at

the time of the '733 patent.  *Id.*  Instead, Ameranth contends that its claims are not

limited to "***simple*** handwriting or voice recognition," but rather also require

"coupling" computer inputs generated by handwriting and voice recognition or

capture with the claimed second menu.  Ameranth Br. at 67 (emphasis added).  In

support of its argument, Ameranth cites to the specification and portions of

Appellants' brief referencing embodiments described in the specification.  *Id.* at

67-68.  But the Section 101 inquiry focuses on the language of the claims

themselves, not the specification or extrinsic evidence.  *See*, *e.g.*, *Accenture Global*

*Service. GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013)

(holding that "the important inquiry for a § 101 analysis is to look to the claim[s]"

and that "the complexity of the implementing software or the level of detail in the

specification does not transform a claim reciting only an abstract concept into a

patent-eligible system or method").  Notably absent from Ameranth's argument is

any discussion of the actual language of the challenged claims.

The claims do not recite any limitations requiring that computer inputs

generated by handwriting or voice recognition be "coupled" with the claimed

second menu.  Claims 6-9 and 13-16 simply require that the "manual modification

involves [handwriting/voice] capture" and that the "[handwriting/voice] capture involves [handwriting/voice] recognition and conversion to text." A67 at 17:14-22, 18:23-13. Ameranth cannot read limitations into the claims to try to save them under Section 101. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1218 (Fed. Cir. 2014) ("Although the claims must be read in light of the specification, it is important that we "avoid importing limitations from the specification into the claims.") (quoting *Phillips v. AWH Corp.,* 415 F.3d 1303, 1323 (Fed. Cir. 2005)).

Likewise, the Director does not dispute that the specification fails to disclose any non-conventional hardware or software implementation for handwriting or voice capture or recognition. Director Br. at 40-41. Instead, the Director argues that this lack of description could instead be indicative of lack of enabling disclosure under 35 U.S.C. § 112. *Id.*

All parties agree that compliance (or lack thereof) with Section 112 is not an issue on appeal. The issue is what significance the lack of disclosure of technology for implementing the types of manual modification recited in claims 6-9 and 13-16 has for the Section 101 inquiry. Unlike "machines for time travel" or a "process for transforming lead into gold," handwriting and voice capture technologies existed and were widespread at the time of the '733 patent. *See* Director Br. at 41. Indeed, they were so conventional that the patent had no need to even describe them. As the Director acknowledges, the Board recognized that manual

- 19 -

modification via handwriting capture or recognition on a handheld computer was well-known. *Id.* at 32. Moreover, as discussed above, the '496 patent further confirms that technologies for manual modification, including handwriting recognition on a handheld computer, were well known at the time of the '733 patent. *See supra* at 12-13. Thus, the lack of an enabling disclosure of handwriting or voice recognition or capture in the '733 patent demonstrates that these techniques were well-known and conventional. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986) (a patent specification "need not teach, and preferably omits, what is well known in the art"); *see also* MPEP § 2164.05(a).

As established in Appellants' Opening Brief, simply appending conventional steps specified at a high level of generality, such as the use of conventional handwriting/voice recognition and capture techniques, is not sufficient to transform a patent-ineligible abstract idea into patent-eligible subject matter. Opening Br. at 16-18. Given the well-known and conventional nature of these elements—as shown by the patent itself—the additional limitations recited in dependent claims 6-9 and 13-16 fail to disclose an inventive concept sufficient to confer patent eligibility. Accordingly, the Board erred in failing to find those claims patent-ineligible under 35 U.S.C. § 101.

- 20 -

     **c.**       **Linking a Menu to a Customer Was a Well-Known, Conventional Concept That Is Insufficient to Confer Patent-Eligibility.**

As established in Appellants' Opening Brief, the concept of linking a menu reflecting a customer's order to the customer who placed the order has been a well-known, conventional practice in the restaurant industry for decades. Opening Br. at 42-44. Neither Ameranth nor the Director disputes that associating (or linking) an order with a customer at a table was a common practice in the restaurant industry. Instead, Ameranth and the Director fault Appellants for not citing to the '496 patent as evidence of the conventionality of linking. Ameranth Br. at 64; Director Br. at 41. However, for purposes of the Section 101 analysis, there was no need to present extrinsic evidence to demonstrate the conventionality of a concept that the patentee did not even purport to invent. *See supra* at 10. At nearly any restaurant, each person at the table typically receives the food that they ordered. Waiters must have some method (*e.g.*, in their memory or on a pad of paper) for associating (*i.e.*, linking) an order to each customer at a table. *See also* Opening Br. at 42-44. Nowhere in the patent did Ameranth even purport to have invented that basic concept.

In any event, although not necessary to demonstrate that linking an order to a customer at a table was a well-known and conventional concept, the '496 patent does provide further evidence of this fact. Just as a waiter would associate (or

link) an order with a particular customer in a particular chair at a particular table, the '496 patent teaches linking a medical record to a particular patient in a particular bed in a particular room.  Opening Br. at 42-44 (showing A1707 at Fig. 12 C).  There is nothing novel or inventive about the concept of linking a record to a particular user.

Moreover, Ameranth's attempt to distinguish the teachings of the '496 patent is meritless.  Ameranth Br. at 66, 70-71.  Ameranth asserts that a hospital bed is not a table and that there are never multiple patients in a single bed.  *Id.* at 66.  However, the '496 patent discloses a patient information form that includes entries for both a bed and a room.  '496 patent at Fig. 12c.  The analogy between a hospital room with multiple beds and a restaurant table with multiple chairs is evident from a simple comparison of figures from the '496 patent and '733 patent, which are reproduced below.



*Fig. 12C*



FIG.7

A1707 at Fig. 12C; A56 at Fig. 7 (reproduced in Ameranth Br. at 70 as an

illustration of the claimed linking). Indeed, neither Ameranth nor the Director

disputes that simply entering the patient's bed and room number on the form is

sufficient to link the patient's information to the specific room and bed.

As established in Appellants' Opening Brief, simply appending conventional

steps specified at a high level of generality, such as linking a menu to a customer

and displaying and modifying a menu in a GUI of a handheld device, is not enough

to transform a patent-ineligible abstract idea into patent-eligible subject matter.

Opening Br. at 16-18. Given the well-known and conventional nature of these

elements—as shown by the patent itself—the additional limitations recited in

dependent claims 3 and 11 fail to disclose an inventive concept sufficient to confer

patent eligibility. Accordingly, the Board erred in failing to rule that those claims

are patent-ineligible under 35 U.S.C. § 101.

## III.    ARGUMENT:  RESPONSE TO CROSS-APPEAL

### A.    THE BOARD CORRECTLY FOUND THAT THE '733 PATENT IS NOT DIRECTED TO A TECHNOLOGICAL INVENTION.

Under section 18 of the AIA, patents for "technological inventions" are

excluded from the definition of CBM patents, and thus are excluded from the

category of patents subject to covered business method review. [1]  AIA, Pub. L.

---

[1] The Director argues that the Court lacks jurisdiction under *In re Hiniker Co.*, 150 F.3d 1362 (Fed. Cir. 1998), to review the "technological invention" finding

112-29, § 18(d)(1), 125 Stat. 284, 329-31 (2011).  Here, the Board correctly concluded that the '733 patent does not recite "a technological invention" and thus is subject to review under Section 18 of the AIA.  A1404.

The Board has stated—and Ameranth does not contest—that it analyzes the content of the claims to determine whether the claims recite a novel technological feature, and "[a] patent need have only one claim directed to a covered business method to be eligible for review."  A1402, A1398; *see also* 77 Fed. Reg. 48,734, 48,736 (Aug. 14, 2012) ("A patent having one or more claims directed to a covered business method is a covered business method patent for purposes of the review, even if the patent includes additional claims.").  Applying this analysis, the Board concluded that at least claim 12 of the '733 patent meets the definition of a covered business method because, to the extent the claims contain any technological features, they are neither new nor non-obvious.  A1400-01, A1403.  The Board's conclusion was based on the fact that the specification makes clear that software for implementing the purported invention involved "commonly known"

---

because that threshold determination was effectively superseded by the Board's final decision.  *See* Director Br. at 14-15.  As the Director notes, however, it is ultimately immaterial to the proper outcome of this appeal whether the Court has jurisdiction to review the finding of no technological invention because that threshold inquiry is essentially the same as the second step of the Section 101 inquiry.  *Id*. at 15-19; *see also infra* at 10.  Thus, affirmance of the Board's determination that the '733 patent fails to satisfy Section 101 because it recites no inventive technology necessarily means that it also does not involve a technological invention under Section 18 of the AIA.

- 24 -

programming steps and fails to disclose any "inventive device for manually

modifying menus." A1403-04 (quoting A64 at 11:54-56, 12:61-65; A61 at 6:47-

52). That decision was correct.

> ### 1. The Technological Invention Inquiry Does Not Involve a Novelty and Non-Obviousness Determination Under Sections 102 and 103.

Ameranth contends that the Board erred by not considering Ameranth's

"objective evidence of non-obviousness" in conjunction with the "technological

invention" inquiry. Ameranth Br. at 21. But Ameranth's focus on non-

obviousness is misplaced. The threshold inquiry as to whether a patent qualifies as

a covered business method under Section 18(d)(1) of the AIA, and therefore is

subject to review within a CBM review proceeding, does not involve a full-blown

novelty or non-obviousness analysis under 35 U.S.C. §§ 102 or 103. Such an

analysis would be a question for the merits in cases where (unlike here)

proceedings are instituted on those grounds. *See Versata Dev. Grp. v. SAP Am.,

Inc.*, 793 F.3d 1306, 1326-1327 (Fed. Cir. 2015) (holding that, in reviewing the

"technological invention" issue, there is "little cause" to consider novelty and non-

obviousness, which "will be one of the ultimate questions if review is granted" on

those grounds). The "technological invention" inquiry is far narrower; it asks only

whether any claim of the patent, on its face, fails to recite a non-conventional

*technological* feature. *See* 37 C.F.R. § 42.301(b) (defining a "technological

- 25 -

invention as one in which "the claimed subject matter as a whole recites a technological feature that is novel and unobvious over the prior art; and solves a technical problem using a technical solution").  It is immaterial to this inquiry whether a patent claim—including its non-technological features—might fail to satisfy the requirements of Sections 102 and/or 103 on the merits.

The claimed technological feature, moreover, must be inventive rather than merely conventional or generic.  As this Court has recognized, the PTO has identified "certain characteristics which, if present, [weigh against] a finding that the invention [is a] technological invention." *Versata*, 793 F.3d at 1326; *see also* Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,763-64 (Aug. 14, 2012).  Those characteristics include: "(1) mere 'recitation of known technologies'; (2) 'reciting the use of known prior art technology'; and (3) 'combining prior art structures to achieve the normal, expected, or predictable result of that combination.'" *Versata*, 793 F.3d at 1326 (quoting 77 Fed. Reg. 48,764).

In this regard, the Court's recent decision in *Versata* is instructive.  In *Versata*, the Court concluded that the alleged technological feature—a "hierarchical data structure" implemented on a computer—was insufficient to preclude CBM review.  793 F.3d at 1327.  As the Court explained, "even if the invention required the use of a computer, the claim did not constitute a technological invention" because the use of "a general purpose computer to

- 26 -

facilitate operations through uninventive steps does not change the fundamental character of an invention" and because the asserted feature "is not a technical solution but more akin to creating organizational management charts." *Versata*, 793 F.3d at 1327 (citing *Alice*, 134 S. Ct. 2347). The novelty and non-obviousness component of the technological invention inquiry is thus akin to the search for an inventive concept under Section 101; it asks whether a purportedly technological feature is an inventive technical solution rather than one that simply employs conventional technology. *Cf. Alice*, 134 S. Ct. at 2359 (holding that recitation of "well-understood," "routine," or "conventional" features cannot transform abstract ideas into patent-eligible claims).

Here, the Board correctly concluded that the features identified by Ameranth are insufficient to render claim 12 of the '733 patent a "technological invention" because those features are nothing more than the recitation of known technologies. A1403-04. To support these findings, the Board relied on evidence from the patent itself, which demonstrates that the features identified by Ameranth were well-known at the time. *See infra* at 30-36. The patent's failure to describe any non-prior art means for implementing the claims further confirms the Board's findings. *See* Director Br. at 30 ("The '733 patent's failure to describe any non-prior art means for [implementing the claims] also supports the Board's conclusion that [the claims recite] routine computer operations."). As already noted, a patent

- 27 -

specification "need not teach, and preferably omits, what is well known in the art." *Hybritech*, 802 F.2d at 1384; *see also* MPEP § 2164.05(a). Thus, to the extent the patent leaves the implementation of any claim elements unelucidated, it makes clear that they are to be implemented through pre-existing, conventional technology.

Ameranth now faults the Board for not also addressing its purported "objective evidence of non-obviousness." Ameranth Br. at 21 (citing A1474-77). But Ameranth's criticism is misplaced. This evidence fails to identify a technological feature involving anything other than the recitation of well-known and conventional technology. *See* A1474-77. And the Board's inquiry properly focused on claimed subject matter itself. A1402-04; 77 Fed. Reg. 48,736 ("Consistent with the AIA, the definition set forth in § 42.301(a), as adopted in this final rule, is based on what the patent *claims*.") (emphasis added). But even if the Board were required to engage in an obviousness determination in deciding this threshold issue (it is not), the proffered material consists only of general, non-specific statements lacking any demonstrated nexus to any patent claim. *See* A1474-77. As an example, one of the proffered press releases describes a license agreement, and states that the license "was very important" to the licensee, which "provide[s] most of the restaurant industry's top brands with web, mobile, and call center remote ordering technology." A1048. Like much of the other material

- 28 -

proffered by Ameranth, however, this press release merely states the importance of the license to the licensee with a general reference to "remote ordering technology." *Id.* It does not, in any way, link the importance of the licensee to any patented feature. Without the requisite nexus, such statements could not establish non-obviousness. *See, e.g., Muniauction Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327-28 (Fed. Cir. 2008).

### 2. The '733 Patent Is Not Directed to a Technological Invention.

Ameranth's attempts to recharacterize the purported invention to avoid CBM review are misplaced. Ameranth asserts that the claims of the '733 patent are directed to "solving the problem of how to display and synchronize computerized multi-level menus on non-standard device interfaces," and that the claims require functionality to enable "manual modification" of a computerized menu. Ameranth Br. at 23. Ameranth further argues that, in determining that the '733 patent is not directed to a technological invention, the Board failed to consider these allegedly "technological features." *Id.* at 24-25.

But just as in *Versata*, the features identified by Ameranth involve known technologies combined to achieve the normal, expected, or predictable result of that combination. S*ee Versata* 793 F.3d at 1326-27; *see also* A1402-04 (concluding that, to the extent any features recited by the claims are "technological," they are merely the "recitation of known technologies"). Both

- 29 -

this Court and the PTO have made clear that the recitation of known technologies is insufficient to render the claims a "technological invention." *Versata*, 793 F.3d at 1326; *see also* 77 Fed. Reg. 48,764. Thus, the Board correctly determined that the '733 patent does not recite a technological invention.

### a.    Synchronization

Each of Ameranth's attempts to identify a "technological invention" fails. Ameranth first contends that the claims of the '733 patent require "functionality for 'synchronizing' a newly generated menu." Ameranth Br. at 24-25. Ameranth argues that the Board "fail[ed] to give effect to the 'synchronous communication' limitation of the preamble" and thus erred in determining that the patents are not directed to a technological invention. *Id.*

It is immaterial whether the preamble is limiting, however, because the Board expressly considered whether the synchronization recited by claim 12 renders the claim a technological invention. A1404 ("claim 12's computer system synchronizes data with a data storage medium"). The Board determined that the claimed synchronization fails to render the claims a technological invention because synchronization is not "a technological feature that is novel and unobvious over the prior art." *Id.*

The Board's conclusion is correct because "synchronous communication" is nothing more than the recitation of a routine and well-known technology. The

- 30 -

patent itself demonstrates that synchronization was a known technology.  For

example, the specification states that existing operating systems, such as

Windows® CE, included "built in synchronization between handheld devices,

internet and desktop infrastructure."  A64 at 12:15-20.  At the oral hearing,

Ameranth explained that the synchronization described in the patent requires

nothing more than simply downloading.  A1922 at ll. 9-16.  Specifically, Ameranth

stated that "downloading [a] menu" from one device to another device "is

synchronizing the data between those two devices."  *Id.*  The patent does not—and

cannot—assert that the concept of downloading was anything other than a

conventional or generic computer function at the time of the '733 patent.

### b.    Displayability on non-standard devices

Despite Ameranth's contrary assertion (*see* Ameranth Br. at 23), the

challenged claims do not include limitations relating to the display of menus on

non-PC standard devices.  For example, claim 12 recites a "computer system

having … a video display [and] an operating system including a graphical user

interface," "outputting at least one window on the video display," "outputting a

first menu in a window," and "selecting items from the first menu with the input

device or graphical user interface."  A67 at 17:31-18:22.  Claim 12 further recites a

"second menu" which is also "output in a window."  *Id.*  While claim 12 also

recites "synchronizing" the second menu with "at least one data storage medium"

(*id*.), the claim does not "recite displaying the menu on a display associated with this storage medium." A1404. Thus, claim 12 merely requires the display of menus in a window of a video display.

Ameranth does not contest that displaying a menu in a window on a video display simply involves the application of well-known, conventional, or generic technology. Indeed, the patent itself demonstrates that displaying a menu in a window of a graphical user interface ("GUI") on a video display—even on a non-PC standard device—was well-known at the time of the '733 patent. For example, the patent explains that "as is conventional, [a] GUI is configured to present a graphical display on the display screen," and "[t]he use of menus is conventional in GUIs." A62 at 7:5-6; A61 at 6:31-32. The patent further states that "[m]ost personal computers today run under an operating system that provides [GUI] for accessing user applications . . . [t]hrough an interface of windows, pull-down menus, and toolbars." A61 at 6:6-10; s*ee also id.* at 6:32-34 ("Menus are typically utilized to provide end users of applications with available choices or processing options while using the applications."). The patent also explains that "common GUI operating systems" include both PC-standard operating systems, such as Microsoft Windows® for personal computers, and non-PC standard operating systems, such as Windows® CE for wireless handheld devices. *Id.* at 6:20-24.

- 32 -

Because the "[m]ere recitation of known technologies," such as the display

of a menu in a window on a computer system display, "do[es] not render a patent a

technological invention" (*see* A1402; *see also Versata*, 793 F.3d at 1326), the

Board correctly concluded that claim 12 is not directed to a technological

invention.  A1404.

### c.    The generation of hierarchical menus

Despite Ameranth's contrary assertion (*see* Ameranth Br. at 24), claim 12 of

the '733 patent includes no limitation requiring the generation of a hierarchically

structured menu.  A67 at 17:31-18:22.  Indeed, unlike claim 1, claim 12 does not

require that any menus even be "displayable in a hierarchical tree format."

*Compare* A66 at 16:1-5 *with* A67 at 17:31-18:22.  Regardless, the generation of

hierarchical menus was also a known, conventional, and generic computer function

that is insufficient to render the patent a "technological invention."

In *Versata*, this Court concluded that merely reciting a computer was

insufficient to render a patent a technological invention where the claims can be

implemented using a conventional computer without specialized hardware or

software.  *Versata*, 793 F.3d at 1327.  The claims at issue in that case recited "[a]

method for determining a price of a product" by creating hierarchical groups of

both customers and products and associating pricing information with the groups.

*Id.* at 1311-13.  The Court concluded that, "even if the [claims] required the use of

- 33 -

a computer," the claims did not constitute a technological invention because the

pricing determination recited by the claims "could be achieved in any type of

computer system or programming or processing environment" without "specific,

unconventional software, computer equipment, tools or processing capabilities."

*Id.* at 1327 (internal quotation marks omitted).

Like the claims at issue in *Versata*, the menu generation claimed in the '733

patent can be achieved by any type of conventional or generic computer system,

without specialized software or hardware.  In this regard, the patent states that the

display and generation of hierarchical menus is "*conventional* in GUIs for software

applications."  A61 at 6:31-32 (emphasis added).  The patent explains that a

"typical" menu system for a software application includes "cascading sets of

menus which are displayable in context to show the parent/child relationships

between options of the context menu."  *Id.* at 6:34-46.  The patent also explains

that a conventional GUI, such as Microsoft Windows® and Windows® CE, can be

used to generate a hierarchical menu.  *Id.* at 6:13-24 (explaining that entries within

a hierarchical menu "can be created, deleted, modified, and arranged" using a GUI

such as Microsoft Windows® and Windows® CE).  Further, the patent equates the

claimed menus to known technology, stating that the menus are "similar to the

Windows® File Explorer in the way the items are organized hierarchically."  A62

at 8:1-4.

The patent also explains that the hardware and software components recited by the claims are "typical." In this regard, the patent states:

> The preferred embodiment of the present invention uses *typical hardware elements in the form of a computer workstation, operating system and application software elements* which configure the hardware elements for operation in accordance with the present invention. *A typical workstation platform includes hardware such as a central processing unit ("CPU"), e.g., a Pentium® microprocessor,* RAM, ROM, *hard drive storage* in which are stored various system and application programs and data used within the workstation, modem, *display screen, keyboard, mouse* and optional removable storage devices such as floppy drive or a CD ROM drive. The workstation hardware is configured by software including *an operating system, e.g., Windows® 95, 98, NT or CE,* networking software (including internet browsing software) and *application software components.*

A61 at 6:47-62 (emphases added); *see also id.* at 6:63-67 (stating that the invention "also encompasses a *typical* file server platform") (emphasis added).

Because the "[m]ere recitation of known technologies," such as the generation of hierarchical menus, "do not render a patent a technological invention" (*see* A1402; *see also Versata*, 793 F.3d at 1326), the Board correctly concluded that claim 12 is not directed to a technological invention. A1404.

### d. Manual modification

Ameranth's arguments about the purported technical nature and complexity of "manual modification" of menus ignore the actual language of the claims. *See* Ameranth Br. at 23-25. The claims do not include limitations that require the claimed "manual modification" to be implemented on a computer. Rather, the

- 35 -

claims of the '733 patent simply require that "said second menu is manually modified *after* generation."  A66 at 16:22-24, 16:51-53; A67 at 17:12-13, 18:21-22 (emphasis added).  Thus, as the Board correctly recognized, the claims "encompass[] modifying the menu by a user writing changes on the menu after it is generated and printed."  A29, A33, A36, A39.  There is nothing technical, much less technically complex, about writing changes on a printed menu.

Even if the claims were limited to computerized modification of menus (and they are not), computerized modification would be nothing more than the "mere recitation of known technologies."  This is because, as the Board correctly concluded, the patent describes the purportedly inventive device as using "typical" hardware and "commonly known" software programming techniques.  A1403 ("The specification states that … the programming steps were 'commonly known.'") (citing A64 at 11:54-56, 12:51-65); s*ee also* A1403-04 ("The claims are not directed to, nor does the specification disclose, an inventive device for manually modifying menus.") (citing A61 at 6:47-52).  Furthermore, as established in Appellants' Opening Brief, techniques for manual modification on a handheld computer, including handwriting/voice recognition and capture, were well known and conventional at the time of the patent.  *See* Opening Br. at 34-40.  The mere recitation of known technologies is insufficient to transform the claimed subject matter into a "technological invention."  *Versata*, 793 F.3d at 1326.

- 36 -

Ameranth's reliance on prior art references (*see* Ameranth Br. at 20-21) is also misplaced.  As noted above, the technological invention inquiry does not require the Board or this Court to conduct a merits-based novelty or obviousness inquiry.  *See supra* at 25-26.  Even if, as Ameranth contends, its claimed method were novel (and Appellants contend that it is not), that contention is immaterial to the inquiry under Section 18(d)(1) of the AIA because the patents merely recite the use of conventional technology to accomplish the method.  As the PTO has explained, "[r]eciting the use of known prior art technology to accomplish a process or method" is not a technological invention "even if that process or method is novel and non-obvious."  77 Fed. Reg. 48,764; s*ee also* A1402.

The '733 patent demonstrates that the claimed menu generation requires nothing more than conventional computer functions performed by conventional or generic computer hardware and software.  As the Board correctly ruled, the "claims of the '733 patent do not recite a technological feature that is novel and unobvious over the prior art."  A1404; *see also* A1402 ("[m]ere recitation of known technologies or combinations of prior art structures to achieve the normal, expected, or predictable result[s] do not render a patent a technological invention"); *Versata*, 793 F.3d at 1326.  The Board therefore properly instituted review.

**B.    THE BOARD CORRECTLY DETERMINED THAT CLAIMS 1-
2, 4-5, 10 AND 12 OF THE '733 PATENT ARE
UNPATENTABLE UNDER 35 U.S.C. § 101.**

Under 35 U.S.C. § 101, abstract ideas are patent-ineligible subject matter

and may not be removed from the public domain.  *See Alice*, 134 S. Ct. at 2354;

*Mayo Collaborative Services v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293

(2012); *Bilski*, 561 U.S. at 601-02.  Such ideas are not patent-eligible because they

are basic tools in the "storehouse of knowledge" that are "free to all . . . and

reserved exclusively to none."  *Bilski*, 561 U.S. at 602 (internal citation omitted);

*see also Alice*, 134 S. Ct. at 2354.  An alleged invention is patent-ineligible if (1)

the claims are directed to an abstract idea, and (2) there are no "additional

elements" set forth in the claims that supply "an 'inventive concept' sufficient to

'transform' the claimed abstract idea into a patent-eligible application."  *Alice*, 134

S. Ct. at 2357 (quoting *Mayo*, 132 S. Ct. at 1294, 1298).

Simply reciting an abstract idea and adding "well-understood," "routine," or

"conventional" features contributes nothing inventive and thus does not transform

the claims into a patent-eligible application of the abstract idea.  *Id.* at 2359.  For

example, "[g]iven the ubiquity of computers, wholly generic computer

implementation is not generally the sort of 'additional featur[e]' that provides any

'practical assurance that the process is more than a drafting effort designed to

monopolize the [abstract idea] itself.'"  *Id.* at 2358 (quoting *Mayo*, 132 S. Ct. at

- 38 -

1297).  Limiting the alleged invention to a particular technological environment or field of use is likewise insufficient to transform the claimed abstract idea into a patent-eligible application of that idea.  *See Bilski*, 561 U.S. at 612; *Parker v. Flook*, 437 U.S. 584, 593 (1978).

As was true in *Alice*, *Bilski*, and their progeny, the '733 patent improperly attempts to claim an abstract idea implemented through generic and conventional computer technology.  Accordingly, the Board correctly ruled that claims 1-2, 4-5, 10 and 12 of the '733 patent are patent-ineligible under 35 U.S.C. § 101.  A43.

### 1.    The Claims Are Directed to a Patent-Ineligible Abstract Idea.

As shown in Appellants' Opening Brief, the Board correctly determined that the claims of the '733 patent are directed to the abstract idea of "generating a second menu from a first menu and sending the second menu to another location." Opening Br. at 19-22 (quoting A26).  The claims do not include any meaningful limitations regarding how the second menu is generated or transmitted.  To the contrary, the patent states that "*any means* for displaying the master menu to the user and generating another menu in response to and comprised of the selections made *is encompassed by the contemplated invention*."  A66 at 15:4-7 (emphases added).  Likewise, the patent states, with respect to transmission of the second menu, that "*[a]ny* display and *transmission means* known to those skilled in the art

*is equally usable* with respect to menus generated in accordance with the claimed invention." *Id.* at 15:39-42 (emphases added).

Both the Supreme Court and this Court have consistently held that such generic concepts are patent-ineligible abstract ideas. Opening Br. at 20-22. For example, in *Alice* and *Bilski*, the Supreme Court held that claims reciting generic business concepts such as a method for mitigating settlement risk and a method for hedging risk, respectively, are directed to patent-ineligible abstract ideas. *See*, *e.g.*, *Alice*, 134 S. Ct. at 2355-57; *Bilski*, 561 U.S. at 609-612. Similarly, in *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354-55 (Fed. Cir. 2014), this Court held that claims reciting a method of "creating a contractual relationship" were directed to a patent-ineligible abstract idea. And most recently, in *Versata*, this Court held that claims reciting a method of "[u]sing organization and product group hierarchies" to determine a price were directed to a patent-ineligible abstract idea. 793 F.3d at 1331-36. Accordingly, the Board correctly concluded that the generic concepts recited by the claims of the '733 patent are patent-ineligible abstract ideas. A26; *see also* Opening Br. at 18-22.

Ameranth argues that the claims of the '733 patent go beyond the basic concept of generating a second menu from a first menu and sending the second menu to another location because they "require that one form of menu structure is transformed into another." Ameranth Br. at 53-54. As an initial matter, the claims

- 40 -

do not include any such requirement.  For example, claims 1 and 4 simply recite "generating a second menu from [a] first menu" by "select[ing] categories and items from the first menu."  A66 at 16:12-22, 16:41-48.  Similarly, claim 5 recites "creat[ing] the modified menu from said master menu," and claim 12 recites generating a second menu by "selecting items from the first menu" and "inserting the items selected from the first menu into a second menu."  A67 at 17:6-10, 18:7-15.  None of these limitations requires any structural modification.

Even if the claims did recite manipulating the menu information to change its structure, however, the outcome of the Section 101 analysis would remain the same.  This Court has consistently held that "[a]ny transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the [patent-eligibility] analysis." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014).[2]  Even under Ameranth's

---

[2] *See also Intellectual Ventures I LLC v. Capital One Bank,* 792 F.3d 1363, 1367-68 (Fed. Cir. 2015) (finding a computerized method of customizing web page content as a function of navigation history and information about the user to be an abstract idea); *Internet Patents*, 790 F.3d at 1348 (finding a computerized method of maintaining state during navigation of online forms to be an abstract idea); *Content Extraction and Transmission, LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (finding a computerized method of extracting data from a hardcopy document using a scanner, recognizing specific information in the extracted data, and storing this information in a memory to be an abstract idea); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370-73 (Fed. Cir. 2011) (finding a computerized method involving the "collection and organization of data regarding credit card numbers and Internet addresses" to be an abstract idea).

conception of its claims, they involve merely "[c]onverting . . . data . . . into a second, different, form of that data" using generic computer components and routine, well-known functionality. *See* Ameranth Br. at 54. But "[t]he mere manipulation or reorganization of data" does not render claims patent-eligible. *CyberSource*, 654 F.3d at 1375.

Nor did the Board preclude Ameranth from making its case by purportedly subsuming within the abstract idea the "additional elements" that Ameranth alleges render the claims patent-eligible. *Cf.* Ameranth Br. at 51-52. As explained below, the Board expressly considered each of the "additional elements" identified by Ameranth as allegedly supplying an inventive concept and correctly found each insufficient to render the claims patent-eligible. *See* A26-41. Ameranth identifies no argument that the Board did not consider or that Ameranth was precluded from presenting. For example, Ameranth apparently faults the Board's Final Written Decision for noting that the abstract idea includes transmitting a menu to another location rather than just generating the menu. *See* Ameranth Br. at 51-52; A26. But the Board's decision expressly considered and rejected Ameranth's contention that transmitting a menu to another location (including a Web page) is a sufficiently inventive concept to transform the claims into patentable subject matter, correctly noting that such activity "is merely a conventional post-solution activity." A28-29, A32-33, A34-35, A38-49.

- 42 -

Accordingly, both the Supreme Court's and this Court's precedent confirms that the generic concepts recited by claims 1, 2, 4-5, 10 and 12 of the '733 patent are patent-ineligible abstract ideas.

### 2. The "Additional Elements" Identified by Ameranth Are Insufficient to Impart Patent Eligibility.

Ameranth asserts that the claims of the '733 patent include "additional elements" sufficient to impart patent-eligibility, including: (a) synchronous communication elements, (b) a hierarchical menu structure, (c) the purportedly specialized nature of the central processing unit, (d) the alleged requirement that the second menu must be displayable on "non-PC standard devices," (e) the alleged "computerized" manual modification requirement, and (f) printing the modified second menu from a GUI. *See* Ameranth Br. at 38-60. But these purported "additional elements" either (a) are not recited by the claims, and/or (b) amount to nothing more than the mere recitation of a generic computer performing generic computer functions, which "cannot transform a patent-ineligible abstract idea into a patent eligible invention." *Alice*, 134 S. Ct. at 2358. Thus, the Board correctly concluded that the claims "convey[ ] nothing more meaningful than the [abstract idea itself]." A29, A33, A36, A39-40.

- 43 -

a.  **Synchronous Communication Is A Conventional Computer Function That Is Insufficient to Impart Patent Eligibility.**

Amaranth argues that the claims of the '733 patent require functionality for synchronizing menus with another device. Amaranth Br. at 39, 46. While claims 4, 5 and 12 each recite limitations for "synchronizing" the second menu with another device ('733 patent at claims 4, 5, 12), claim 1 includes no such limitation. A66 at 15:60-16:25. Instead, Amaranth contends that the preamble to claim 1, which recites a "synchronous communications system," should be construed as a limitation to the claim. Amaranth Br. at 39.

It is immaterial whether the preamble of claim 1 is limiting, however, because synchronizing menus with another device is merely a conventional computer function. *See* Opening Br. at 27-28; *supra* at 30-31. In this regard, Amaranth explained at the oral hearing that the synchronization described in the patents requires nothing more than simply "downloading [a] menu" from one device to another device. A1922; A32, A34-35, A38-39. As the Board recognized, Amaranth's statement at the oral hearing is consistent with the description of synchronization in the patent, noting that "the Specification discloses downloading a generated menu from a desktop PC to a connected wireless handheld device." A28 (citing A60 at 3:42-43; A61 at 6:33-36, 7:26; A63 at 10:12-14); *see also* A32, A35, A38. Neither Amaranth nor the patent itself

- 44 -

claims that the concept of downloading was anything other than a conventional computer function at the time of the '733 patent. Nor could they, given the well-known nature of this conventional and generic computer function.[3]

Ameranth asserts that the "'synchronous communication' aspect of … claim 1 and the 'synchronized' aspect of claims 4, 5 and 12" are "non-conventional[]" because "synchronization requires a system that communicates in ***both directions***." Ameranth Br. at 36-37 (emphasis in original). The patent itself demonstrates, however, that synchronization—including the ability to communicate in both directions—was a known computer function at the time of the '733 patent. As the Board correctly recognized, the specification states that "common GUI operating systems," such as Windows CE included "built in synchronization between handheld devices, internet and desktop infrastructure." A32 (citing '733 patent at 12:15-18; 6:20-24); *see also* A36, A38-39.

Ameranth discounts the statements in the '733 patent regarding the synchronization features of Windows CE, stating that there were problems with prior art systems relating to the synchronization of menus "between a back-office server and non-standard devices/displays." Ameranth Br. at 56-57. But the

---

[3] Ameranth appears to contend that, even if synchronizing menus is a conventional computer function, synchronizing menus with a hierarchical structure is sufficiently inventive to impart patent-eligibility. Ameranth Br. at 40-41. But as explained in Appellants' Opening Brief, the transmission and/or synchronization of data—whether or not hierarchical—is a conventional computer function. *See*, *e.g.*, Opening Br. at 37-43.

- 45 -

challenged claims do not require synchronization between a back office server and non-standard devices.  The challenged claims merely require that "the second menu is synchronized between [a] data storage device . . . and at least one other computing device."  A66 at 16:48-51; A67 at 10-12 (reciting "the modified menu is synchronized between the data storage device and one other computing device"); A67 at 18:17-20 (reciting "synchronizing the . . . second menu between the storage device and at least one other data storage medium").  The '733 patent acknowledges that the ability to communicate in both directions between multiple devices—which is all the claims require—was a well-known computer function at the time.

The Board thus correctly concluded that the synchronization described by the patent is "merely a conventional post-solution activity" that "is not sufficient to transform the abstract idea into patent-eligible subject matter."  A32, A36, A39, A28-29.

> **b.**    **The Display and Generation of Hierarchical Menus Is A Conventional Computer Function That Is Insufficient to Impart Patent Eligibility.**

Ameranth wrongly contends that the term "menu" in claim 1 should be construed to require a menu with a hierarchical structure and argues that, if the term were construed in that way, it would be sufficient to render the claims patent-eligible.  Ameranth Br. at 38-39.  But the Board *did* recognize that claim 1 recites

WEST\266751750.1

that the "first menu is displayable in a hierarchical tree format."  A27.  Thus,

Ameranth seems to fault the Board for declining to improperly import the

hierarchical structure requirement into every instance of the term "menu" in

claim 1.  Ameranth also contends that the term "menu" in claims 4, 5, and 12

should be construed to require a menu with a hierarchical tree structure, because

the term menu "must be interpreted consistently."  Ameranth Br. at 38.  But there

is no basis for reading the limitation "displayable in a hierarchical tree format"

from claim 1 into claims 4, 5 and 12, which do not include the limitation.  *See*

*D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570 (Fed. Cir. 1985) ("It is long and well

established" that it is improper to "'read into' a claim [a limitation] that already

appears in another claim.").

Regardless, even if the term "menu" were construed to require a hierarchical

structure, it would still be insufficient to impart patent eligibility.  The patent

demonstrates—and thus the Board correctly concluded—that the generation and

display of hierarchical menus is a "typical" computer function that requires no

specialized hardware or software.  *See* Opening Br. at 24-25; A61 at 6:32-46

(stating that a "typical" menu system for a software application includes

"cascading sets of menus which are displayable in context to show the parent/child

relationships between options of the context menu"); A61 at 6:13-24 (explaining

that entries within a hierarchical menu "can be created, deleted, modified, and

arranged" using a GUI operating system such as Microsoft Windows® and Windows® CE).  Thus, the Board correctly concluded that generating and "displaying menus in a GUI, *including in a hierarchical format*, is a well-understood, routine, conventional activity that does not add significantly more to the abstract idea."  A28 (emphasis added).[4]

Ameranth mistakenly relies on *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).  *See* Ameranth Br. at 57-58.  The Court explained in *DDR Holdings* that merely requiring the use of a computer is insufficient to render claims patent-eligible where the claims simply "recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations."  773 F.3d at 1259.  As established above, the computer-related limitations of the '733 patent are nothing more than the recitation of a generic computer performing generic computer functions, which cannot transform a patent-ineligible abstract idea into a patent-eligible invention.  *Id.*; *see also Alice*,

---

[4] Ameranth contends that the Board's determination that this and other elements of the patent merely involved conventional computer technology and functionality was based on the Board's own knowledge and thus lacked evidentiary support. S*ee, e.g.*, Ameranth Br. at 38-39.  To the contrary, the determinations were based on the most authoritative evidence of all—the patent itself.  *See, e.g.*, *Internet Patents*, 790 F.3d at 1348 (relying solely on statements in the patent specification to find that recited internet browser functionality was conventional); *see also* Opening Br. at 32-34 & 34 n.4.

- 48 -

134 S. Ct. at 2358. Unlike the claims at issue in *DDR Holdings*, Ameranth's

menu-generation claims do not involve "an inventive concept for resolving [a]

particular Internet-centric problem." 773 F.3d at 1259. Ameranth's patent merely

seeks to migrate the age-old concept of generating and transmitting menus onto a

computer, using "well-understood, routine, conventional activity that does not add

significantly more to the abstract idea." A26-41.

In any event, the Board properly construed the term "menu," noting that

nothing in the specification "provides support for [Ameranth's] proposed

construction." A20-21. Although the patent discloses that some menus include a

hierarchical structure, it also contemplates others that do not. For example, the

patent explains that "selection of a 'file' from a menu bar may cause display of a

context menu [that] provides 'file' options," which "*can* have additional

subordinate or child options associated with them." A61 at 6:34-38 (emphasis

added). The specification also contemplates, however, that not all menus will have

subordinate or child options. *Id.* at 6:38-41 ("***If*** a file option having subordinate

options is selected, the child options are displayed.") (emphasis added). Thus, the

"broadest reasonable interpretation" in light of the specification must encompass

both menus that include a hierarchical structure and those that do not. *See In re*

*Cuozzo Speed Technologies, LLC*, 793 F.3d 1268, 1278 (Fed. Cir. 2015); 37 C.F.R.

§ 42.300(b).

The Board correctly gave the term "menu" its ordinary and customary meaning: "a list of options available to a user displayable on a computer."  A20-21.  Generation of such a menu is unquestionably a routine, conventional activity that is insufficient to impart patent-eligibility to the claims at issue.

### c. The Recited Central Processing Unit Is A Generic Computer Component That Is Insufficient to Impart Patent Eligibility.

Ameranth wrongly argues that the Board erred in construing "central processing unit" in claims 1 and 4 as "the computational and control unit of a computer" (A19), because "[t]he recited central processing unit is not a generic CPU or 'microprocessor.'"  Ameranth Br. at 34.  Ameranth asserts that "central processing unit" should instead be construed as a "central server."[5]

Ameranth's proposed construction cannot be the broadest reasonable interpretation of the term because it is inconsistent with the plain meaning of "central processing unit" and contrary to the specification.  The patent repeatedly equates the claimed "central processing unit"—in both the computer workstation and server embodiments—with a conventional CPU or microprocessor.  *See*, *e.g.*, A61 at 6:52-54, 6:63-65.  Thus, the Board correctly concluded that the recited

---

[5] To support its argument, Ameranth relies on a previous district court construction *See* Ameranth Br. at 34 (citing Judge Everingham's construction of the preamble).  But Ameranth's reliance on that construction is misplaced because it is for a different claim term.  A1088 (discussing "information management and synchronous communications system" claim term).  The district court did not construe the term "central processing unit."

"central processing unit" is nothing more than a conventional CPU, *i.e.*, "the computational and control unit of a computer." *See* A18-19.

Regardless, even if Ameranth's proposed construction were correct, the patent demonstrates—and the Board correctly found—that the server embodiment described by the '733 patent is merely a generic computer element rather than an inventive concept sufficient to impart patent eligibility. The patent states:

> The preferred embodiment also encompasses a *typical file server platform* including hardware such as a CPU, e.g., Pentium® microprocessor, RAM, ROM, hard drive, modem, and optional removable storage devices, e.g., floppy or CD ROM drive. The server hardware is configured by software including an operating system, e.g., Windows® 95, 98, NT or CE, networking software (including Web server software) and database software.

A61-62 at 6:63-7:3 (emphasis added). Thus, the server embodiment described by the '733 patent is a "typical file server" including generic computer hardware and software. And the Board correctly found that all of the claim elements identified by Ameranth, including the CPU, "require nothing more than a generic computer with generic computer elements performing generic computer functions," and are therefore insufficient to impart patent eligibility. A27 (citing *Alice*, 134 S. Ct. at 2358); *see also* A31, A34-35, A37-38.

- 51 -

### d. Displayability On "Non-PC Standard Devices" Is Not An "Additional Element" Sufficient to Impart Patent Eligibility.

As explained above, contrary to Ameranth's contentions, the claims of the '733 patent do not include limitations relating to the display of menus on non-PC standard devices. *See supra* at 31; *see also* Ameranth Br. at 40-46. Ameranth asserts that claim 1 requires a second menu that "is displayable to a user in hierarchical tree format on a handheld GUI or web page." *Id.* at 40-41. But claim 1 does not include limitations relating to the display of menus on non-PC standard devices. Claim 1 instead recites "a first menu," "a modifier menu," and "a sub-modifier menu," all of which are "displayable in a window of [a] graphical user interface." A66 at 16:1-11. The display limitations of claim 1 therefore merely require a menu displayable in a window of a GUI. As the Board correctly concluded, the claims do not "require that the application software functions to configure the second menu so that it is in a non-PC standard graphical format." A30-31 ("[N]o such limitations appear in the claims").

Regardless, the patent demonstrates—and the Board correctly concluded—that displaying a menu in a window of a graphical user interface, even on a non-PC standard device, was well-known and conventional at the time of the '733 patent. *See supra* at 32. For example, the patent explains that "[t]he use of menus is conventional in GUIs." A61 at 6:31-32; *see also id.* at 6:6-10 ("Most personal

computers today run under an operating system that provides a [GUI] for accessing

user applications . . . [t]hrough an interface of windows, pull-down menus, and

toolbars.").  The patent also states that "common GUI operating systems" include

both Microsoft Windows® for personal computers (a PC-standard operating

system) and Windows® CE for wireless handheld devices (a non-PC standard

operating system).  *Id.* at 6:20-24.

Thus, even if the claims did require the display of menus on non-PC

standard devices (and they do not), the Board correctly concluded that the claims

"convey nothing more meaningful than the [abstract idea]."  A29, A31, A36, A39.

### e.    Manual Modification of the Second Menu Is A Conventional Computer Function That Is Insufficient to Impart Patent Eligibility.

Ameranth argues that the claimed manual modification must be

implemented in software—and not pen and paper—citing various embodiments in

the specification.  Ameranth Br. at 48-50 (citing A60 at 3:51-64; A57 at Fig. 8).

As explained above, however, the independent claims of the '733 patent do not

require "computerized" manual modification of menus.  *See supra* at 35-36.

Ameranth cannot read limitations into the claims from the preferred embodiments

in order to save the claims under 35 U.S.C. § 101.  *Cf. Ericsson*, 773 F.3d at 1218

("Although the claims must be read in light of the specification, it is important that

WEST\266751750.1

we "avoid importing limitations from the specification into the claims.") (quoting *Phillips*, 415 F.3d at 1323).

Accordingly, the Board correctly concluded that the claims encompass a second menu that is printed after generation and manually modified by being written upon by a user. A29, A33, A36, A39. Such modification was a well-known conventional activity that has long been practiced in the restaurant industry. Thus, the Board correctly determined that the manual modification of menus is "nothing more than insignificant post solution activity and is not sufficient to transform the abstract idea into patent-eligible subject matter." A29, A33, A36, A39.

In any event, technology for manual modification, including manual modification using a handheld computer, was well known and conventional at the time of the '733 patent. *See* Opening Brief at 34-40; *supra* at 36. Thus, even if the claims did require computerized manual modification (and they do not), the Board correctly concluded that the claims "convey nothing more meaningful than the [abstract idea]." A29, A33, A36, A39.

> **f.  The Additional Limitations of Claims 2 and 10 Are Not Sufficient to Impart Patent Eligibility.**

Ameranth contends that the Board purportedly failed to recognize that claims 2 and 10 require "that the modified menu is displayed on a GUI." Ameranth Br. at 60. But there is no such requirement in the claims. Claims 2 and

- 54 -

10 recite the additional limitation "wherein the modified menu can be selectively printed from any printer directly from the graphical user interface of" a "hand-held device" (claim 2) or "other computing device" (claim 10).  A66 at 16:26-28; A67 at 17:23-26.  As the Board correctly concluded, however, the claims do not require that the modified menu be displayed (or even displayable) on a graphical user interface or handheld device.  A40-41.  There can be no credible argument, therefore, that such non-existent limitations supply an inventive concept sufficient to render Ameranth's claims patent-eligible under Section 101.

Regardless, technology for displaying a menu in a graphical user interface was well known and conventional at the time of the '733 patent.  *See* Opening Brief at 44-45; *supra* at 32.  Thus, even if claims 2 and 10 did require the display of menus on a GUI (and they do not), it would nonetheless be insufficient to render the claims patent-eligible under 35 U.S.C. § 101.

As to the limitations actually recited by claims 2 and 10, the Board correctly concluded that these limitations were insufficient to provide an inventive concept.  As the Board recognized, the specification acknowledges that printing menus on paper was a common (*i.e.*, conventional) practice.  A40; A59 at 2:9-10.  The specification also acknowledges that GUIs were conventional aspects of operating systems, including operating systems for handheld devices.  A61 at 6:6-30.  Thus, the Board correctly concluded that the limitations of claims 2 and 10 were "nothing

- 55 -

more than insignificant post solution activity" and "not sufficient to transform the abstract idea into patent-eligible subject matter."  A40.

## IV.  <u>CONCLUSION</u>

Appellants thus respectfully ask this Court to (1) affirm the Board's correct determination that claims 1-2, 4-5, 10 and 12 are unpatentable under 35 U.S.C. § 101 and (2) reverse the Board's erroneous determination that claims 3, 6-9, 11, and 13-16 of the '733 patent are patent-eligible under 35 U.S.C. § 101.

WEST\266751750.1

Respectfully submitted,

Dated:  December 9, 2015

By: */s/ Stanley J. Panikowski*

Mark D. Fowler
James M. Heintz
Erin P. Gibson
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700

*Attorneys for Appellant*
*Apple Inc.*

By: */s/ Jonathan S. Franklin*

Jonathan S. Franklin
Richard S. Zembek
Gilbert A. Greene
Norton Rose Fulbright US LLP
799 9th Street, N.W.
Washington, D.C. 20001
202.662.0466

*Attorneys for Appellants*
*Fandango, LLC and OpenTable, Inc.*

By: */s/ Frank A. Angileri*

Frank A. Angileri
Thomas W. Cunningham
BROOKS KUSHMAN P.C.
1000 Town Center, 22nd Floor
Southfield, Michigan 48075
248.358.4400

*Attorneys for Appellants Domino's Pizza,*
*Inc. and Domino's Pizza, LLC*

WEST\266751750.1

## <u>Declaration of Authority Pursuant to Federal Circuit Rule 47.3(d)</u>

I, Stanley J. Panikowski, declare:

1.      I am a member of the State Bar of California, a member of the bar of this Court, and an attorney with DLA Piper LLP (US), counsel for Appellant Apple Inc. in this appeal.

2.      Jonathan S. Franklin, counsel of record for Appellants Fandango, LLC and OpenTable, Inc., has authorized me to sign on his behalf Appellants' Reply and Cross-Appeal Response Brief.

3.      Frank A. Angileri, counsel of record for Appellants Domino's Pizza, Inc. and Domino's Pizza, LLC, has authorized me to sign on his behalf Appellants' Reply and Cross-Appeal Response Brief.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on December 9, 2015 in San Diego, California.


*/s/ Stanley J. Panikowski*
Stanley J. Panikowski

- 58 -

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 9, 2015, I electronically filed the

foregoing Appellants' Reply and Cross-Appeal Response Brief with the Court's

CM/ECF filing system, which constitutes service, pursuant to Fed. R. App. P.

25(c), Fed. Cir. R. 25(a), and the Court's Administrative Order Regarding

Electronic Case Filing 6(A) (May 17, 2012).

*/s/ Stanley J. Panikowski*
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief contains 12,961 words, as calculated by the word count of the word processing system used in preparing it, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in Microsoft Word 2010 in Times New Roman 14 point font.


*/s/ Stanley J. Panikowski*
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700